ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

         -v.-

RAMSES OWENS,
   a/k/a "Ramses Owens Saad,"
DIRK BRAUER,
RICHARD GAFFEY,
   a/k/a "Dick Gaffey," and
HARALD JOACHIM VON DER GOLTZ,
   a/k/a "H.J. von der Goltz,"
   a/k/a "Johan von der Goltz,"

              Defendants.

- - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9\27\18

SEALED INDICTMENT

18 Cr. ___ (___)

18 CRIM 693

## COUNT ONE
### (Conspiracy to Defraud the United States)
### (OWENS, BRAUER)

The Grand Jury charges:

### The Defendants and Associated Entities

1.   At all times relevant to this Indictment, RAMSES
OWENS, a/k/a "Ramses Owens Saad," the defendant, was a citizen and
resident of Panama.

2.   From at least in or around 1992, up through and
including at least in or around 2010, RAMSES OWENS, a/k/a "Ramses
Owens Saad," the defendant, worked as an attorney at Mossack
Fonseca & Co. ("Mossack Fonseca"), a Panama-based global law firm
and entity that specialized in creating foundations and trusts,
incorporating offshore companies for a fee, and setting up overseas
bank accounts for clients, including U.S. taxpayer clients.

JUDGE BERMAN

3.   At all times relevant to this Indictment, DIRK BRAUER, the defendant, was a citizen of Germany and a resident of Panama.

4.   From at least in or around 2005, up through and including at least in or around 2017, DIRK BRAUER, the defendant, worked as an investment advisor for Mossfon Asset Management, S.A. ("Mossfon Asset Management"), a Panama-based asset management company, which was closely affiliated with Mossack Fonseca.

5.   While employed as an attorney at Mossack Fonseca, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, assisted clients of Mossack Fonseca, including U.S. taxpayer clients, in, among other things, setting up offshore foundations, companies, and bank accounts.   In so doing, OWENS worked closely with DIRK BRAUER, the defendant, along with others at Mossfon Asset Management, who helped manage the money in the offshore accounts after the accounts were established.

6.   At all times relevant to this Indictment, RAMSES OWENS, a/k/a "Ramses Owens Saad," and DIRK BRAUER, the defendants, assisted U.S. taxpayer clients of Mossack Fonseca, including U.S. taxpayer clients in the Southern District of New York, in defrauding the Internal Revenue Service ("IRS") by concealing the clients' assets and investments, and the income generated by those assets and investments, from the IRS.

2

## The Relevant Reporting Obligations of United States Taxpayers

7.    The IRS is an agency of the United States Department of the Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

8.    United States citizens, resident aliens, and legal permanent residents (collectively, "U.S. taxpayers") are obligated to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040") with the IRS reporting their worldwide income for each year if their gross income for the tax year exceeded a threshold amount. On the Form 1040, the U.S. taxpayer must also report all capital gains, e.g., profits from the sale of stock or real estate, which he or she received.  These requirements apply equally to income and capital gains earned abroad, on which U.S. taxpayers are obligated to pay U.S. taxes.

9.    In addition, on Schedule B of Form 1040, the U.S. taxpayer must indicate whether "at any time during [the relevant calendar year]" he or she had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  If the U.S. taxpayer answers that question in the affirmative, then the U.S. taxpayer must indicate the name of the particular country or countries in which the account is, or the accounts are, located.

10.   Separate and apart from the obligation to file Forms 1040 that report all income and capital gains, U.S. taxpayers who have a financial interest in, or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the United States Department of the Treasury a Report of Foreign Bank and Financial Accounts, FinCEN Report 114 (formerly TD F 90-22.1) ("FBAR"). At all times relevant to this Indictment, the FBAR for any calendar year was required to be filed on or before June 30 of the following calendar year.   In general, the FBAR requires that the U.S. taxpayer filing the form identify the financial institution at which the financial account is held, the type of account (bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

11.   When a U.S. taxpayer beneficially owns[1] a bank account, securities account, or other financial account that is maintained outside the United States, but fails to disclose the account or the income generated in the account on Schedule B of Form 1040 or on an FBAR, the account is referred to as an "undeclared account."

---

[1] Beneficial ownership, as used herein, means that a person enjoys the benefits of ownership of an asset regardless of the nominal owner of that asset.

4

12.  At all times relevant to this Indictment, a federal tax was imposed on the transfer of the taxable estate of every decedent who was a U.S. taxpayer and whose gross estate, plus adjusted taxable gifts and specific exemptions, was more than $5,450,000.

13.  At all times relevant to this Indictment, the IRS's Offshore Voluntary Disclosure Program ("OVDP") was a voluntary disclosure program specifically designed for U.S. taxpayers with exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to report foreign financial assets and pay all tax due in respect of those assets.  As part of their participation in the OVDP, U.S. taxpayers have immunity from criminal prosecution so long as they cooperate fully and truthfully with the IRS and pay all back taxes due, along with interest and penalties.

## The Conspiracy

14.  From at least in or about 2000 through in or about 2017, RAMSES OWENS, a/k/a "Ramses Owens Saad," and DIRK BRAUER, the defendants, conspired with each other, and with others known and unknown, to help U.S. taxpayer clients of Mossack Fonseca conceal assets and investments, and the income generated by those assets and investments, from the IRS through fraudulent, deceitful, and dishonest means.

5

## Means and Methods of the Conspiracy

15.   Among the means and methods by which RAMSES OWENS, a/k/a "Ramses Owens Saad," and DIRK BRAUER, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.   In order to conceal their clients' assets and income from the IRS, OWENS and BRAUER aided, assisted, advised, facilitated the establishment of, maintained, and managed undeclared accounts on behalf of U.S. taxpayers who were clients of Mossack Fonseca.

b.   OWENS and BRAUER created, marketed, sold, and serviced sham foundations[2] and shell companies[3] formed under the laws of countries such as Panama, Hong Kong, and the British Virgin Islands ("BVI") to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at overseas banks, as well as the income generated in those accounts.

---

[2] As used herein, a "sham foundation" is a legal entity that is established under the laws of a jurisdiction outside of the United States for the purpose of obscuring beneficial ownership of assets held by the foundation or the corporate entities held by the foundation.

[3] As used herein, a "shell company" is a corporate entity formed under the laws of a jurisdiction outside of the United States for the purpose of holding assets and obscuring the beneficial ownership of those assets. A shell company does not have an actual business function other than holding assets.

c.   The sham foundations were one of the primary products marketed by OWENS and BRAUER at Mossack Fonseca. Mossack Fonseca advertised the sham foundations as including asset protection and privacy. OWENS also advised clients that the sham foundations provided tax benefits in multiple jurisdictions, including the United States. As structured by Mossack Fonseca, the sham foundations typically "owned" the shell companies that nominally held the undeclared assets on behalf of the U.S. taxpayer clients of Mossack Fonseca.

d.   The sham foundations and related shell companies were incorporated in various foreign countries and typically held one or more bank accounts in different foreign countries. The names of Mossack Fonseca's clients generally did not appear anywhere on the incorporation paperwork for the sham foundations or related shell companies, and the clients typically did not have signature authority on associated bank accounts. However, the clients beneficially owned the assets in the bank accounts.

e.   The clients were instructed by OWENS, BRAUER, and others to transfer their assets, typically real property and bank accounts, to the sham foundations and related shell companies, in order to conceal their true ownership from the U.S. government and other interested parties, including creditors.

f.   Although the clients transferred ownership of their assets into the names of the sham foundations and related shell companies, which had nominee officers and directors provided by Mossack Fonseca, the clients continued to have complete access to the assets and complete control over the assets.

g.   To continue assisting with the concealment of the clients' assets, and in exchange for additional fees, OWENS and BRAUER provided support to the clients who had purchased the sham foundations and related shell companies by providing corporate meeting minutes, resolutions, mail forwarding, and signature services.

h.   In order to conceal assets and income from the IRS, OWENS and BRAUER aided, assisted, advised, and facilitated the transfer of the clients' funds to the undeclared bank accounts nominally held by the shell companies.

i.   OWENS and BRAUER purposefully established the bank accounts in locations with strict bank secrecy laws, which impeded the ability of the United States to obtain bank records for the accounts.

j.   In certain cases, OWENS and BRAUER met with U.S. taxpayer clients of Mossack Fonseca within the Southern District of New York and elsewhere to solicit and maintain clients for Mossack Fonseca by falsely representing that the taxpayers could lawfully avoid paying income taxes by placing their income

and assets in the name(s) of the various shell companies and sham foundations.

k.   OWENS and BRAUER caused U.S. taxpayer clients of Mossack Fonseca to travel outside the United States, to destinations including Switzerland, Panama, the Bahamas, and Costa Rica, to provide banking services and investment advice related to their undeclared accounts.

l.   OWENS and BRAUER instructed U.S. taxpayer clients of Mossack Fonseca about how to repatriate funds to the United States from their offshore bank accounts, in a manner designed to keep the undeclared bank accounts concealed. Among other things, OWENS and BRAUER instructed clients to use debit cards and fictitious sales to repatriate their funds covertly.

m.   U.S. taxpayers who conspired with OWENS and BRAUER filed false and fraudulent Forms 1040, which, among other things, failed to report their interest in their undeclared accounts and the income generated in their undeclared accounts.

n.   Certain U.S. taxpayers who conspired with OWENS and BRAUER failed to file FBARs identifying their undeclared accounts.

**OWENS and BRAUER's U.S. Taxpayer Clients at Mossack Fonseca**

16.   At various times relevant to this Indictment, RAMSES OWENS, a/k/a "Ramses Owens Saad," and DIRK BRAUER, the defendants, carried out the means and methods of the conspiracy

with respect to various U.S. taxpayer clients of Mossack Fonseca. Details for several examples of those U.S. taxpayer clients — who are only a subset of the U.S. taxpayer clients of Mossack Fonseca with whom OWENS and BRAUER unlawfully conspired — are set forth more fully below.

### Client-1

17. Client-1 is a U.S. citizen.  Client-1 grew up in the United States and currently lives in Manhattan.

18. In or about 2001, when Client-1 was approximately 33 years old, Client-1 moved to London, United Kingdom.  In London, Client-1 worked as a liaison between investors and financial managers, and earned fees when a potential investor whom Client-1 introduced to a financial manager made an investment.

19. While in London, Client-1 decided to open an offshore trust to hold the money that Client-1 was earning. Client-1 was referred to RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, for assistance in creating such a trust.

20. Thereafter, Client-1 met with RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, at Mossack Fonseca's headquarters in Panama.  OWENS explained to Client-1 the manner in which he would set up the trust for Client-1.  Shortly after this meeting, OWENS opened two offshore bank accounts for Client-1 at a bank located on the Isle of Man.  The two offshore accounts on the Isle of Man were nominally held by two offshore shell

companies, which were formed by Mossack Fonseca, conducted no real operations, and existed solely for the purpose of holding Client-1's offshore accounts.   Client-1 selected the names of the two shell companies at the instruction of OWENS.   OWENS also formed two offshore sham foundations for Client-1, which Client-1 understands were the owners of the two shell companies that nominally held Client-1's accounts on the Isle of Man.

21.  Initially, Client-1 deposited approximately $1 million U.S. dollars in value, which Client-1 had earned from Client-1's job, into the two offshore bank accounts on the Isle of Man.  Over time, Client-1 continued to deposit Client-1's earnings into those accounts, making additional deposits that totaled approximately several million U.S. dollars in value.

22.  RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, who held himself out as an international tax expert, and who was aware that Client-1 was a U.S. citizen, falsely advised Client-1 that Client-1 would not have to report any of this income to the IRS, so long as Client-1 did not invest in U.S. securities, U.S. real estate, or anything related to the United States.  OWENS never told Client-1 that Client-1 was obligated to report the existence of Client-1's foreign bank accounts, and the income that Client-1 earned on Client-1's foreign investments, as OWENS well knew that Client-1 was legally required to do.  Client-1 relied on OWENS' advice.

11

23.  In or around 2005, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, moved Client-1's money from the two offshore accounts at a bank on the Isle of Man to an offshore account at a bank located in Hong Kong.  The offshore account in Hong Kong was nominally held by a new offshore shell company, which was formed by Mossack Fonseca, conducted no real operations, and existed solely for the purpose of holding Client-1's offshore account in Hong Kong.  Client-1 chose the name of the shell company at OWENS' instruction.  Mossack Fonseca also formed a new offshore sham foundation for Client-1.  At or around that time, Client-1 moved back to the United States on a permanent basis.

24.  In or around the fall of 2008, Client-1 met with RAMSES OWENS, a/k/a "Ramses Owens Saad," and DIRK BRAUER, the defendants, at a hotel in Manhattan.  During that meeting, OWENS introduced Client-1 to BRAUER.  BRAUER told Client-1, in sum and substance, that BRAUER was going to make money for Client-1 by making certain investments with Client-1's offshore assets.  During the meeting, Client-1 told OWENS, in sum and substance, that Client-1 was interested in entering the OVDP and disclosing Client-1's offshore bank account to the IRS, so that Client-1 could bring Client-1's offshore money back to the United States.

25.  At this meeting, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, told Client-1, in sum and substance, that joining the OVDP would not be necessary.  Instead, OWENS

recommended that Client-1 speak with Richard Gaffey, a/k/a "Dick Gaffey" (who is charged as a defendant in other counts of this Indictment). Gaffey, at all times relevant to this Indictment, was a partner at a U.S.-based accounting firm (the "U.S. Accounting Firm"). OWENS stated to Client-1, in sum and substance, that Gaffey was an international tax accountant based in the United States and that Gaffey could assist Client-1 in repatriating the money to the U.S. without having to disclose Client-1's offshore bank account in Hong Kong to the IRS.

26. On or about November 7, 2008, Client-1 met with Gaffey at a train station in Boston, Massachusetts. During that meeting, Client-1 told Gaffey that Client-1 wanted to bring Client-1's offshore money back to the United States. In response, Gaffey told Client-1, in sum and substance, that there were different ways to accomplish that goal, including by putting the money into artwork or real estate, or by "selling" a real or made-up company. At the time, Client-1 did not agree to pursue any of these ideas because Client-1 was still interested in entering the OVDP.

27. In or about February 2009, Client-1 had another meeting with RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, in Panama. At that time, Client-1 again told OWENS, in sum and substance, that Client-1 wanted to enter the OVDP. OWENS reiterated that entering the OVDP would not be necessary and that Client-1 should not do it. OWENS asked whether Client-1 had spoken

with Gaffey, and Client-1 relayed to OWENS what Gaffey had told Client-1. OWENS had follow-up questions for Gaffey regarding how the money could be repatriated through the sale of a company, and specifically, OWENS wanted to know whether Client-1 would have to pretend to sell all of the company or just some of it. Client-1 wrote down OWENS' questions and, subsequently, asked Gaffey for the answers to them. Gaffey, in response, provided additional guidance to Client-1 about how Client-1 could continue to conceal Client-1's offshore account by creating a fictitious company sale.

28. Thereafter, in or around 2009, Client-1 followed the advice of Gaffey and RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and covertly repatriated approximately $3 million of Client-1's offshore money to the United States. Client-1 was able to repatriate that money covertly by falsely stating on Client-1's 2009 federal tax return that the money was the result of the sale of a company, even though, in truth, it was not. After Client-1 repatriated approximately $3 million in this manner, approximately $1 million still remained in Client-1's offshore account, the existence of which Client-1 continued to conceal from the IRS.

29. At the time the offshore money was repatriated to the United States, Client-1's offshore account was located at a bank in Switzerland because Mossack Fonseca had moved Client-1's money to Switzerland from Hong Kong. RAMSES OWENS, a/k/a "Ramses

Owens Saad," the defendant, arranged to have Client-1's approximately $3 million repatriated by wiring it from the bank in Switzerland to a domestic bank account held by Client-1.

30. Client-1 did not disclose to Client-1's tax preparer the fact that, in truth, the approximately $3 million had come from an offshore bank account and was not actually from the sale of a company. Moreover, the fictitious sale was included in Client-1's 2009 federal tax return for tax purposes, and Client-1's offshore bank account was not disclosed on that return, or on Client-1's federal tax returns for other years, as required by law.

31. Client-1 paid Gaffey for his advice regarding the fraudulent repatriation of the offshore money.

32. In or around late 2013, without consulting either RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, or Gaffey, Client-1 entered the OVDP, and reported the existence of Client-1's previously undisclosed accounts to the IRS. In connection with entering the OVDP, Client-1 sought and obtained records regarding Client-1's undeclared accounts from DIRK BRAUER, the defendant, and from a co-conspirator at Mossack Fonseca who is not named as a defendant herein ("CC-1"). At that time, in response to hearing that Client-1 was in the process of entering the OVDP, both BRAUER and CC-1 asked Client-1 not to disclose their names to the IRS.

33.   On Client-1's Forms 1040 for the tax years 2001 through and including 2013, prior to entering the OVDP, Client-1 falsely and fraudulently failed to report Client-1's interest in, or signature or other authority over, Client-1's undeclared accounts that were opened, maintained, and managed by Mossack Fonseca.  Moreover, for these years, Client-1 failed to file FBARs disclosing these undeclared accounts.

### Client-2

34.   Client-2 is Harald Joachim von der Goltz, a/k/a "H.J. von der Goltz," a/k/a "Johan von der Goltz" (who is charged as a defendant in other counts of this Indictment).  Von der Goltz is a German-born national who grew up in Guatemala, and who has been a resident of the United States since approximately 1984.

35.   As a resident alien of the United States, von der Goltz is subject to U.S. tax laws, which require him to report and pay income tax on worldwide income, including income and capital gains generated in domestic and foreign bank accounts.  At all times relevant to this Indictment, von der Goltz evaded these requirements by setting up a series of shell companies and bank accounts, and hiding his beneficial ownership of the shell companies and bank accounts from the IRS.  Von der Goltz was assisted in this scheme by RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and by Gaffey.

36. As part of this fraudulent scheme, and as discussed in greater detail below, von der Goltz, Gaffey, and RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, have falsely claimed that von der Goltz's elderly mother (the "Mother") is the sole beneficial owner of the shell companies and bank accounts at issue. At present, the Mother is approximately 102 years old. She is a Guatemalan citizen and resident, and — unlike von der Goltz — she is not a U.S. taxpayer.

## Von der Goltz's Beneficial Ownership of the Relevant Entities and Assets

37. Beginning in or around at least the 1980s, von der Goltz used the services of Mossack Fonseca to create various foreign entities, which are shell companies (the "Revack Entities"), for the purpose of holding unreported assets for himself in the U.S. and abroad. The Revack Entities were initially "owned" by an overlying trust (the "Revack Trust") and, later, by an overlying foundation (the "Revack Holdings Foundation"), which were also created by Mossack Fonseca. The relevant documentation regarding the Revack Trust and the Revack Holdings Foundation, which dates to in or about 1988, makes clear that von der Goltz was, at all relevant times, a beneficial owner of the Revack Entities, along with the other assets of the Revack Trust and the Revack Holdings Foundation.

38.   The Revack Trust, domiciled in the BVI, was first formed in or about 1988.  The trust agreement for the Revack Trust (the "Revack Trust Agreement"), which was written with the assistance of Mossack Fonseca, stated that upon the death of von der Goltz's father -- which occurred in or about 1990 — the assets in the trust were for the use and benefit of von der Goltz.   The Revack Trust Agreement identified von der Goltz as the trust's primary beneficiary.  The Revack Trust Agreement also identified von der Goltz's wife and his three children as secondary beneficiaries.  The Revack Trust Agreement made no mention of von der Goltz's Mother, from whom von der Goltz's father was estranged at the time of the Revack Trust's creation.

39.   Later, in or about 2007, von der Goltz used the services of Mossack Fonseca, including the services of RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, to resettle the Revack Trust into the Revack Holdings Foundation, domiciled in Panama.  The original regulations for the foundation (the "Revack Holdings Foundation Regulations") — which were maintained by Gaffey in the files of the U.S. Accounting Firm — identified von der Goltz as the first beneficiary of the Revack Holdings Foundation, consistent with his status as the primary beneficiary of the Revack Trust.  The Revack Holdings Foundation Regulations identified the other beneficiaries of the Revack Holdings Foundation as von der Goltz's wife and three children.  The Revack

Holdings Foundation Regulations further identified von der Goltz as the founder and manager of the Revack Holdings Foundation, and they identified Gaffey as a substitute manager. Mossack Fonseca was identified as the resident agent, and OWENS was identified as a member of the foundation council. Like the Revack Trust Agreement, the Revack Holdings Foundation Regulations made no mention of the Mother.

40. The Revack Holdings Foundation Regulations provided that von der Goltz was to contribute assets to the Revack Holdings Foundation, and that those assets were to be held and owned by the foundation. Moreover, the Revack Holdings Foundation Regulations stated that after von der Goltz's death, the Revack Holdings Foundation was to distribute between 20% and 40% of its annual income to his family members, i.e., von der Goltz's wife and three children, in a "tax efficient manner." At von der Goltz's insistence, the Revack Holdings Foundation Regulations also cautioned that "[a]ny family member engaging in reprehensible conducts [sic], or marrying an unacceptable trouble making or gold-digging spouse, can be either partially or totally eliminated from receiving any benefits from the Foundation."

41. The Revack Holdings Foundation Regulations further provided that von der Goltz's initial contributions to the Revack Holdings Foundation were to serve as the "base" for growth of the Revack Holdings Foundation, not only of the investments

contributed, but also to provide liquidity for future investments in private equity, real estate, and "fun investments" that had been "thoroughly researched and fit into the philosophy of the founder [von der Goltz]."

42. The Revack Holdings Foundation, through various Revack Entities, made investments of the type described in the Revack Holdings Foundation Regulations, totaling tens of millions of dollars in value. For instance, the December 31, 2012, balance sheets for the Revack Holdings Foundation and the Revack Entities, which were also maintained by Gaffey in the files of the U.S. Accounting Firm, listed out the entities' various investments, including investments in private equity companies, real estate investment companies, and a watch company founded by von der Goltz. The December 31, 2012 balance sheets further reflect that, as of that date, the investments made by the Revack Entities had a total value of approximately $35,012,126.

## The Evasion of von der Goltz's U.S. Reporting and Tax Obligations

43. Beginning in or about 2000, von der Goltz maintained bank accounts held in the names of various Revack Entities, as well as the Revack Holdings Foundation (the "Revack Bank Accounts"). At all times relevant to this Indictment, the Revack Bank Accounts, which included investment accounts as well as checking and savings accounts, were located both in the United

States and abroad at various financial institutions.  Von der Goltz — as the beneficiary of the Revack Trust and the Revack Holdings Foundation, and as a beneficial owner of the Revack Entities — was a beneficial owner of the assets in the Revack Bank Accounts. However, von der Goltz used the assets in the Revack Bank Accounts for his personal benefit without properly reporting the assets to the IRS or paying the appropriate income taxes on income generated by the assets as he was legally obligated to do.  Von der Goltz was assisted in that effort by RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and by Gaffey.

44.  RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and Gaffey served as the authorized signatories on the Revack Bank Accounts, and facilitated the opening of those accounts in a manner designed to conceal von der Goltz's beneficial ownership from the IRS.  As an example, between in or about 2010 and 2013, Gaffey and OWENS assisted von der Goltz in opening domestic Revack Bank Accounts in the name of a particular Revack Entity, EMJO Investments Limited ("EMJO"), at banks in Boston, Massachusetts and New York, New York.  At all times relevant to this Indictment, von der Goltz was the sole beneficial owner of EMJO and the assets that EMJO held.  However, Gaffey and OWENS did not identify von der Goltz as such when they opened these accounts at the U.S.-based banks.  Instead, Gaffey and OWENS signed IRS

Form W-8BENs,[4] falsely certifying to the banks that the accounts were not subject to U.S. income tax withholding, because EMJO, a foreign shell entity, beneficially owned the assets in the accounts. As a result, although these accounts made investments that generated income, no U.S. income tax was reported or paid on the gains generated.

45. As another example, in the early 2000s, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, assisted von der Goltz in opening foreign bank accounts in the names of various Revack Entities at a bank in Panama (the "Panamanian Bank"). In contrast to the account opening documentation supplied to the U.S. banks, described above, the account opening documentation for the Panamanian Bank identified von der Goltz as the beneficial owner of the assets in these accounts. OWENS, however, served as a director of the Revack Entities that nominally held the accounts, held signature authority over the accounts, and directed transfers to and from the accounts on von der Goltz's behalf, including to and from places within the United States. Although the Revack Entities accounts at the Panamanian Bank held millions of dollars in assets, von der Goltz never reported the existence of the accounts, or the interest generated in the accounts, to the IRS, nor did he ever file FBARs with respect to the accounts.

---

[4] The IRS Form W-8BEN is a tax form that identifies the foreign status of non-U.S. persons for U.S. tax withholding purposes.

46.   RAMSES  OWENS,  a/k/a  "Ramses  Owens  Saad,"  the defendant, and Gaffey discussed with each other the need to conceal von der Goltz's beneficial ownership status in the United States. For instance, in an email to Gaffey dated June 5, 2007, OWENS proposed ways in which he and Gaffey could help von der Goltz conceal his ownership of EMJO from U.S. companies in which EMJO was an investor.   OWENS stated that "I know it is not good to comment this by email," but he had been unable to reach Gaffey via phone and wanted Gaffey to "see this message the soonest."   OWENS then informed Gaffey that several U.S. companies had requested the "real and final beneficial owner" of EMJO, "which name, as you know, we cannot disclose."   OWENS further stated that von der Goltz's passport should not be provided "as we cannot make a link" between von der Goltz and EMJO "inside the USA."   OWENS suggested providing, instead, the passport of the Mother.   OWENS also stated that he had suggested to Mossack Fonseca that he (OWENS) — who, like the Mother, is not a U.S. taxpayer — be identified as the beneficial owner of EMJO, but his partners at Mossack Fonseca "did not like the idea."

47.   Von der Goltz, as a beneficial owner of these assets, regularly benefited from the money in the Revack Bank Accounts.   Email correspondence shows that from at least in or about 2003 through 2016, Gaffey instructed various individuals, including individuals at Mossack Fonseca, to wire funds from

various Revack Bank Accounts to entities and accounts that personally benefited von der Goltz.   Gaffey repeatedly directed the payment of von der Goltz's various personal expenses, including hunting trips, grouse shoots, art, hangar rentals, and mortgage payments, as well as the payment of purported personal loans.   Bank records show that between in or about 2010 and 2016, von der Goltz received over $1.4 million into his personal bank accounts from accounts nominally held by EMJO, alone.

48.   On von der Goltz's Forms 1040 for the tax years 2000 through and including 2016, von der Goltz falsely and fraudulently failed to report the income and capital gains generated in connection with the domestic Revack Bank Accounts. He also falsely and fraudulently failed to report his interest in, or signature or other authority over, the offshore, undeclared Revack Bank Accounts.   Moreover, for these years, von der Goltz failed to file FBARs disclosing his beneficial ownership of the offshore, undeclared Revack Bank Accounts.

### Additional Payments Made to Promote the Scheme

49.   Von der Goltz compensated RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and Gaffey for their assistance in perpetrating this fraudulent scheme.   For example, between in or about June of 2011 and June of 2014, von der Goltz used his undeclared accounts at the Panamanian Bank to make a series of payments to OWENS at a new law firm (the "Owens Firm"), which OWENS

joined sometime after 2010, and to Gaffey at the U.S. Accounting Firm. These payments, which went from Panama to or through places in the United States, included an April 15, 2013 transfer of $110,000 to OWENS at the Owens Firm. This transfer, which constituted the repayment of a loan made by the Owens Firm as part of the scheme, was routed through a correspondent bank in New York, New York.

50. The scheme was also promoted through a series of wire transfers from bank accounts in Panama and Switzerland to places in the United States. These wire transfers, which were sent between in or about May 2007 and July 2011, were made in order to fund capital calls[5] for U.S. investments. RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, Gaffey, and von der Goltz made these U.S. investments through the Revack Entities, rather than through von der Goltz individually, so that von der Goltz could invest in U.S. venture capital funds and evade the payment of U.S. taxes on the capital gains.

The Fraud Involving the Swiss Bank Revack Accounts

51. In or about November 2007, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and Gaffey began working together to open certain Revack Bank Accounts for von der Goltz at

---

[5] A capital call is a legal right of an investment firm or an insurance firm to demand a portion of the money promised to it by an investor when the need arises, pursuant to a previous agreement between the parties.

a bank in Switzerland (the "Swiss Bank"). Those accounts were held in the names of EMJO (the "Swiss Bank EMJO Account") and the Revack Holdings Foundation (collectively, the "Swiss Bank Revack Accounts"). OWENS and Gaffey determined, and discussed via email, that individuals other than von der Goltz would serve as signatories on the Swiss Bank Revack Accounts. Ultimately, OWENS, along with two other individuals, held signature authority over these accounts, which were established in or about January 2008.

52. Bank account forms for the Swiss Bank Revack Accounts identified von der Goltz as the sole beneficial owner of the assets held in these accounts. Notably, these forms listed an address for von der Goltz in Guatemala, even though von der Goltz had been living permanently in the United States since approximately 1984, and RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, and Gaffey were well aware that von der Goltz was a U.S. resident. Moreover, despite the fact that the forms identified von der Goltz as the sole beneficial owner of the assets in the accounts, OWENS also signed "Declarations of Non-U.S. status" for "Corporations and Other Entities" for the accounts, which falsely certified that the nominal foreign account holders — i.e., the Revack Holdings Foundation and EMJO — were the "beneficial owner[s]" of the accounts for United States tax purposes.

53. Email correspondence between RAMSES OWENS, a/k/a

"Ramses Owens Saad," the defendant, Gaffey, and a Swiss Bank representative reveals that during the years that the Swiss Bank Revack Accounts were held at the Swiss Bank, von der Goltz visited the bank, met with bank representatives, and provided instructions to the bank, including instructions concerning payments that should be made from the Swiss Bank EMJO Account. In this email correspondence, the participants repeatedly referred to von der Goltz as the beneficial owner of the Swiss Bank Revack Accounts.

54. In or about May 2013, von der Goltz, with the assistance of RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, altered the Revack Holdings Foundation Regulations. The new documentation (the "Amended Revack Holdings Foundation Regulations") listed, for the first time, the Mother as the first beneficiary of the Revack Holdings Foundation. As a result, the Mother also became the purported beneficial owner of EMJO, and a purported beneficial owner of all the other Revack Entities. However, the beneficial ownership forms on the Swiss Bank Revack Accounts were not changed, and von der Goltz retained his sole financial interest in these accounts.

55. On or about June 14, 2013, shortly after the issuance of the Amended Revack Holdings Foundation Regulations, von der Goltz received, into a personal bank account at a bank in Boston, Massachusetts (the "Boston Bank"), a transfer of approximately $430,000 from the Swiss Bank EMJO Account. Email

correspondence from June 2013 reveals that at the time von der Goltz received this transfer from the Swiss Bank EMJO Account, he needed money to pay off an outstanding home equity line of credit at the Boston Bank. As bank records from the Swiss Bank show, the funds from the Swiss Bank EMJO Account were the result of the liquidation of shares in precious metals held by the account. However, because the account was not identified as a U.S. account, and no IRS Form W-9[6] was on file with the Swiss Bank, no taxes were withheld from any capital gains generated from the sale. Similarly, no taxes were paid on any gains generated by the sale because von der Goltz, with Gaffey's assistance as the return preparer, filed a Form 1040 for the 2013 tax year that falsely failed to report this income to the IRS.

56.  Subsequently, in or about the fall of 2016, after von der Goltz became aware that he was under investigation by the U.S. Department of Justice ("DOJ"), von der Goltz provided the DOJ with an IRS Form 3520, which is a form used to report gifts received from a foreign person. The Form 3520 that von der Goltz provided to the DOJ, which purported to cover the 2013 tax year, characterized the transfer of approximately $430,000 from the Swiss Bank EMJO Account as a non-taxable "gift" from a foreign person, i.e., the Mother, who is a Guatemalan citizen and resident.

---

[6] The IRS Form W-9 is a tax form that identifies an individual as a U.S. taxpayer.

As discussed above, however, this transfer was not a non-taxable gift from a foreign person, but rather a transfer of von der Goltz's own money to one of his personal domestic bank accounts. Furthermore, there is no record of the Form 3520 ever having been filed with the IRS. Instead, von der Goltz appears to have provided it to law enforcement for the first time after learning that he was under investigation for tax evasion.

### The False FBARs

57. By letter dated March 4, 2014, the Swiss Bank informed von der Goltz that, pursuant to requirements under the Foreign Account Tax Compliance Act and the Swiss Bank Program run by the DOJ, the bank had undertaken a review of its account relationships and that, in the course of that review, the bank had identified von der Goltz's accounts as "U.S. related" because he was the beneficial owner of the accounts and had U.S. resident status. The Swiss Bank further informed von der Goltz that the bank, in certain circumstances, could be required to report his accounts, and provide his identity, to the United States. In the letter, the bank encouraged von der Goltz to enter into the IRS's OVDP and voluntarily report his accounts to the IRS himself.

58. In or about April 2014, von der Goltz retained a U.S.-based law firm (the "U.S. Law Firm") to assist him with entering into the OVDP. However, in or about September 2014, instead of entering into the OVDP, von der Goltz filed amended

FBARs for the years 2009 to 2013 (the "Amended FBARs"). The Amended FBARs were prepared by Gaffey and the U.S. Law Firm.

59. The Amended FBARs filed by von der Goltz were materially false. Prior to 2014, von der Goltz had annually filed FBARs reporting his interest in two foreign accounts held in his personal name; however, he did not report his interest in any accounts at the Swiss Bank. The Amended FBARs reported that von der Goltz had signature authority, but no financial interest in, the Swiss Bank Revack Accounts. However, as von der Goltz, Gaffey, and RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, well knew, von der Goltz was the beneficial owner of those accounts and he did not actually have signature authority by design. Accordingly, the Amended FBARs contained false statements that directly contradicted the contents of the account records from the Swiss Bank. The Amended FBARs also failed to include other Revack Bank Accounts in which von der Goltz held a financial interest, including the undeclared accounts at the Panamanian Bank, which the Revack Entities nominally held.

## OWENS' Proposal for How to Continue the Fraud in the Event of the Mother's Death

60. In or around November 2014, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, von der Goltz, Gaffey, a prospective investment advisor (the "Investment Advisor"), and others met in London, United Kingdom, to discuss the Revack

Holdings Foundation.  Von der Goltz informed the Investment Advisor that the purpose of the meeting was to provide an overview of the structure of the Revack Holdings Foundation and the assets it held, which the Investment Advisor understood to be valued at approximately $30 million.

61.  At the meeting in London, United Kingdom, RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendant, gave a Power Point presentation.  In his presentation, OWENS proposed that upon the death of the Mother, the Revack Holdings Foundation be restructured to put a new foundation in place that OWENS — who is not a U.S. taxpayer — owned and controlled.  OWENS suggested that if the Revack Holdings Foundation was restructured in this manner, von der Goltz and von der Goltz's children would be able to evade paying U.S. taxes on the Revack Holdings Foundation's earnings. After hearing OWENS' presentation, the Investment Advisor expressed to von der Goltz the Investment Advisor's belief that restructuring the foundation in the manner that OWENS had proposed — i.e., with OWENS set up to be a straw beneficial owner — would be illegal in the United States.

### Von der Goltz's False Statements to the DOJ

62.  In or about early May 2016, a representative of the U.S. Law Firm (the "U.S. Law Firm Representative") contacted the DOJ on von der Goltz's behalf.  The U.S. Law Firm Representative indicated that von der Goltz had recently appeared in news reports

regarding the "Panama Papers," and offered to make von der Goltz available for an interview to "correct" the statements that had been made about him in the press. The so-called Panama Papers story broke on or about April 3, 2016, when a global network of investigative journalists disclosed that it possessed approximately 11.5 million documents of Mossack Fonseca, which had been obtained from an unnamed source.

63. On or about May 11, 2016, shortly after contacting the DOJ on von der Goltz's behalf, the U.S. Law Firm Representative followed up with an email. In this email, which the U.S. Law Firm Representative sent to a DOJ official in New York, New York, the U.S. Law Firm Representative included a "Statement of Facts" which purportedly described von der Goltz's "situation." The Statement of Facts, which was written in the first person with von der Goltz as the speaker, falsely represented, in substance and in part, that upon the death of von der Goltz's father, in 1990, the Mother became the beneficial owner of EMJO and the other Revack Entities. The Statement of Facts further falsely represented, in substance and in part, that von der Goltz was not the beneficial owner of EMJO, that he had "signature only" authority over the Swiss Bank EMJO Account, and that he had not used EMJO "to hide funds from the U.S. or other tax authorities." The email also attached copies of the materially false Amended FBARs, which von der Goltz filed in 2014.

64.   Approximately one week later, on or about May 19, 2016, von der Goltz was interviewed by representatives of the DOJ, including an Assistant United States Attorney for the Southern District of New York, and Special Agents from an IRS Field Office in New York, New York.   During the interview, which was also attended by the U.S. Law Firm Representative, von der Goltz falsely stated, in substance and in part, that he only had signature authority over the Swiss Bank EMJO Account, and that the Revack Entities were beneficially owned by the Mother.

### Client-3

65.   Client-3 was a U.S. citizen and businessperson who passed away in or about September 2017.

66.   Prior to Client-3's death, Client-3 cooperated with the DOJ, and supplied the DOJ with numerous emails and other materials documenting Client-3's longstanding relationship with Mossack Fonseca, which dates back to at least 2005.   At the direction of the U.S. government, Client-3 also participated in consensually monitored telephone calls with DIRK BRAUER, the defendant, and introduced BRAUER to an undercover law enforcement agent (the "Undercover"), as set forth in greater detail below.

### Materials Documenting Client-3's Relationship with Mossack Fonseca

67.   Incorporation documents provided by Client-3 show that Mossack Fonseca created a number of shell companies for

Client-3, which were incorporated in jurisdictions such as Turks & Caicos and the BVI. In addition to supplying Client-3 with shell companies, Mossack Fonseca also provided Client-3 with nominee officers and directors for the companies. Many of the companies that Mossack Fonseca used for Client-3 were created specifically for Client-3, and at least one of the companies was a "shelf company," created in advance by Mossack Fonseca and kept unused on a virtual "shelf" until a client needed it. At the time when these shell companies were created, the share certificates were issued as "bearer shares," meaning that there was no record of shareholders, and whomever physically held shares could cash them in. Mossack Fonseca also set up a sham foundation for Client-3 to serve as a shareholder of the shell companies.

68. Mossack Fonseca ultimately set up dozens of foreign bank accounts for Client-3, which were nominally held by these offshore shell companies, in jurisdictions that included Panama, Switzerland, and Andorra, all for the purpose of shielding Client-3's interest in these accounts and evading U.S. taxes. After Client-3 sent money to Mossack Fonseca for deposit into these accounts, Client-3 relied on Mossack Fonseca, and in particular, on DIRK BRAUER, the defendant, to invest the money for Client-3. Mossack Fonseca also created offshore shell companies that were used to purchase property for Client-3, for the purpose of shielding Client 3's interest in the purchased properties and

evading U.S. taxes.   One of these shell companies nominally purchased and owned a condominium in Grand Bay Towers in Panama City ("the Panama City Condo").   In total, over the years, Mossack Fonseca managed approximately $8 million in offshore assets for Client-3.

69.   On Client-3's Forms 1040 for the tax years 2004 through and including 2016, Client-3 falsely and fraudulently failed to report Client-3's interest in, or signature or other authority over, any of the undeclared accounts that Mossack Fonseca opened, maintained, and managed for Client-3.

70.   Email correspondence provided by Client-3 documents the role of Mossack Fonseca, and the roles of DIRK BRAUER and RAMSES OWENS, a/k/a "Ramses Owens Saad," the defendants, in providing Client-3 with the tools to conceal millions of dollars in assets offshore.   For example:

a.   In a July 5, 2005 email exchange, a former employee of Mossack Fonseca, who is a co-conspirator not named as a defendant herein ("CC-2"), informed Client-3 that CC-2 had found a bank that seemed to be "exactly what we are looking for.   No W8 forms no BO [beneficial owner] signatures, no presence in the U.S." Client-3 advised CC-2 to open an account at that bank "ASAP," in the name of one of the shell companies that Mossack Fonseca had created for Client-3.

b.   In a March 13, 2006 email, copying OWENS, CC-