J1OAGAFHps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            18-cr-693 (RMB)

5    RICHARD GAFFEY, et al.,

6                    Defendants.             Hearing

7    ------------------------------x

8                                            New York, N.Y.
                                             January 24, 2019
9                                            12:00 p.m.

10
     Before:
11
                      HON. RICHARD M. BERMAN
12
                                             District Judge
13

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  NATHAN REHN, ESQ.
17        MICHAEL PARKER, ESQ.
          SARAH PAUL, ESQ.
18        Assistant United States Attorneys

19   HOGAN LOVELLS LLP
          Attorneys for Defendant Gaffey
20   BY:  ROBERT BUEHLER, ESQ.

21
     Also Present:  Lea Harmon
22                  U.S. Pretrial Services Officer

23

24

25

J1OAGAFHps

1          THE COURT:  I gather that Mr. Gaffey is unavailable

2     today.  Is that correct?

3          MR. BUEHLER:  Yes, your Honor.  As I have mentioned to

4     the government and explained to your clerk -- and by the way,

5     Robert Buehler for Mr. Gaffey, your Honor.  Good afternoon.

6          Mr. Gaffey was on the 8 a.m. flight from Logan Airport

7     to LaGuardia.  It would have gotten him here with over two

8     hours to spare.  They got on the plane.  They pulled out.  They

9     waited for 30 minutes and then another 45 minutes, and then

10    after two hours they went back to the terminal, and because of

11    the weather he was unable to make it here.  But he was fully

12    intending to do that.

13         I have spoken to him.  He consents to this proceeding

14    occurring without him being present, of course assuming your

15    Honor agrees.  However, just to let your Honor know -- and of

16    course it is in the Court's discretion if this is possible --

17    but I do have Mr. Gaffey's number where he can be reached and

18    he would be able to listen in at least to the argument, if

19    that's something that the Court was amenable to.

20         THE COURT:  Let me understand, this is essentially a

21    review of the bail conditions in this case.  Right?  A de novo

22    review, I guess you would call it.  The magistrate judge here

23    limited travel, restricted travel, and consequently now the

24    application is for two overseas or out-of-the-country trips in

25    February and March.  And there's a written application by

J1OAGAFHps

1    defense counsel, which is opposed by the government.  So I'm

2    happy to hear.  And pretrial, who is here, I think, takes no

3    position?  Is that correct?

4              MS. HARMON:  That's correct, your Honor.

5              THE COURT:  So I'm happy to hear you out.  It's your

6    application, I guess.

7              MR. BUEHLER:  Right.  OK.  Well, I appreciate that,

8    your Honor.  And your Honor's summary of the procedural posture

9    is correct.  Mr. Gaffey has two trips, both of which were

10   planned before he was arrested on the charges in the

11   indictment, and both of which are prepaid, so there would be a

12   financial hardship to Mr. Gaffey if he was unable to take these

13   trips.  But the important point is, he didn't plan them after

14   his arrest; they were all planned some time before that.

15             I'd like to just kind of start with the basics, your

16   Honor, and go back to first principles here.  In any kind of a

17   bail hearing, whether it's to set bail or modify bail, the real

18   key issue is a defendant's personal characteristics and his

19   ties to the community.  And here, your Honor --

20             THE COURT:  Risk of flight.

21             MR. BUEHLER:  Yes, it is risk of flight.  That's a

22   hundred percent correct.  And so his personal characteristics

23   and ties to the community would be the most important aspects

24   to evaluate his level of flight risk, if any.

25             We strongly posit to your Honor that Mr. Gaffey poses

J1OAGAFHps

1    absolutely no flight risk whatsoever.  This was recognized by

2    both of the magistrate judges before whom he was presented,

3    once in Boston and again here in the Southern District, neither

4    of whom set any bond for Mr. Gaffey and instead released him on

5    his own recognizance.

6            THE COURT:  But they did restrict, to be sure, the

7    travel.

8            MR. BUEHLER:  They did, your Honor, which is more or

9    less a customary, standard condition of pretrial release in

10   this district.  But we would argue, your Honor, that, in the

11   context of this request, which is simply to have him have his

12   passport returned for the two week-long trips that we're

13   talking about, Mr. Gaffey simply does not pose a risk of

14   flight.

15           And so I just would like to go through that, your

16   Honor.  I do feel that when you hear this, you would agree

17   that --

18           THE COURT:  I read your letter.  I know what's in

19   there.

20           MR. BUEHLER:  OK, great.

21           THE COURT:  I did not read the transcript of the

22   magistrate judge's proceeding.  Did you all discuss risk of

23   flight there?

24           MR. BUEHLER:  Well, your Honor, what occurred before

25   Judge Freeman is that the government requested that a bond be

J1OAGAFHps

set.  The defense opposed that request.  And Judge Freeman

agreed with the defense and did not require Mr. Gaffey to post

a bond of any kind.  She instead released him, again, on his

own recognizance.

Her reasoning was very straightforward, your Honor,

which was, it just wasn't necessary after hearing from the

parties.  And I think the points made were pretty similar to

what have been made in both sides' submissions here.  She

determined that no bond was necessary, and he was simply

released on his own recognizance.

So just as you see in our letter, your Honor, he does

have extraordinarily strong ties to our community, and it

really is the Greater Boston area.

He's 74 years old.  He was born in the United States,

in one of the suburbs of Boston.  He has spent his entire life

really within a 50- or 60-mile radius of where he was born.  He

grew up in Watertown, Massachusetts.  He went to school at

Northeastern University, which is in Boston.  After he

graduated, from 1968 to 1978, he worked for Arthur Andersen,

which at the time was one of the Big Eight accounting firms.

But while Andersen was a national firm, he worked only in the

Boston office for ten years.

He left Arthur Andersen in 1978, along with another

individual, and founded his own accounting firm, that was based

also within the Greater Boston area.  He was there for eight

1  years.

2           In 1986 he parted ways with his first partner, merged

3  his firm with two other partners, to form the firm called Elder

4  Gaffey & Paine, which is where he has worked for the last 32

5  years, since 1986 to the present.  That is based in

6  Marlborough, Massachusetts.  So his entire work life, your

7  Honor, has been there --

8           THE COURT:  Yes.  I've got it.

9           MR. BUEHLER:  -- all of his family.  He has a wife of

10  50 years.  Indeed one of the purposes of their trip to Mexico

11  is to celebrate their 50th wedding anniversary.  She's also

12  from Watertown, Massachusetts.  That is where they met.

13  They've lived together in the Boston area for 50 years.  They

14  currently live in Medfield now, in the same house that they

15  have owned for the last 32 years.

16           THE COURT:  So he has a house in Massachusetts.  He

17  has another house, I forget if it's a weekend house or summer

18  house, in Martha's Vineyard or --

19           MR. BUEHLER:  That's correct, your Honor.

20           And that's his only real property that he owns, your

21  Honor, both of which are properties in Massachusetts.

22           Just for the sake of completeness, he has four living

23  siblings.  He's the oldest of six.  One of his brothers passed

24  away, but his four remaining siblings all live in the same area

25  where they grew up, which is in the Greater Boston area.  They

1    do actually own cottages in the same area, Oak Bluffs,

2    Massachusetts, because they vacation together.  They are a very

3    close family.  Mr. Gaffey has the two adult children, three

4    grandchildren, numerous nieces and nephews, grandnieces and

5    nephews, all of whom also really all live in this same area,

6    none even outside Massachusetts, much less outside the United

7    States.

8            And as we also noted, which is important, he doesn't

9    have any assets outside the country.  They're really all,

10   again, in Massachusetts or in accounts with U.S. firms within

11   the United States.

12           As you know, your Honor, the allegations in the

13   indictment are very wide ranging, all sorts of international

14   finance and transactions and things like that.  But despite all

15   that, the government concedes that Mr. Gaffey doesn't have

16   assets himself outside of the United States.  None of the

17   accounts are his.  He has no money outside the U.S.  And that's

18   the most important thing.

19           And this was recognized, your Honor, the fact that he

20   wasn't a flight risk, by the two magistrates.

21           You know, the government notes, in their letter they

22   state that, you know, the current set of bail conditions give

23   the defendant little incentive to return to the U.S. to face

24   charges.  But we would submit, your Honor, the government

25   totally misses the mark when they make that point.  The fact

1    is, the magistrate judge has determined he has a lot of

2    incentive to return to and stay in the United States.  And

3    those are his ties to the community.  Family --

4              THE COURT:  You keep saying that, but they also said

5    he couldn't take these trips, in so many words, right?  So you

6    can't have it both ways.  Perhaps if he had said to the

7    magistrate judge that he wants to go to the Cayman Islands and

8    Mexico, he might have said, well, you have to put up security

9    or something like that.

10             MR. BUEHLER:  Your Honor, I will just say they weren't

11   faced with that issue.

12             THE COURT:  Right.  This is de novo review.  But I'm

13   just saying that if you're going to use the magistrate's

14   conclusions, you have to put it in the context in which the

15   magistrate decided.

16             MR. BUEHLER:  Understood, your Honor.  And I

17   understand what you're saying.  And the main point that I am

18   submitting to your Honor is just, again --

19             THE COURT:  I know.

20             MR. BUEHLER:   -- they understood the ties to the

21   community.

22             THE COURT:  I appreciate that.

23             MR. BUEHLER:  I'd also like to just comment on a

24   handful of the points that the government made in their letter.

25             THE COURT:  There are two that stand out to me.  One

1    is that the government contends that Mr. Gaffey's company,

2    partners, whatever, were not forthcoming with respect to

3    subpoenas and supplying information.

4          By the way, I know you recognize, Mr. Gaffey is not

5    here, so I hope you'll tell him that whatever we say here today

6    has no bearing on his guilt or innocence and nothing we say

7    should be taken in any way as disparaging him or predetermining

8    what's going to happen in this case.

9          That's what I read, number one.  They seem to say

10   that.  They also seem to say that -- I'm not sure I've got this

11   right -- but they seem to say that he had some control over

12   assets that are outside of the United States.  So those are the

13   two.  If there are more, I'm happy to hear about those.  But

14   those are the two that jump out.

15         MR. BUEHLER:  OK.  Well, I will address that, your

16   Honor.  And I appreciate you directing us to those issues.

17         In general terms, I think the context of what happened

18   here is, we indicated in our letter that Mr. Gaffey and his

19   firm cooperated in the investigation and specifically complied

20   with the subpoenas.  And I think, writ large, the government

21   takes issue with that point.  And we take issue, in turn, with

22   the government's disagreement with us.

23         So first of all, we would note, in terms of just

24   cooperation in general, Elder Gaffey & Paine, the accounting

25   firm, produced over 185,000 pages of documents to the

1    government.  The government in fact just produced to the

2    defense last week its first set of discovery.  It's about

3    800,000 pages.  The materials from Elder Gaffey & Paine made up

4    almost 25 percent of the government's discovery to us.  So

5    there was a significant amount of documentation that was

6    produced by the accounting firm.

7         They also produced a handful of privilege logs, your

8    Honor.  So there clearly was compliance with the subpoenas.  We

9    would call that cooperation with the subpoenas.

10        Then the government points to really three issues in

11   their letter that they somehow claim show a lack of compliance

12   or a lack of cooperation.  One is they say -- and I think this

13   is what your Honor was alluding to -- that the accounting firm,

14   their production was deficient.  And I think that was directed

15   to the first subpoena, which was issued in 2016.  So I would

16   note a few things about that, your Honor.  First of all, when

17   that subpoena was issued, it did not come with what is

18   frequently standard with subpoenas from the DOJ; it didn't have

19   a set of instructions that laid out -- and some of these can be

20   very, very detailed in terms of the specs, the specification

21   and the details about how the documents should be produced.

22   And so that didn't exist.

23        Second of all, Elder Gaffey & Paine is not a Big Four

24   accounting firm, your Honor.  It doesn't get subpoenas like

25   this on a regular basis.  That first subpoena in particular was

1    extremely broad, had at least a dozen different categories,

2    which were themselves very broad.

3          And so this was not something they were used to doing.

4    As a result of misunderstandings and technical issues, the

5    government notes that there were some attachments to some

6    e-mails that weren't produced.  That was not purposeful.  That

7    was a result of just not having done this before.  Once this

8    was brought to the attention of the accounting firm, they

9    retained a formal e-discovery, electronic discovery vendor, who

10   then handled the productions from then on.  And that did result

11   in voluminous -- search terms being used, the 185,000 pages of

12   documents, privilege logs, etc.  And the government was in

13   touch with counsel in connection with that.

14         And indeed, your Honor, Elder Gaffey & Paine was

15   making productions to the government up through October of just

16   last year, just before the indictment was issued in this case.

17   And so we would argue, first of all, the productions weren't

18   deficient.  And certainly that does not reflect on Mr. Gaffey's

19   risk of flight.  It was really more an issue of learning how to

20   produce the documents, which they then did and they did fully.

21   Number one.

22         Number two, they note how two of Mr. Gaffey's partners

23   when they were interviewed by the government apparently said

24   they weren't familiar with the first subpoena.  So there, your

25   Honor, is a very straightforward response.  As soon as the

subpoenas were issued in this case, and maybe even before, but once they were aware of the investigation, Mr. Gaffey retained counsel, Elder Gaffey & Paine and the other partners retained separate counsel.  And Mr. Gaffey was instructed, as would be customary in any case, not to discuss the investigation or any issues in the investigation, with his partners.  And that's what happened here.  So when the government says they were never -- the other partners weren't informed by Mr. Gaffey of the existence of the subpoena, that's fully understandable.  Mr. Gaffey wasn't to discuss these issues, at the instruction of counsel, with his partners.

        To the extent the partners knew or didn't know about the subpoena, that would have been a result of whatever their counsel, their separate counsel elected to share with them.  I can't comment on that.  I don't know what they were told and not told.  But that is the explanation for why they weren't aware.

        And then finally, your Honor, to address the last point which you raised, the government stated in its letter that they believe that there were responsive documents to one of the subpoenas.  Specifically it was a subpoena, your Honor, that asked for records of foreign bank accounts in which Mr. Gaffey had a financial interest or over which he had signature or other authority.  That is a defined term, your Honor.  It's very clearly defined.  It's a term of art that's

1    defined in the federal regulation.  And there's a specific test

2    that's applied to whether or not somebody does have signature

3    or other authority over a foreign bank account.  And counsel

4    was in touch -- this was a subpoena that was actually not

5    issued by the Southern District.  It was issued by the Tax

6    Division of the Department of Justice.  Counsel was in touch

7    with the lawyer at the Tax Division who issued the subpoena,

8    made it very clear that, under the terms of the definition that

9    is in the federal regulations for this particular term,

10   Mr. Gaffey did not possess such documents because he did not

11   have a financial interest in -- which I don't think the

12   government takes issue with -- nor signature or other authority

13   over any foreign bank accounts.

14          Now, I have not seen whatever evidence the government

15   claims to have, so I can't address the specifics.  But there is

16   a specific test, which I can discuss with your Honor, and

17   Mr. Gaffey did not satisfy that test.  There were no such

18   accounts.

19          THE COURT:  All right.  Shall we hear from them?

20          MR. BUEHLER:  Of course.  Thank you, your Honor.

21          MR. REHN:  Thank you, your Honor.  Thane Rehn

22   appearing for the United States.  And I am joined today by

23   Michael Parker, who is with the Money Laundering and Asset

24   Recovery Section at the Department of Justice, and by Sarah

25   Paul, who is also with the United States Attorney's Office.

1        A couple of points, your Honor.  As the Court is

2   aware, there are a number of factors set forth in the statute.

3        THE COURT:  You oppose these trips?

4        MR. REHN:  We very much do, as laid out in our letter.

5   I think there are a few points that would explain the reasons

6   why, under the statutory factors and applied to the facts of

7   this case.  It would be that there's a risk of flight that

8   there's no way to address while permitting the defendant to

9   engage international travel while in possession of his

10  passport.

11       I will respond to the sentence points, but I would

12  just like to lay out a few high-level issues in terms of what

13  we think the Court should be particularly focused on in making

14  this decision.

15       The first factor laid forth in the statute that I

16  think is important is just the strength of the government's

17  case against the defendant and the nature and circumstances of

18  the defense.  And I think it's important to recognize that this

19  case comes before the Court with an unusually strong wealth of

20  evidence and information for the Court to consider, in the form

21  of the more-than-60-page indictment that lays out in detail all

22  of the abundant evidence that the grand jury considered in

23  returning the charges against Mr. Gaffey.

24       And particular there is witness testimony.  There are

25  bank records.  There are fraudulent filings that the defendant

himself submitted to the IRS that all show that the defendant
was a key participant in a sophisticated international scheme
to defraud the United States government of tax revenues.

And this isn't the sort of case where the Court has to
take barebones allegations that are in an indictment or even a
proffer from the United States Attorney's Office in assessing
the strength of the case.  This is a case where there's a
wealth of evidence laid forth, including a number of e-mails
from the defendant himself showing his activity participation
in this fraud.

And when you look at the nature and circumstances of
the offense, another important thing to keep in mind is the
seriousness of this offense.  Obviously there are two different
components of that.  One component of the seriousness of the
offense is just the high-profile nature of the offense, as the
Court is well aware.  This is a significant widespread fraud
that has attracted a large amount of attention, and the
defendant was a major player in that.

But more specifically, the second component of this,
in terms of looking specifically at this defendant, there's
real criminal exposure here.  We aren't far along enough in the
case at this point to have a final position in terms of what
the sentencing guidelines would be, but just conservatively
based on our initial estimations, we think that, given the
nature of the loss involved here that the defendant is directly

1    connected to, which we think conservatively is in excess of $3

2    1/2 million, and combined with some of the other enhancements

3    that would apply in the sentencing guidelines, we think likely

4    the offense level here is at an, again, initial ballpark

5    conservative estimate, in the range of 27, which would result

6    in the defendant's exposure to a substantial term of

7    imprisonment.  It gives him a very strong incentive to not stay

8    around in the United States and await that term of

9    imprisonment, which, given the strength of the case, is

10   extremely likely to occur.

11          And so while it's true that the defendant has a

12   lifelong connection to the United States and specifically to

13   the Boston area, there's been a big change, and the defendant

14   now has been confronted with the wealth of the government's

15   evidence against him and it does give him an incentive to flee,

16   one that is one addressed by any other bail conditions in this

17   case.  The one thing the magistrate judge has put in place was,

18   surrender your passport, no international travel, because at

19   that point there is just nothing holding him back.

20          Now, what the defense says in relation to that is,

21   well, he's got property here, he has family here, you know, all

22   of his assets are in the United States.  But there are a couple

23   of problems with that, your Honor.  Most importantly, this

24   defendant, as alleged in the indictment, is a leading expert in

25   moving assets in and out of the United States in a manner

1    designed to conceal them from the United States government.  He

2    was highly compensated for that.  That was his role in this

3    scheme.  He provided advice to multiple clients, as set forth

4    in the indictment, as to how to do that.  And so the defendant

5    certainly has the ability and the experience to support himself

6    in a foreign country, whether or not he has currently has

7    assets located there.  He spent a large portion of his recent

8    career at least advising people on exactly how to do that.

9              So there is nothing about the fact that his assets are

10   primarily located in the United States that necessarily would

11   prevent him from establishing a new lifestyle everywhere.

12             And while we haven't been able to confirm, prior to

13   today's hearing, with OIA whether we would be able to obtain

14   extradition from the Cayman Islands or Mexico, what we do know

15   is that we would face some substantial obstacles with respect

16   to each of those governments.  But we certainly know that those

17   two locations are in close proximity to multiple other

18   jurisdictions where extradition would be essentially

19   impossible.  And there would be, again, nothing preventing the

20   defendant from removing himself to one of those jurisdictions

21   if he's permitted to travel.  So we think that there is a real

22   risk of flight and there's nothing preventing the defendant

23   from engaging in that, no real security.

24             The next thing I just want to get into a little bit is

25   this issue with the cooperation of the investigation, because I

1    think the picture that's been put forward by defense counsel

2    doesn't give the Court a fully accurate picture.  We've

3    provided somewhat of a thumbnail sketch in our written

4    submission.  But I think the full timeline would help the Court

5    in understanding just the degree to which the defendant really

6    did not comply with this investigation and really attempted to

7    prevent the government from obtaining records in response to

8    the various forms of process.

9        The first thing that happened in terms of attempting

10   to get records from the defendant was a subpoena addressed to

11   him in his individual capacity.  After receiving that subpoena,

12   his lawyer advised the government that the subpoena should

13   instead be addressed to the accounting firm, Elder Gaffey &

14   Paine.  The government generated a new subpoena addressing the

15   accounting firm, but, importantly, served that subpoena on the

16   defendant, which was what his lawyer had requested, on his

17   attorney.  So his attorney was in receipt of a subpoena that,

18   at the attorney's request, was addressed to the firm.

19       Now, essentially, no documents were produced, for an

20   extended period of time.  And eventually the government begins

21   making inquiries of the accounting firm and talking to the

22   other partners, and discovers that the defendant and his

23   counsel had never even provided the firm with that subpoena.

24   They didn't know they had been subpoenaed.  So the defendant

25   was essentially preventing the government from obtaining the

1    business records of that firm that were clearly responsive to

2    the subpoena.  I mean, the defense certainly now admits that

3    there were responsive records to the subpoena because, as the

4    defense has just told you, hundreds of thousands of pages were

5    eventually produced.  Those could have been produced much

6    sooner if the defendant had actually not attempted to bury that

7    subpoena but had actually shared it with the firm, which was

8    what was certainly the expectation of the government when it

9    reissued that subpoena and addressed it to the firm.

10            But another point to make in terms of the timeline is

11   that, in response to that initial subpoena, the accounting firm

12   and the defendant only produced essentially a few hundred pages

13   of documents in response to that first subpoena.  Again, this

14   is somewhat based on the government's counsel's recollection;

15   the numbers may be a little bit off.  But it's in that

16   neighborhood, is our recollection.  And just from the face of

17   that production, it was clear it was deficient.  For example,

18   e-mails were produced without the attachments, containing

19   things like bank records and accounting records.

20            THE COURT:  You said that in your letter.

21            MR. REHN:  Yes.  So, again, there were multiple

22   requests from the government to defense counsel to remedy this

23   situation and essentially a flat refusal from the defendant to

24   engage in good faith with the process that had been issued.

25            So the government issued another grand jury subpoena.

1    This one again was to the defendant individually, requesting

2    information about these bank accounts.

3          Now, the defense makes this technical argument.  We

4    allege in the indictment the defendant had authority over these

5    bank accounts.  We have other bank records indicating that; the

6    defendant had authority over these bank accounts.  He was

7    certainly directing payments into and out of these overseas

8    bank accounts on behalf of a client of his.  And we don't

9    believe that he produced records that were covered by the

10   subpoena.  And, again, to the extent there was confusion about

11   this, the defense was not an open book in terms of

12   communicating with the government, again indicating perhaps an

13   attempt to conceal evidence of the defendant's crimes rather

14   than a good-faith attempt to cooperate.

15         So the government issued a third subpoena, this time

16   to the defendant's accounting firm, again trying to get

17   responsive records relating to this ongoing investigation.  The

18   date for production expired.  Nothing was produced.  And at

19   that point, the government obtained a search warrant for the

20   accounting firm and executed that search warrant in the summer

21   of 2017, I believe.  It was only after that search warrant was

22   executed and the government seized a large volume of records

23   from the accounting firm that all of a sudden compliance

24   started happening.  And the vast majority of those 185,000

25   pages that the defense is referring to were only produced at a

1  point at which continued refusal to comply with the subpoena
2  was essentially futile, because it was clear that the
3  government had another means of obtaining those records and was
4  in the process of reviewing documents that it seized from the
5  accounting firm to identify the records pursuant to the search
6  warrant.
7        So any suggestion that the defendant was engaged in
8  some sort of good-faith effort at compliance we would submit is
9  just belied by the actual investigative record in this case.
10        And that's consistent with a larger pattern of
11 behavior on the part of the defendant, going back to, as
12 alleged in the indictment, the fraudulent filings he submitted
13 to the IRS, where he made misrepresentations about the true
14 nature of various bank accounts that were held by his clients
15 overseas with the purpose of concealing their assets from the
16 United States government.
17        So, given all of these factors and given that the
18 defendant would have no real reason to come back to the United
19 States and certainly would have the ability to maintain himself
20 in a location where extradition would be difficult or
21 impossible, we just don't think it would be appropriate to
22 allow international travel, which is a highly unusual request
23 in any case, but in particular in this case, given the nature
24 of the locations where the defendant is going and his personal
25 criminal history and personal history.

1            THE COURT:  I've got it.  Is there personal security

2      he could provide that would change your mind?

3            MR. REHN:  We would submit that the nature of the

4      international travel is such that there isn't really a way to

5      assure his appearance in court.  Obviously it would be somewhat

6      mitigated by certain forms of security, such as pledging the

7      real properties, but we don't believe that would fully address,

8      given the -- the defendant is a wealthy individual with a large

9      number of assets, and we're not certain that even something

10     like that would prevent him from being able to flee, especially

11     given the serious nature of the charges.

12            THE COURT:  He has two co-defendants that I'm aware of

13     that are in the extradition process now from London and Paris

14     perhaps?

15            MR. REHN:  That's correct, your Honor.  The one who's

16     in Paris, there is a competing extradition request from

17     Germany.  It appears there may be a chance that defendant will

18     ultimately not be extradited but will instead be extradited to

19     Germany to face charges there.  We're still working with the

20     French authorities.  We're trying to get a better picture of

21     what's going on in that case.  But extradition requests have

22     been submitted to both the United Kingdom and France.  With

23     respect to the defendant in the United Kingdom, we do expect

24     that he will be extradited at some point.

25            THE COURT:  OK.  I think I have enough.

1          Counsel, did you want a last word?

2          MR. BUEHLER:  Well, yes, your Honor.

3          THE COURT:  I think I do have enough information, but

4     I'm happy to hear you.

5          MR. BUEHLER:  Well, I would like to be heard, your

6     Honor.  I think the government threw a lot of stuff on the

7     wall, hoping some of it would stick.

8          First of all, your Honor, they start off with the

9     strength of the evidence and the nature and circumstances of

10    the charges.  If it's not clear already --

11         THE COURT:  I guess the part that mostly stuck had to

12    do with the response to the three subpoenas and the search.

13         MR. BUEHLER:  All right.  So if that's the case, your

14    Honor, then I would just note that the allegations in the

15    indictment are exactly that.  They are just allegations.

16         THE COURT:  Sure.

17         MR. BUEHLER:  We would strongly, and do strongly

18    dispute them, and Mr. Gaffey has pled not guilty and is going

19    to maintain that position up to and including trial.

20         THE COURT:  And he is not guilty until such time as he

21    were found to be guilty.

22         MR. BUEHLER:  That is correct, your Honor.

23         THE COURT:  We get all that.

24         MR. BUEHLER:  I just wanted to make that clear.  I

25    just didn't feel the need -- I could go through the specific

1    allegations.  But it is not nearly as cut and dried as the

2    government would make one believe.

3          I also would like to just address just generally the

4    concept of the defendant somehow making his way to some third

5    country that doesn't have extradition.  I would note both the

6    Cayman Islands and Mexico, for what it's worth, do have

7    extradition treaties with the United States.  Mexico has its

8    own.  The Cayman Islands is covered by the United Kingdom

9    extradition treaty.  So I just want your Honor to understand

10   that.

11         Beyond that, though, your Honor, there is this idea

12   where the defendant would just somehow leave the country and

13   then all of a sudden relocate to yet another country and live

14   out his remaining days.  That sound the like some sort of a spy

15   movie.  Mr. Gaffey is a 74-year-old grandfather who has never

16   lived a day outside the United States.  He's on medication for

17   hypertension, prediabetes, and various other issues.  All of

18   his family is here.  All his support is here.  He is not a

19   particularly wealthy man by the -- I don't know, by any

20   standards.  He was a CPA for his life and not at some massive

21   accounting firm.  So the idea that he's going to use this

22   knowledge that he's gained, which is hardly unique in his field

23   or a lot of other fields, and somehow pick up stakes and live

24   for the rest of his life, it's easy to say, your Honor.  It's

25   impossible to do.  In my experience --

1          THE COURT:  Would he put up his real property?

2          MR. BUEHLER:  Your Honor, he's not here.  I can check

3    with him.  I know he would have some very good co-signers.  And

4    that would be a quicker --

5          THE COURT:  No.  I mean the real property.

6          MR. BUEHLER:  Yes.  I would have to check.  I would

7    have to check with him, your Honor.  I don't know.  But I

8    will -- I can do that, your Honor.

9          With regard to the issues that your Honor raised about

10   the production, that's not the position of the defense, your

11   Honor.  The government is basically again kind of looking at it

12   from an extremely one-sided perspective.  The fact of the

13   matter is, I would note just right off the bat the issue about

14   the subpoena, which, you know, the government says, well, the

15   defense is engaging in a very technical explanation here.  That

16   was the subpoena that was issued by the government.  OK.  There

17   are a lot of ways you can ask for these kinds of documents.

18   They used a defined term.  We used that definition.  In our

19   response to the government, we even cited the specific terms

20   and the specific segments of the Federal Register, the

21   regulations that we are referring to.  And the lawyer from the

22   Tax Division to whom that letter was submitted, with whom we

23   had been in touch, did not object at the time, never came back

24   to us and said such documents exist.  And we continue to submit

25   that under the terms of that subpoena that was fully complied

1    with.

2             THE COURT:  There's no way we're going to ultimately

3    resolve those issues now.  I hear the arguments for both sides.

4             So if you give me a couple minutes, I'll give you a

5    suggestion or two.

6             (Recess)

7             THE COURT:  Hold on for just one second.

8             Counsel, the trip to Mexico, is it just the Gaffeys?

9    Are they going with anybody else?

10            MR. BUEHLER:  No, your Honor.  The first trip to

11   Mexico was just Mr. Gaffey and his wife.

12            THE COURT:  OK.  I've heard now both sides and read

13   your submissions, and the thrust is that the defense is seeking

14   modification of the existing bail conditions to allow

15   Mr. Gaffey to travel out of the country.  I think that the

16   government has demonstrated that there is a risk of flight by a

17   preponderance of the evidence, unless, in my opinion, he puts

18   up real assets as a condition of taking that trip, namely the

19   two houses that he owns, his primary residence and his weekend

20   residence.  So if he were willing to do that, I would authorize

21   him making the first trip only at this time, and when he comes

22   back we can consider the second trip separately.  So if you let

23   me know, counsel, if he's willing to do that, then, as I say, I

24   would allow him to take that trip, as it's described by defense

25   counsel in defense counsel's letter of January 8, 2019.

1          OK?  So I'll hear from you, I suppose, one way or the

2     other.   Thanks.

3          MR. BUEHLER:   Thank you, your Honor.  We'll be back in

4     touch with the Court.

5          THE COURT:  All right.

6          MR. REHN:  Thank you, your Honor.

7          MR. PARKER:  Thank you, your Honor.

8          THE COURT:  You bet.  Nice to see you.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25