IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In The Matter of the Search of

Elder, Gaffey & Paine, P.C.
171 Locke Drive, Suite 120
Marlboro, MA 01752

M.J./Court No.  17-MJ-2239  -MBB

## MOTION TO SEAL

The United States of America respectfully moves this Court to seal the search warrant application, supporting affidavit, search warrant, this motion, any ruling on this motion, and all related paperwork until further order of this Court.  In support of this motion, the government states that the public disclosure of any of these materials at this juncture could jeopardize the government's ongoing investigation in this case.

The United States further moves, pursuant to General Order 06-05, that the United States Attorney, through undersigned counsel, be provided copies of all sealed documents which the United States has filed in this matter.

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney

By:  /s/ Maxim Grinberg
MAXIM GRINBERG
Assistant U.S. Attorney

Date:  August 4, 2017

Confidential – Subject to Protective Order

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   17-MJ-2239   -MBB |
| Elder, Gaffey & Paine, P.C. 171 Locke Drive, Suite 120 Marlboro, MA 01752 | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ **Massachusetts** *(identify the person or describe the property to be searched and give its location)*:

Elder, Gaffey & Paine, P.C., 171 Locke Drive, Suite 120, Marlboro, MA 01752, as described in the attached Affidavit and Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Fruits, and instrumentalities of violations of tax evasion, tax fraud, willful failure to file a Report of Foreign Bank and Financial Accounts ("FBAR"), securities fraud, false statements, and obstruction of criminal investigations (and conspiracy to commit those crimes, and aiding and abetting those crimes), in violation of Title 15, United States Code Sections 78ff and 78j; Title 18, United States Code, Sections 2, 371, 1001, 1348, and 1510; Title 26, United States Code, Sections 7201, 7206 (1), 7206(2), and 7212(a); and Title 31, United States Code, Sections 5314 and 5322 (the "Subject Offenses"), from in or around 1990, up to and including the present, as described in the attached Affidavit and Attachment A.

**YOU ARE COMMANDED** to execute this warrant on or before      August 18, 2017      *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the Honorable Marianne B. Bowler _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   August 4, 2017 @ 2:51 PM

Judge's signature

City and state:   Boston, MA      Marianne B. Bowler, Magistrate Judge

Printed name and title

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>    17-MJ-         -MBB | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

### Certification

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Confidential – Subject to Protective Order          PANAMA0005129576

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Elder, Gaffey & Paine, P.C.<br>171 Locke Drive, Suite 120<br>Marlboro, MA 01752 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 17-MJ-2239  -MBB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Elder, Gaffey & Paine, P.C., 171 Locke Drive, Suite 120, Marlboro, MA 01752, as described in the attached Affidavit and Attachment A.

located in the _____ District of _____ **Massachusetts** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Fruits, and instrumentalities of violations of 15 U.S.C. §§ 78ff and 78j; 18 U.S.C. §§ 2, 371, 1001, 1348, and 1510; 26 U.S.C. §§ 7201, 7206(1), 7206(2), and 7212(a); and 31 U.S.C. §§ 5314 and 5322, as described in the attached Affidavit and Attachment A.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| See above list of code<br>sections, and description in the<br>attached Affidavit and Attach A | |

The application is based on these facts:
See the Attached Affidavit and Attachment A.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Quoc Tuan Nguyen, Special Agent, IRS-CI
*Printed name and Title*

Sworn to before me and signed in my presence.

Date:    08/04/2017

*Judge's signature*

City and state:  Boston, MA

Marianne B. Bowler, Magistrate Judge
*Printed name and title*

AFFIDAVIT OF SPECIAL AGENT QUOC TUAN NGUYEN

Quoc Tuan Nguyen, Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI"), being duly sworn, deposes and says:

## I.  Introduction

### A.  Affiant

1.      I have been a Special Agent with IRS-CI for approximately six years.  As a Special Agent with IRS-CI, I have conducted multiple criminal investigations involving violations of federal law to include money laundering and tax evasion.   In addition, I have worked on investigations involving the use of offshore bank accounts, offshore trusts and offshore corporations being used for the purposes of money laundering and tax evasion.  As a Special Agent, I have received extensive training on money laundering techniques to include the use of layering. I have also participated in the execution of search warrants involving electronic evidence.  I earned a Bachelor of Science Degree in Accounting and Finance and a Master of Science Degree in Finance from Syracuse University in 2009 and 2010, respectively.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachment A.  This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and

2017.03.18

Confidential – Subject to Protective Order                                          PANAMA0005129578

conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B.   The Subject Premises

3.      The Subject Premises are particularly described as the offices of Elder, Gaffey & Paine, P.C. ("the Company"), the only offices of which are located at 171 Locke Drive, Suite 120, Marlboro, MA 01752.  This commercial space is located in a one-story red brick building with a glass entry door located in the center of the front of the building. The glass door is clearly marked "120, Elder, Gaffey, & Paine, P.C., Certified Public Accountants" in gold letters.  Behind the entry door is a small vestibule with a second glass door that leads into the reception area of the Company's office.

### C.   The Subject Offenses

4.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of tax evasion, tax fraud, willful failure to file a Report of Foreign Bank and Financial Accounts ("FBAR"), securities fraud, false statements, and obstruction of criminal investigations (and conspiracy to commit those crimes, and aiding and abetting those crimes), in violation of Title 15, United States Code Sections 78ff and 78j; Title 18, United States Code, Sections 2, 371, 1001, 1348, and 1510;, Title 26, United States Code, Sections 7201, 7206(1), 7206(2), and 7212(a),; and Title 31, United States Code, Sections 5314 and 5322 (the "Subject Offenses").

## II.  Probable Cause

### A.   Probable Cause Regarding Subjects' Commission of the Subject Offenses

<u>Overview of the Investigation</u>

5.      On April 3, 2016, the International Consortium of Investigative Journalists ("ICIJ") disclosed that it possessed approximately 11.5 million documents of Mossack Fonseca & Co. (the

2

2017.03.18

Confidential – Subject to Protective Order                                                                     PANAMA0005129579

"Firm"), a Panama-based global law firm and entity that specializes in selling offshore companies and asset management, which had been obtained through an unnamed source. According to the ICIJ, the so-called "Panama Papers" reflect more than 200,000 offshore entities created by or with the assistance of the Firm that may have been used by Firm clients, including some of the world's wealthiest and most powerful people. The ICIJ and its media partners have identified numerous offshore companies created by the Firm that were tied to individuals accused of fraud or other serious financial misconduct. I am currently involved in an investigation of the Firm, its employees and associated service providers for engaging in possible violations of securities fraud, foreign bribery, wire fraud, mail fraud, money laundering, tax evasion, tax fraud, making false statements, willful failure to file an FBAR, and obstruction of the due administration of justice (as well as conspiracy to commit those crimes, and aiding and abetting those crimes). The ICIJ published a database of companies created by the Firm that included the dates that the companies were created and dissolved (the "ICIJ Database").

6.     Based on my conversations with other law enforcement agents, my review of memoranda of interviews, and my review of documents, including emails and the Firm's promotional materials, I have learned the following, in substance and in part:

      a.  The Firm describes itself as a "leader in Corporate, Trust, and Asset Management Services with 44 offices worldwide." Their "professionals specialize in Commercial Law, Trust Services, Wealth Management and Offshore structures."

      b.  The Firm primarily offers services in Corporate Formation, Trust Services, Asset Management Services, and Legal Services.

      c.  The Corporate Formation division sells companies incorporated in a variety of jurisdictions including the British Virgin Islands ("BVI"), the Bahamas, Seychelles,

2017.03.18

3

Confidential – Subject to Protective Order

PANAMA0005129580

Panama, Nevada, Florida, and Hong Kong.  As part of its corporate formation services, the Firm acts as the registered agent for companies, and often times provides nominee directors.

d.   The Trust division is a trust company operating under the supervision of the Panama Banking Superintendency.  According to the Firm, it "provide[s] solutions for: Privacy, Wealth Protection, Spendthrift Protection, Wills and Estate Planning, Successory Structures, Pension Plans, Tax Optimization, and much more."  These "solutions" include the formation of private foundations and trusts that hold corporations, including corporation sold by the Corporate Formation division.  The Firm opens bank accounts for these corporate entities, and employees of the firm often serve as signatories for the bank accounts and direct the movement of money to and from the bank accounts.

7.     Based on my conversations with other law enforcement agents, and my review of memoranda of interviews, I know that U.S. authorities have identified criminal investigations in the United States where subjects of the investigation used the Firm to set up shell companies to facilitate criminal schemes involving tax fraud, tax evasion and other crimes.  For example, attorneys in the Trust division created offshore corporate structures for United States taxpayers. Others at the Firm then established offshore bank accounts held by the offshore corporate entities and managed the monies in the offshore bank accounts.  There is probable cause to believe that the purpose of these corporate structures was to evade paying United States taxes.

8.     As discussed in further detail below, there is probable cause to believe that since at least in or around 1990, Richard J. Gaffey ("Gaffey"), a Certified Public Accountant who is a

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129581

partner at the Company located at the Subject Premises, has worked with persons at the Firm and elsewhere to commit the Subject Offenses.

**CW-8**

9.      Based on my review of grand jury testimony provided by a cooperating witness ("CW-8"),[1] my conversations with other law enforcement officers regarding CW-8, and my review of documents provided by CW-8, I have learned the following, in substance and in part:

a.   CW-8 is a U.S. citizen and is not a citizen of any other country.  CW-8 grew up in the United States and currently lives in New York.

b.   In or around 2001, when CW-8 was approximately 33 years old, CW-8 moved to London.  In London, CW-8 worked as a liaison between investors and financial managers, and earned fees when a potential investor who CW-8 introduced to a financial manager made an investment.

c.   While in London, CW-8 decided to open an offshore trust to hold the money that CW-8 was earning.  CW-8 asked a friend, Carlos Andreas von der Goltz ("Andreas von der Goltz"), for a referral to someone who could create such a trust.  Andreas von der Goltz referred CW-8 to an attorney at the Firm, Ramses Owens ("Owens").  Andreas von der Goltz indicated to CW-8 that his father, Harold Joachim von der

---

[1] CW-8 is a participant in the IRS's Overseas Voluntary Disclosure Program ("OVDP").  OVDP is a voluntary disclosure program specifically designed for taxpayers with exposure to potential criminal liability and/or substantial civil penalties due to a willful failure to report foreign financial assets and pay all tax due in respect of those assets.  As a participant in the OVDP, CW-8 provided a voluntary disclosure of CW-8's failure to report foreign financial assets and pay taxes on those assets.  CW-8 is participating in the OVDP in order to receive protection from criminal liability and resolve CW-8's civil tax and penalty obligations.  As part of the OVDP, CW-8 has agreed to cooperate with the IRS, including in assessing CW-8's income tax liabilities and making good faith arrangements to pay all taxes, interest, and penalties associated with CW-8's voluntary disclosure.  CW-8's information has proven reliable in the past and has been corroborated by, among other things, documents and emails.

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129582

Goltz, also known as Johan von der Goltz ("H.J. von der Goltz") had worked with Owens.

d.  Thereafter, CW-8 met with Owens at the Firm's headquarters in Panama. At that time, Owens explained to CW-8 the manner in which he would set up the trust for CW-8. Shortly after this meeting, Owens opened two offshore bank accounts for CW-8 at a bank located on the Isle of Mann ("Bank-1"). The two offshore accounts at Bank-1 were nominally held by two offshore shell companies, Merit and GLB, respectively, which were formed by the Firm, conducted no real operations, and existed solely for the purpose of holding CW-8's offshore accounts at Bank-1. CW-8 selected the names of the two companies at Owens's instruction. Owens also formed two offshore foundations for CW-8, called Red River and Pegasus, respectively, which CW-8 now understands were the owners of Merit and GLB.

e.  Initially, CW-8 deposited approximately $1 million, which CW-8 had earned from CW-8's job as a liaison between investors and financial managers, into the two offshore bank accounts at Bank-1. Over time, CW-8 continued to deposit CW-8's earnings into those accounts, making additional deposits that totaled approximately several million dollars. CW-8 did not pay any income tax on the funds deposited into her foreign account even though, under U.S. law, she was required to report and pay taxes on this income.

f.  U.S. citizens and resident aliens living abroad are required to file tax returns and pay estimated tax payments regardless of whether they are living in the United States or abroad. Worldwide income is subject to U.S. income tax, regardless of where the individual resides.

2017.03.18

6

                                    PANAMA0005129583

g.  Owens, who was aware that CW-8 was a U.S. citizen, advised CW-8 that CW-8 would not have to report any of this income to the IRS, so long as CW-8 did not invest in U.S. securities, U.S. real estate, or anything related to the U.S.  Owens never told CW-8 about either the obligation to report the existence of CW-8's foreign bank accounts, or the obligation to report the income that CW-8 earned on CW-8's foreign investments.  Owens held himself out as an international tax expert and CW-8 relied on his advice.

h.  In or about 2005, Owens moved CW-8's money from the two offshore accounts at Bank-1, to an offshore account at a bank located in Hong Kong ("Bank-2").  The offshore account at Bank-2 was nominally held by an offshore shell company, Long Hold International Management, which was formed by the Firm, conducted no real operations, and existed solely for the purpose of holding CW-8's offshore account at Bank-2.  CW-8 chose the name of the company at Owens's instruction.  CW-8 recalls selecting the name "Long Hold," in particular, because CW-8 wanted to hold the money for a long time.  The Firm also formed a new offshore foundation for CW-8, called Balfour International Foundation.  At or around that time, CW-8 moved back to the United States on a permanent basis.

i.  In or about the fall of 2008, CW-8 met with Owens at the Four Seasons Hotel in New York, New York.  During that meeting, CW-8 told Owens that CW-8 was interested in entering the IRS's OVDP so that CW-8 could bring CW-8's offshore money back to the United States.  Owens told CW-8 that joining the OVDP would not be necessary, and recommended that CW-8 instead speak with an international

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129584

tax accountant, Gaffey, who could assist CW-8 in repatriating the money without having to disclose CW-8's offshore bank account to the IRS.

j.  On or about November 7, 2008, CW-8 met with Gaffey at a train station in Boston, Massachusetts.  During that meeting, CW-8 told Gaffey that CW-8 wanted to bring CW-8's offshore money back in the United States.  In response, Gaffey told CW-8 that there were different ways to accomplish that goal, including by putting the money into artwork or real estate, or by selling a real or made-up company.  At the time, CW-8 did not agree to pursue any of these ideas, because CW-8 was still interested in entering the OVDP.

k.  In or around February of 2009, CW-8 had another meeting with Owens in Panama. At that time, CW-8 again told Owens that CW-8 wanted to enter the OVDP.  Owens reiterated that entering the OVDP would not be necessary and that CW-8 should not do it.  Owens asked whether CW-8 had spoken with Gaffey, and CW-8 relayed to Owens what Gaffey had told CW-8.  Owens had follow-up questions for Gaffey regarding how the money could be repatriated through the sale of a company, e.g., Owens wanted to know whether CW-8 would have to sell all of the company or just some of it.  CW-8 wrote down Owens' questions and, subsequently, asked Gaffey for the answers to them.  Gaffey, in response, provided additional guidance to CW-8 about how CW-8 could continue to conceal CW-8's offshore account by creating a fictitious sale.

l.  Thereafter, in or around 2009, CW-8 followed the advice of Gaffey and Owens, and covertly repatriated approximately $3 million of offshore money to the United States.  CW-8 was able to covertly repatriate that money by falsely stating on

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129585

CW-8's 2009 federal tax return that the money was the result of the sale of a company, even though, in truth, it was not.

m. At the time the offshore money was repatriated to the United States, CW-8's offshore account was located at a bank in Switzerland ("Bank-3"), because the Firm had moved CW-8's money to Bank-3 from Bank-2.  Owens arranged to have the money wired from Bank-3 to a domestic bank account held by CW-8.

n. CW-8 did not disclose to CW-8's tax preparer the fact that, in truth, the money had come from an offshore bank account, and was not actually from the sale of a company.  Moreover, CW-8's offshore bank account was not disclosed on CW-8's 2009 federal tax return, or on CW-8's federal tax returns for other years, as required by law.

o. CW-8 paid Gaffey for his advice regarding the repatriation of the offshore money.

p. In or around 2013, without consulting with either Owens or Gaffey, CW-8 entered the OVDP, and reported the existence of CW-8's previously undisclosed accounts to the IRS.

**The von der Goltz Family**

10.     Based on my review of a memorandum of a May 19, 2016 interview with H.J. von der Goltz by law enforcement agents,[2] my review of bank records, my July 12, 2017 and July 28, 2017 interviews of persons employed at the Company, and my review of other documents,

---

[2] This interview of H.J. von der Goltz was governed by the terms of a proffer agreement.  Pursuant to that proffer agreement, the Government may use information derived directly or indirectly from the meeting for the purpose of obtaining leads to other evidence, which evidence may be used in any prosecution of H.J. von der Goltz or others by the Government.  In accordance with H.J. von der Goltz's proffer agreement, the Government is using information provided by H.J. von der Goltz during his proffer for the purpose of obtaining other evidence--here, a search warrant for the Subject Premises.

2017.03.18

9

PANAMA0005129586

including emails, obtained through this investigation, I have learned the following, in substance and in part:

a.  H.J. von der Goltz is a German born national who grew up in Guatemala.  H.J. von Der Goltz has been a resident of the United States since approximately 1984.

b.  H.J. von der Goltz's father, Ruediger von der Goltz, started an import business called Compania Agro Comercial, which eventually grew into an export business and became the largest exporter of coffee in Central America.

c.  According to H.J. von der Goltz, in the 1970s, Ruediger von der Goltz hired Jurgen Mossack ("Mossack") to manage the family's finances.  Mossack, and later another lawyer at the Firm, Owens, set up a trust, a foundation, and a series of companies to hold assets of various von der Goltz family members.

d.  Specifically, documents provided by H.J. von der Goltz show that in 1988, the Firm set up a British Virgin Islands trust known as the Revack Trust, which was later resettled into a Panamanian foundation, Revack Holdings Foundation ("Revack"). Revack, in turn, has directly or indirectly held an ownership interest in at least seven different companies, which were incorporated by the Firm:  EMJO Investments Limited ("EMJO"), Goldbean Inc. ("Goldbean"), Worldwide Investment Services and Holdings Inc. ("WISH"), Union Properties Inc. ("Union Properties"), Brecknock Corporation ("Brecknock"), Treetop Properties, Inc. ("Treetop Properties"), and Offshore Venture Investment Corp. ("Offshore Venture Investment") (collectively, the "Seven Revack Entities").

e.  The Seven Revack Entities are BVI and Panamanian entities that nominally hold foreign and domestic bank accounts, which H.J. von der Goltz controls, and which

10

Confidential – Subject to Protective Order                                      PANAMA0005129587

earn income through various means.  For example, EMJO made the same or similar financial investments as those made by H.J. von der Goltz individually.  Although these investments generated gains, no income tax was reported or paid on the income generated by the investments held in the name of EMJO.  Gaffey and Owens assisted H.J. von der Goltz in concealing income by submitting false Forms W-8 BEN with respect to EMJO's domestic bank accounts, certifying that EMJO was a foreign entity and therefore exempt from U.S. income taxes.  H. J. von der Goltz used the funds in EMJO's domestic accounts for his personal expenses and did not report or pay tax on the funds he received from EMJO.

f.  ICIJ records and other documents also link H.J. von der Goltz to additional companies incorporated by the Firm — Conservation Tourism, Ltd., Tecmant Resales, S.A., Horlogue Corporation, Rain Forest Tram Limited, and Rain Forest Trams, Ltd.

g.  Since at least approximately 2005, Gaffey, working together with Owens, has assisted H.J. von der Goltz in managing the entities' bank accounts and the income they have generated.  Moreover, since at least in or around 1990, Gaffey has been the tax return preparer for H.J. von der Goltz.  Gaffey is also the tax return preparer for H.J. von der Goltz's wife, Belle von der Goltz, and three of his children, Annemarie von der Goltz, Andreas von der Goltz, and Joachim Alexander von der Goltz.

h.  As discussed below, there is probable cause to believe that H.J. von der Goltz, with the assistance of Gaffey, Owens, and others, has endeavored to conceal the true nature of his financial interest in Revack and the Seven Revack Entities, and to hide

2017.03.18

11

Confidential – Subject to Protective Order

the existence of their foreign bank accounts from the IRS in violation of foreign information reporting obligations under the United States law, including failing to file FBARs.

i.   Prior to May of 2013, the relevant documentation showed that H.J. von der Goltz was the beneficiary of Revack and, in turn, of the Seven Revack Entities that Revack owned.  The 1988 trust agreement for Revack, for instance, specifically stated that upon the death of Ruediger von der Goltz (which occurred in or around 1990), the trust was to be used for the use and benefit of H.J. von der Goltz. Moreover, foreign bank account documentation for Revack and EMJO from 2008 — including documentation produced by Gaffey — lists H.J. von der Goltz as the beneficial owner of both entities.  Additionally, between at least in or about 2005 and in or about 2008, EMJO made a series of loans to a watch company.  During that time period, H.J. von der Goltz, in written correspondence to Gaffey and others, referred to EMJO's loans to the watch company as loans that H.J. von der Goltz had made with his own money.

j.   On or about May 23, 2013, however, Owens – who was then working at a new firm, called Owens and Watson ("Owens & Watson") – and H.J. von der Goltz changed the Revack-related documentation.    The new documentation listed Erika Nottebohm von der Goltz ("Erika von der Goltz"), H.J. von der Goltz's mother, as the beneficial owner of Revack.  Erika von der Goltz is a Guatemalan citizen and resident and is approximately 100 years old.  In the two months following this change in the documentation, H.J. von der Goltz received a transfer of approximately $450,000 from a bank account nominally held by EMJO at a bank

12

Confidential – Subject to Protective Order

PANAMA0005129589

in Switzerland, on which H.J. von der Goltz had historically been named as the first and only beneficial owner.  Documents produced by H.J. von der Goltz indicate that H.J. von der Goltz, with Gaffey's assistance as the return preparer, reported this money on his 2013 federal tax return as a "gift" from a foreign person — *i.e.*, Erika von der Goltz — and that because he reported it in that way H.J. von der Goltz paid no taxes on the money.

k.   Further, in 2014, H.J. von der Goltz — through Gaffey — filed amended FBARs, on which he stated that he had "signature authority" only over the EMJO account in Switzerland – even though, as reflected by the relevant bank records, H.J. von der Goltz was the beneficial owner of that account, and did not actually have signature authority, by design.  H.J. von der Goltz did not disclose on his FBARs any of the other foreign bank accounts that have been nominally held by the Seven Revack Entities.

l.   Based on my review of bank records, I have conducted a financial analysis of bank accounts, both foreign and domestic, that are nominally held by EMJO.  This financial analysis shows that between 2010 and 2016, H.J. von der Goltz received millions of dollars from EMJO for his own benefit.  Those transfers occurred both before and after May 23, 2013, the date on which Owens, Gaffey, and H.J. von der Goltz changed the paperwork to list Erika von der Goltz as the beneficial owner of Revack and the entities that it owned.  Moreover, emails sent by Gaffey in 2014 and 2015 directed money from accounts nominally held by EMJO be used for the benefit of H.J. von der Goltz.

2017.03.18

13

PANAMA0005129590

m. H.J. von der Goltz nevertheless continues to contend that the beneficial owner of Revack and the other entities, including EMJO, is his 100-year-old mother, Erika von der Goltz, who – in contrast to H.J. von der Goltz – is not a U.S. taxpayer.

n. As a resident alien of the United States, H. J. von der Goltz is subject to U.S. tax laws. U.S. tax laws require that U.S. citizens and U.S. resident aliens pay report and pay income tax on worldwide income.

11.    Based on my review of records from the IRS, I also know that two of H.J. von der Goltz's children, Andreas von der Goltz and Joachim Alexander von der Goltz, have recently applied to participate in IRS amnesty programs. Specifically, Andreas von der Goltz – who, as discussed above, is the person who initially referred CW-8 to Owens for the creation of an offshore trust – submitted a preliminary request for entry in the OVDP on or about March 9, 2017. Andreas von der Goltz's OVDP submission of that date indicates that he had undisclosed offshore bank accounts in Panama, at least one of which was held in the name of EMJO, and another of which was held in the name of Roonster Investment Corporation. Moreover, in or around 2016, Joachim Alexander von der Goltz applied to participate in the Streamlined Foreign Offshore Procedures, an IRS program open to taxpayers who can certify that their failure to report foreign financial assets and pay all tax due in respect of those assets did not result from willful conduct on their part. Joachim Alexander von der Goltz had an interest in at least one entity that was created by the Firm, called Baron International Holdings Corp. As noted above, Gaffey is the tax return preparer for both Andreas von der Goltz and Joachim Alexander von der Goltz.

### EXA Corporation and Boston Capital Ventures

12.    Based on my review of a memorandum of a May 19, 2016 interview with H.J. von der Goltz by law enforcement agents, my review of bank records, my review of filings with the

2017.03.18

14

Confidential – Subject to Protective Order

PANAMA0005129591

U.S. Securities and Exchange Commission ("SEC"), and my review of other documents, including emails, obtained through this investigation, I have learned the following, in substance and in part:

  a.  H.J. von der Goltz is a founder of Boston Capital Ventures ("BCV"), which is a holding group of private equity partnerships, including Boston Capital Ventures III LP ("BCV III LP") and Boston Capital Ventures IV LP ("BCV IV LP").  BCV III and IV LP were formed by H.J. von der Goltz and Jack Shields ("Shields") to pursue investment opportunities.  H.J. von der Goltz is one of the general partners of BCV III and IV LP.  EMJO, Goldbean, WISH, Union Properties, Brecknock, and Offshore Venture Investment – which are six of the Seven Revack Entities – are direct or indirect limited partners of both BCV III and IV LP.

  b.  EXA Corporation ("EXA"), a technology company founded in 1991, made an initial public offering ("IPO") on June 28, 2012.  Prior to that date, BCV III and IV LP acquired a significant number of shares of EXA in private offerings.

  c.  Following EXA's IPO, Credit Suisse Securities (USA) LLC ("Credit Suisse") acted as a broker for BCV III and IV LP for distributions of shares of EXA to their general partners, including H.J. von der Goltz, and limited partners, including EMJO, Goldbean, WISH, Brecknock, and Union Properties.  Annemarie von der Goltz ("Annemarie"), daughter of H.J. von der Goltz, and her business partner Doug Sonnenshein ("Sonnenshein"), both of whom were employed by Credit Suisse, assisted in making certain of those distributions.  Once the distributions were made, Annemarie and Sonnenshein also handled the sales of EXA shares held in H.J. von der Goltz's name, and in the names of EMJO, Goldbean, Brecknock, WISH, and Union Properties.

15

2017.03.18

d. In connection with the distribution of stock by BCV III LP and BCV IV LP, and later sales of EXA stock by H.J. von der Goltz, H.J. von der Goltz concealed his ownership and control of EMJO, Goldbean, WISH, Brecknock, and Union Properties.

e. For example, during the first quarter of 2015, there was a blackout period whereby restricted shares of EXA, including shares held by BCV IV LP, could not be sold. The restriction expired on June 1, 2015.

f. On June 5, 2015, BCV IV LP began the process of selling 10,000 shares of EXA. In connection with the sale, H.J. von der Goltz and Jack Shields sent a "Rule 144 Affiliate Seller's Representation Letter" to Credit Suisse ("June 5 Letter"). In the June 5 Letter, they represented that "[t]o the best of BCV IV's knowledge, members of the general partners' immediate family who live in their household and others with whom BCV IV acts in concert or is closely associated with have sold zero shares of the Company stock within the preceding (3) months." In fact, EMJO – which acted in concert and was closely associated with H.J. von der Goltz and, by extension, BCV IV LP – had made the following transactions in the preceding 3 months, including one sale the day before the letter was issued:

| Date | Number of Shares | Dollar Value |
|---|---|---|
| 5/20/15 | 500 | $ 5,510.89 |
| 6/3/15 | 600 | $ 6,508.89 |
| 6/4/15 | 1,500 | $ 15,977.65 |

**Obstruction of the Investigation**

13.    Based on my review of grand jury subpoenas issued to Gaffey and to the Company

16

2017.03.18

PANAMA0005129593

in 2016 and 2017, my review of documents produced in response to those subpoenas, and my interviews of persons employed at the Company on July 12, 2017 and July 28, 2017, I have learned the following, in substance and in part:

    a.   In connection with this investigation, the Southern District of New York has issued multiple grand jury subpoenas to the Company and to Gaffey, the responses to which have all been deficient.

    b.   The first of these grand jury subpoenas was issued to Gaffey individually on October 13, 2016, and was reissued, at the request of Gaffey's counsel, to the Company on November 8, 2016 (the "2016 Subpoena"). Gaffey and the Company, however, have yet to fully comply with the 2016 Subpoena. It appears, moreover, that Gaffey did not disclose the 2016 Subpoena to any of the other partners of the Company. During interviews conducted on July 12, 2017, in which I participated, two of the other partners of the Company (including the managing partner) stated that they were not informed of the 2016 Subpoena at the time that it was issued or reissued. They were unable to provide information about how the search for responsive records had been conducted and were unaware that any of the Company's records had been produced to the Government. The managing partner stated, in substance and in part, that he had only recently became aware of the 2016 Subpoena, when he received a bill from the IT company that appears to have been retained by Gaffey's counsel to assist with the search of the Company's responsive email correspondence.

    c.   Further, despite the 2016 Subpoena being outstanding for over nine months, the search being conducted by the IT firm has only recently been initiated, and only

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129594

after multiple discussions with the Government concerning the deficiency of the Company's initial production. The production is deficient, for example, because none of the attachments to the produced emails have been provided, despite the Government's multiple requests for these documents. Additionally, the emails reference documents received by Gaffey (*e.g.*, all of H.J. von der Goltz's account statements for all foreign accounts) but again, these documents have not been produced.

    d.   On or about May 2, 2017, another grand jury subpoena was issued to Gaffey individually, requesting the production of foreign account records for accounts that Gaffey has a financial interest in or signature or other authority over (the "May 2017 Subpoena"). In response to the May 2017 Subpoena, Gaffey claimed to have no responsive records. The Government, however, is in possession of records produced by H.J. von der Goltz and by Gaffey, which indicate that Gaffey exercises authority over H.J. von der Goltz's foreign bank accounts, and suggest that Gaffey should have produced records in response to the May 2, 2017 Subpoena.

    e.   Finally, on or about June 14, 2017, another grand jury subpoena was issued to the Company (the "June 2017 Subpoena") with a return date of June 29, 2017. The Company has yet to respond to the June 2017 Subpoena.

    14.   Because Gaffey appears to have concealed the existence of the November 2016 Subpoena from his partners at the Company, and has failed to produce documents that are responsive to the Government's multiple subpoenas, there is reason to believe that Gaffey is deliberately withholding responsive and inculpatory evidence. The execution of a search warrant

18

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129595

on the Company would take away any remaining opportunity by Gaffey to tamper with or destroy such evidence.

### B. Probable Cause Justifying Search of the Subject Premises

15.     I believe there is probable cause that Gaffey has used the Subject Premises, which is the location of his place of business, to work with U.S. taxpayers, the Firm, and Owens & Watson to commit the Subject Offenses.  The electronic files and emails, as well as the hard copy documents, contained within the Subject Premises constitute both evidence and instrumentalities of these crimes.

16.     Specifically, there is probable cause to believe that the Subject Premises will contain Gaffey's correspondence and communications with CW-8 and/or Owens regarding the repatriation of CW-8's undeclared offshore money.  There is also probable cause to believe that the Subject Premises will contain Gaffey's correspondence and communications with H.J. von der Goltz, other members of the von der Goltz family, Owens, and other persons at the Firm and/or Owens & Watson regarding the management of Revack, the Seven Revack Entities, and the bank accounts they have nominally held, as well as H.J. von der Goltz's financial interest in these entities; and there is probable cause to believe that the Subject Premises will contain bank records and corporate records relating to Revack and the Seven Revack Entities.  Indeed, some of these materials – for instance, 2008 bank documentation listing H.J. von der Goltz as the beneficial owner of EMJO – have been produced by counsel for Gaffey in response to 2016 and 2017 grand jury subpoenas issued to the Company, which is located at the Subject Premises, in connection with this investigation.  There is also probable cause to believe that the Subject Premises will contain records relating to Gaffey's work as a tax preparer for H.J. von der Goltz, his wife, and his children, including Andreas von der Goltz and Joachim Alexander von der Goltz, including but

19

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129596

not limited to correspondence and communications relating to foreign bank accounts that they have maintained, including any foreign bank accounts held in the name of Roonster Investment Corporation or Baron International Holdings Corp. Based on training and experience, records related to an accountant's work for clients, such as correspondence, etc., is typically kept at the accountant's office, particularly where the client relationships are ongoing, as is the case here.

17.     I also believe there is probable cause that evidence of securities fraud and false statements will be found at the Subject Premises. Marie Tremarche ("Tremarche") is an accountant and partner at the Company who works with Gaffey on the von der Goltz account. Based on my review of email communications, Tremarche, Gaffey, and other individuals at the Company emailed with individuals at Credit Suisse, including Annmarie and Sonnenshein, hundreds of times regarding BCV III and BCV IV LP distributions and sales of shares by H.J. von der Goltz. These emails include communications about restrictions on H.J. von der Goltz's shares, legal opinions by the law firm Foley Hoag regarding the sale of shares, the dates distributions should be made, the substance of communications with limited partners of BCV III and IV LP, SEC filings, and sales of shares by H.J. von der Goltz, EMJO, Goldbean, WISH, and Union Properties. Individuals at the Company also directly emailed the limited partners of BCV IV LP. Moreover, Tremarche provided Annemarie and Sonnenshein with spreadsheets detailing to whom shares should be distributed. The Credit Suisse brokerage account documents, including brokerage statements, for EMJO, Goldbean, WISH, and Union Properties, include as an address the Company's address. As a result, there is probable cause to believe that the Subject Premise will contain correspondence, communications, books and records, and other records related to securities fraud.

20

2017.03.18

   PANAMA0005129597

18.     Based on interviews conducted of employees and partners of the Company, I have learned that multiple computers are located at the Subject Premises. The computers located at the Subject Premises include a computer at the reception desk and in each of the offices of the five partners of the Company. Additionally, based on my training and experience, each employee of the Company is typically assigned his or her own computer for work applications. The individual computers of the partners and employees are linked to a single server located at the Subject Premises (the "Server"). All client files are stored on a shared drive (the "Shared Drive") located on the Server and every employee has unlimited access to the Shared Drive. Tax returns and other tax-related forms are prepared based, in part, on information and records stored in the client files located on the Shared Drive. Additionally, billing records and QuickBook records of the accounting firm are saved on the Server.

## C.   Probable Cause Justifying Search of ESI

19.     Based on my training and experience, I know that individuals who engage in tax evasion, tax fraud, willful failure to file FBARs, securities fraud, and false statements (and conspiracy to commit those crimes, and aiding and abetting those crimes) commonly use computers to communicate with co-conspirators online; keep track of co-conspirators' contact information; and maintain records of illegal transactions and criminal proceeds. As a result, they often store data on their computers related to their illegal activity, which can include email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; financial and personal identification data, including brokerage and bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and/or records of illegal transactions or the disposition of criminal proceeds.

21

2017.03.18

Confidential – Subject to Protective Order                                    PANAMA0005129598

20.     Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data.  In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

21.     In addition to there being probable cause to believe that computer devices will be found on the Subject Premises that contain evidence of the Subject Offenses, there is also probable cause to believe that these computers constitute instrumentalities of the Subject Offenses, in that that they were used to assist others in conducting financial and other transactions for the purpose of committing tax crimes, securities fraud, and making false statements.

22.     Based on the foregoing, I respectfully submit there is probable cause to believe that Gaffey has been working with U.S. taxpayers, the Firm, and Owens & Watson to assist in the commission of the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers and electronic media found in the Subject Premises.

2017.03.18

22

Confidential – Subject to Protective Order

PANAMA0005129599

## III.  Procedures for Searching ESI

### A.  Execution of Warrant for ESI

23.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search

for and seize property "may authorize the seizure of electronic storage media or the seizure or

copying of electronically stored information . . . for later review."  Consistent with Rule 41, this

application requests authorization to seize any computer devices and storage media and transport

them to an appropriate law enforcement facility for review. This is typically necessary for a number

of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

24.     As discussed herein, Elder, Gaffey & Paine, P.C., (the "Company") is a functioning

company that conducts legitimate business.  The seizure of the Company's computers or other

storage media may limit the Company's ability to conduct its legitimate business. In order to

execute the warrant in the most reasonable fashion, law enforcement personnel will attempt to

investigate on the scene what computers or storage media must be seized or copied, and what

computers or storage media need not be seized or copied. Law enforcement personnel will speak

23

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129600

with Company personnel on the scene as may be appropriate to this. Where appropriate, law enforcement personnel will copy data, rather than physically seize computers, to reduce the extent of any disruption of the Company's business operations. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continued functioning of the Company's legitimate business. If, after inspecting the seized computers off-site, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

### B.   Review of ESI

25.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

26.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

24

Confidential – Subject to Protective Order

PANAMA0005129601

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[3]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

27.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

## C. Return of ESI

28.    If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

---

[3] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

25

2017.03.18

Confidential – Subject to Protective Order

PANAMA0005129602

## IV.   Conclusion and Ancillary Provisions

29.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

30.     Based on my personal knowledge, Gaffey and the Company have employed attorneys to represent them in this criminal investigation.   Accordingly, a group of designated Government attorneys, who will be segregated from the investigating team, will conduct a privilege review of any seized items and information that could in any way be connected to any such legal representation.   To the extent that those designated Government attorneys determine that privileged materials have been seized, those materials will be marked as such and will not be shared with the investigating team.

31.     In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Quoc Tuan Nguyen
Special Agent
Internal Revenue Service, Criminal Investigations

Sworn to before me on August 4, 2017.

HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

2017.03.18

26

PANAMA0005129603

## ATTACHMENT A

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

The Subject Premises are particularly described as the offices of Elder, Gaffey & Paine, P.C., located at 171 Locke Drive, Suite 120, Marlboro, MA 01752. This commercial space is located in a one-story red brick building with a glass entry door located in the center of the front of the building. The glass door is clearly marked "120, Elder, Gaffey, & Paine, P.C., Certified Public Accountants" in gold letters. Behind the entry door is a small vestibule with a second glass door that leads into the reception area of the Company's office.

### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of tax evasion, tax fraud, willful failure to file a Report of Foreign Bank and Financial Accounts ("FBAR"), securities fraud, false statements, and obstruction of criminal investigations (and conspiracy to commit those crimes, and aiding and abetting those crimes), in violation of Title 15, United States Code Sections 78ff and 78j; Title 18, United States Code, Sections 2, 371, 1001, 1348, and 1510; Title 26, United States Code, Sections 7201, 7206(1), 7206(2), and 7212(a); and Title 31, United States Code, Sections 5314 and 5322 (the "Subject Offenses"), from in or around 1990, up to and including the present, described as follows:

1.      Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys;.

2.      Evidence concerning the services of Mossack Fonseca & Co. or Owens & Watson ("the Firms"), including the sale of offshore companies, setting up private foundations and trusts, financial transactions, and the opening of offshore bank and brokerage accounts, including evidence concerning the Firm's prospective, current, or inactive clients, employees, agents, representatives, law firms, banks, and brokerage firms;

3.      Evidence reflecting any communications or correspondence between Gaffey and persons employed by the Firms;

4.      Evidence concerning any payments owed and/or made to Gaffey by the Firms;

5.      Evidence concerning the various entities in which members of the von der Goltz family have and have had a financial interest, including Revack Trust a/k/a Revack Holdings Foundation, Brecknock Corporation, EMJO Investments Limited, Goldbean Inc., Worldwide Investment Services and Holdings Inc., Union Properties Inc., Treetop Properties, Inc., Offshore

2017.03.18

Confidential – Subject to Protective Order                                                    PANAMA0005129604

Venture Investment Corp., Roonster Investment Corporation, Baron International Holdings Corp., Conservation Tourism, Ltd., Tecmant Resales, S.A., Horlogue Corporation, Rain Forest Tram Limited, and Rain Forest Trams, Ltd., (collectively, the "Structures"), including corporate records relating to the Structures, correspondence or communications regarding the Structures, and any other evidence concerning the management or operation of the Structures.

6.    Evidence concerning any domestic or foreign bank accounts nominally held by any of the Structures, including any communications or correspondence regarding such accounts, and any bank records regarding such accounts;

7.    Evidence concerning members of the von der Goltz family, specifically, Harald Joachim von der Goltz ("H.J. von der Goltz"), Belle von der Goltz, Annemarie von der Goltz, Carl Andreas von der Goltz, Joachim Alexander von der Goltz, Ruediger von der Goltz, and Erika Nottebohm von der Goltz, including evidence reflecting communications or correspondence between Gaffey and any of these individuals, any payments made by any of these individuals to Gaffey, and any tax returns or tax return information with respect to any of these individuals;

8.    Evidence concerning offshore bank accounts maintained by U.S. taxpayer CW-8, including tax returns and tax return information for CW-8, correspondence and communications with CW-8 regarding such accounts, and correspondence and communications with persons at the Firms or elsewhere regarding such accounts;

9.    Evidence concerning distributions of cash or stock by Boston Capital Ventures III LP ("BCV III LP") and Boston Capital Ventures IV LP ("BCV IV LP");

10.    Evidence concerning the sale of EXA Corporation ("EXA") securities by H.J. von der Goltz, EMJO Investments Limited, Goldbean Inc., Worldwide Investment Services and Holdings Inc., Union Properties Inc., or Offshore Venture Investment Corp;

11.    Evidence concerning statements made by H.J. von der Goltz, Jack Shields, BCV III LP or BCV IV LP, to the Securities and Exchange Commission, EXA or its agents, including Foley Hoag;

12.    Evidence concerning any investigations of the Firms or its current or former employees for involvement in the Subject Offenses;

13.    Evidence concerning the location of other evidence of the Subject Offenses, including evidence regarding the location of storage containers and safe deposit boxes; and

**B.    Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

2017.03.18

2

Confidential – Subject to Protective Order                                                                 PANAMA0005129605

The items to be seized from the Subject Premises also include:

1.      Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.      Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.      Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.   Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

3

2017.03.18

Confidential – Subject to Protective Order                                                          PANAMA0005129606