```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                              15 Cr. 611 (AJN)

BENJAMIN WEY,

                Defendant.

------------------------------x
                                           New York, N.Y.
                                           January 23, 2017
                                           10:10 a.m.


Before:

                HON. ALISON J. NATHAN,

                                           District Judge


                     APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
MICHAEL FERRARA
AIMEE HECTOR
IAN P. McGINLEY
     Assistant United States Attorneys

HAYNES AND BOONE, LLP
     Attorneys for Defendant
DAVID M. SIEGAL
JOSEPH C. LAWLOR
BARRY McNEIL
SARAH E. JACOBSON
```

1  present.  I believe a lawyer named John Bostany was present at
2  one point.
3  Q.  Did you speak to Mr. Bostany during the search?
4  A.  I believe I did.
5  Q.  About what?
6  A.  Initially about whether he represented or who he
7  represented.  He also raised the question of privileged
8  documents being at the residence.
9  Q.  What was the resolution of the issue of privileged
10 documents being at the residence or potentially privileged
11 documents being as at the residence?
12 A.  The resolution, as I recall it, in part, through refreshing
13 recollection by e-mail, is that he was permitted to designate
14 or he and/or she, Michaela Wey, were permitted to identify
15 certain folders or boxes that contained potentially privileged
16 information, and I believe he was allowed to take them away.
17 And I think the purported basis for privilege is that Michaela
18 Wey, who as a lawyer had represented Ben Wey in connection with
19 his Oklahoma securities proceeding.
20 Q.  Let's talk about the handling of the electronic evidence
21 after the searches were complete.  OK?
22 A.  OK.
23 Q.  First, what happened to the electronic evidence after it
24 was seized, to the extent you know?
25 A.  It was taken by the FBI and then I believe provided to

1  CART, which is the computer forensics arm of the FBI.  The
2  first thing that happened is that copies were made of some or
3  all of the electronic storage devices, thumb drives, hard
4  drives and the like, because either Mr. Siegal or Seth Levine,
5  who represented New York Global Group, or both, told me
6  relatively quickly that they needed it back in order to perform
7  the continuing operations of New York Global Group.  And they
8  retained Stroz Friedberg who help with that process.  So I
9  asked the FBI to make copies of the electronic storage devices
10 and return either the original or a copy to New York Global
11 Group through Stroz Friedberg.
12 Q.  I'm sorry.  Why was that important to them to get those
13 back?
14 A.  Because they said that, you know, some or all of the
15 computers and electronic storage devices had been taken, and
16 they needed to resume business operations.  To respect their
17 need to be back in business, we gave them back copies or the
18 actual original devices.
19 Q.  What was the next step after CART imaged, made copies and
20 then certain things were returned?  What was the next step in
21 the process?
22 A.  CART had to process the information and put it onto their
23 platform in short.
24 Q.  Why did that need to happen?  This is basic stuff.
25 A.  Sort of forensic, you know, purity.  The FBI needed to

1  handle the data and handle the search process of the data so
2  that they could call a witness to offer the data into evidence
3  at the appropriate time.  But it just had to be properly
4  safeguarded and controlled and put onto a platform.  It both
5  had to be safeguarded and put on a platform in which it could
6  be searched.
7  Q.  What is CART?
8  A.  I think it stands for computer -- I don't know.  I don't
9  remember the acronym.
10 Q.  Generally, what is it?
11 A.  It's the computer forensics squad of the FBI.
12 Q.  After CART processed the documents or the electronic
13 evidence in the way you described, were you then able to begin
14 reviewing the documents or the electronic evidence?
15 A.  Not right away.
16 Q.  Why not?
17 A.  Well, a couple of things had to happen.  And one was,
18 privilege review.  We knew that New York Global Group and/or
19 Ben Wey and Michaela Wey had or believed, had a good-faith
20 basis to believe they had legal representation at various
21 points.  And at some point in the investigation I began
22 collecting a list of lawyers' names and e-mail addresses who
23 might have represented one or more of Ben Wey, Michaela Wey or
24 New York Global Group.  In addition I got lists from either
25 David Siegal, certainly also from Seth Levine, counsel for New

1    York Global Group, one or more lists from Seth Levine that
2    purported to list law firms or individual lawyers who had
3    represented one or more of the above.
4    Q.  Let's take a look at what's been marked as Government
5    Exhibit 17 and 18.
6    A.  I see 17, the list.  18.  Yes.
7    Q.  Let's take them in order.  What is 17?
8    A.  17 is a letter from Seth Levine, counsel to New York Global
9    Group to me, including a list of counsel for New York Global
10   Group, Benjamin and/or Michaela Wey.
11   Q.  What is 18?
12   A.  18 is one of the lists.  It might be -- certainly a revised
13   list, revised August 7, 2012.  I can't tell if it was the last
14   one.  But it's the list that I generated over time of lawyers
15   whose names we had identified as counsel to various entities,
16   not just Ben Wey and Michaela Wey, but also to the issuers.
17   Q.  I don't want to cut you off.
18   A.  That's it.
19           MR. FERRARA:  Your Honor, the government offers
20   Exhibits 17 and 18.
21           MR. SIEGAL:  No objection.
22           THE COURT:  Government's 17 and 18 are admitted.
23           (Government Exhibits 17 and 18 received in evidence)
24   Q.  What is the date of the letter from Mr. Levine to you,
25   Government 17?

1   A. June 4, 2012.
2   Q. Now, were you focused on the pace at which the review of
3   the electronic evidence was occurring?
4   A. Yes, I was.
5   Q. Why?
6   A. Well, because I wanted -- various reasons, including, it
7   was important to move forward with the investigation. Also, I
8   was aware of an opinion by Judge Irizarry and just the law in
9   general involving searching of electronic information. Judge
10  Irizarry's opinion, I thought it was very distinguishable, but
11  it was very clear it was important for agents and prosecutors
12  to continue moving forward when they obtained electronically
13  stored data toward the search and use of that data.
14  Q. Who was taking the lead in the privilege review? Was it
15  the FBI, the U.S. Attorney's Office, or was it sort of both
16  jointly?
17  A. It was really the FBI, but I was involved and aware of what
18  was happening. We set up a wall team or wall AUSA, and I think
19  also paralegal at the U.S. Attorney's Office and there was a
20  wall team at the FBI to conduct searches. But the -- most of
21  the work was happening at the FBI.
22  Q. What was the next step after the privilege review was
23  complete? Sorry. Let me actually back up and withdraw that
24  question briefly.
25            If you can remember, was the privilege review, to your

1    mind, done all at once on a certain date or do you remember
2    receiving sort of safe, unprivileged documents on a rolling
3    basis, if you recall?
4    A.  I believe I recall receiving certain documents on a rolling
5    basis, including spreadsheets that were clearly not privileged
6    because no lawyer's name had been found in them, or at least if
7    a lawyer's name had been found, we understood it was not a
8    lawyer who represented Ben Wey, Michaela Wey, or New York
9    Global Group.  The spreadsheet was quickly reviewed by an agent
10   to see if it contained information about one of the issuers,
11   for example.  It was plainly within the scope of the warrant.
12   I believe I got access to spreadsheets like that earlier than
13   other information.
14   Q.  What was the next step after the privilege review was
15   complete or as it was being completed on a rolling basis?
16   A.  The next step was to search it for pertinence, sort of
17   responsiveness to the search warrant application and the
18   warrant itself.  And so that involved preparing a list of
19   search terms which I believe I took the lead on, to give to the
20   FBI so they could run searches through the data.  There is a
21   lot of data.  And the best way to do it was through searches so
22   they caused run searches against the data to identify data that
23   was clearly within the scope of the warrant.
24   Q.  Take a look at Government Exhibit 19.
25   A.  OK.

1    Q.   What is that?
2    A.   That appears to be a list of search terms.  I don't know if
3    it's the final list that I believe I prepared based on the
4    search warrant application and based on additional information
5    that sort of further described individuals or entities listed
6    in this search warrant application or the warrant itself.
7             MR. SIEGAL:  I'm sorry.  Could I have that answer read
8    back, please.
9             THE COURT:  Go ahead.
10            (Record read)
11            MR. FERRARA:  Your Honor, the government offers
12   Exhibit 19.
13            THE COURT:  Without objection, 19 is admitted.
14            MR. SIEGAL:  No objection, your Honor.
15            THE COURT:  Government 19 admitted.
16            (Government Exhibit 19 received in evidence)
17   Q.   How did you come up with those search terms?
18   A.   I believe I started from the list that's in Exhibit B to
19   the warrant and then added names that I believed were tied
20   directly or tied to the names in the search warrant.  For
21   instance, by this point in the investigation we knew the e-mail
22   addresses of Robert Newman, who was a lawyer for the issuers.
23   So the two e-mail addresses for Robert Newman are included here
24   in addition to Robert Newman's name, whereas I think the search
25   warrant itself only listed his name and not his e-mail

1     addresses.
2     Q.  To whom did you provide this list?
3     A.  To the FBI.
4     Q.  I think you sort of alluded to this, but was this list at
5     times augmented?  Having refreshed your memory with the
6     e-mails, was this list at times augmented with other terms as
7     it became clear to you?  Are you able to say this is the final
8     absolute list?
9     A.  I'm not.  Without a cover e-mail and without access to the
10    system, I can't tell if it's the final list.
11            MR. FERRARA:  May I have one moment, your Honor.
12            THE COURT:  You may.
13            MR. FERRARA:  No further questions, your Honor.
14            THE COURT:  Thank you.
15            THE COURT:  Mr. Siegal.
16            MR. SIEGAL:  Thank you, your Honor.  I want to
17    apologize in advance, your Honor, because we do have a lot of
18    material here that we are going to be working with.
19            THE COURT:  So that what you say does not get lost in
20    the beauty of the room but falls on our ears, to the extent
21    you're moving around to get materials, don't talk.  Wait until
22    you are in front of the microphone.
23            MR. SIEGAL:  Thank you, your Honor.  I apologize for
24    that.  We are going to want to put, just for convenience, a set
25    of the 3500 material in front of the witness.  I think your