UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RICHARD GAFFEY,                                              18 CR 693 (RMB)
  a/k/a "Dick Gaffey," and
HARALD JOACHIM VON DER GOLTZ,
    a/k/a "H.J. von der Goltz,"
    a/k/a "Johan von der Goltz,"

        Defendants.

**RICHARD GAFFEY'S SENTENCING MEMORANDUM IN SUPPORT OF REQUEST FOR IMPOSITION OF A SENTENCE BELOW THE ADVISORY SENTENCING GUIDELINE RANGE**

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................1

The Court Should Impose the Recommended Sentence Below the Advisory Sentencing
Guideline Range Based on the Factors Set Forth in 18 U.S.C. § 3553(a) .........................3

Mr. Gaffey's History and Characteristics ..........................................................................4

The Nature and Circumstances of the Offense ...............................................................10

The Purposes of Sentencing ...........................................................................................15

Just Punishment and Deterrence ....................................................................................15

Rehabilitation ..................................................................................................................16

The Need to Avoid Unwarranted Disparities in Sentencing ...........................................17

Mr. Gaffey's Request For A Sentence Below the Advisory Sentencing Guideline
Range ..............................................................................................................................19

Mr. Gaffey Requests That the Court Recommend that the Bureau of Prisons Evaluate
Him Prior to His Surrender Date to Determine Whether He is Eligible to Serve His
Sentence of  Incarceration Home Confinement ..............................................................22

Conclusion ......................................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    522 U.S. 38 (2007) ........................................................................3

*Kimbrough v. United States*,
    552 U.S. 85 (2010) ........................................................................3

*United States v. Arthur*,
    367 F.3d 119 (2d Cir. 2004) .......................................................22

*United States v. Booker*,
    543 U.S. 200 (2005) .........................................................3, 4, 15

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993) ............................................15

*United States v. Grandmaison*,
    77 F.3d 555 (1st Cir. 1996) ...........................................................4

*United States v. Lara*,
    722 Fed. Appx. 433 (10th Cir. 2018) ........................................21

*United States v. Vidal-Reyes*,
    562 F.3d 43 (1st Cir. 2009) ...................................................20, 21

*United States v. Vigil*,
    476 F. Supp. 2d 1231 (D.N.M. 2007) .......................................15

*United States v. Wahid*,
    614 F.3d 1009 (9th Cir. 2010) .............................................20, 21

*Zecevic v. United States Parole Commission*,
    163 F.3d 731 (2d. Cir. 1998), *superseded by rule, United States v. Gonzalez*,
    281 F.3d 38 (2d Cir. 2002) ...........................................................4

**Statutes**

18 U.S.C. § 1028(A) ........................................................................20

18 U.S.C. § 1028(A)(c)(1) ...............................................................20

18 U.S.C. § 1028A(b)(2) ..................................................................20

18 U.S.C. § 1028A(b)(2)&(3) ...........................................................20

\\BOS - 020390/000002 - 1244066 v1

18 U.S.C. § 1028A(b)(3) .............................................................................20, 21

18 U.S.C. § 3553(a) ......................................................................................*passim*

18 U.S.C. § 3553(a)(1)-(7) ....................................................................................3

18 U.S.C. § 3553(a)(2) ..........................................................................................4

18 U.S.C. § 3553(a)(6) ........................................................................................17

18 U.S.C. § 3582(a) ............................................................................................17

28 U.S.C. § 994(k) ..............................................................................................17

**Other Authorities**

*Memorandum for Director of Bureau of Prisons from The Attorney General,* April
    3, 2020,
    https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3
    .pdf.................................................................................................................1

*BOP Implementing Modified Operations,*
    https://www.bop.gov/coronavirus/covid19_status.jsp ......................................23

*Bureau of Prisons COVID-19 Statistics,*
    https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases&text=T
    here%20are%201%2C346%20federal%20inmates,attributed%20to%20COVI
    D%2D19%20disease. ......................................................................................23

*Coronavirus in the U.S.: Latest Map and Case Count,*
    https://www.nytimes.com/interactive/2020/us/coronavirus-us-
    cases.html?action=click&module=Top%20stories&pgtype=Homepage...............…..……….22

*Center for Disease Control publication identifying certain underlying medical conditions that
    create an increased risk for severe illness from COVID-19,*
    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical
    conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2
    Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-
    risk.html...........................................................................................................3

S. Rep. No. 98-225 (1983)...................................................................................17

\\BOS - 020390/000002 - 1244066 v1

## Introduction

Richard Gaffey ("Mr. Gaffey" or "Dick"), by and through undersigned counsel, respectfully submits this sentencing memorandum in support of his request that the Court impose a sentence below the advisory sentencing guideline range.  Upon consideration of the factors set forth in 18 U.S.C. § 3553(a), the Court should impose on Mr. Gaffey a sentence of two years imprisonment, with a judicial recommendation that the Bureau of Prisons determine – prior to his surrender date – whether Mr. Gaffey is eligible to serve his sentence in home confinement in accordance with guidelines issued by the United States Attorney General in response to the COVID-19 pandemic.[1]

The requested sentence is proper and just in light of Mr. Gaffey's full acceptance of responsibility, his extraordinary efforts to make restitution, as well as his advanced age and multiple serious medical conditions that place him at an extremely high risk for severe illness or even death from COVID-19.  The requested sentence is also "sufficient but not greater than necessary" to fulfill the sentencing factors set forth in 18 U.S.C. § 3553(a), is consistent with the sentences imposed on defendants in similar cases involving the use of foreign bank accounts and shell corporations to hide income and assets from the IRS, and is appropriate in light of the Attorney General's guidelines requiring the Bureau of Prisons to prioritize home confinement for eligible inmates during the COVID-19 pandemic.

Simply put, as the dozens of letters from family, friends and colleagues establish, Richard "Dick" Gaffey is an extraordinary person.  He is a seventy-six year old husband, father, grandfather, uncle, friend and mentor, with no criminal history.  He is universally regarded as an exceptional individual.  As the Court can see from the numerous examples provided by his many

---

[1] *See Memorandum For Director of Bureau of Prisons from The Attorney General dated April 3, 2020*, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf

1

friends and family, Mr. Gaffey is beloved for the support, advice, good acts and kind words that he has provided to so many people over the decades.  The case before the court is an aberration from his otherwise law abiding and remarkable life.  This history, along with the other factors set forth below; support the imposition of the requested sentence.

Mr. Gaffey is a non-violent, first-time offender who has led an exemplary life.  He has already been punished severely through the loss of his reputation, the surrender of his Certified Public Accountant's license, and the payment of almost all of his 401(k) retirement account, which he voluntarily agreed to forfeit to the government to satisfy his forfeiture and restitution obligations.

Mr. Gaffey had a fifty-year career preparing tax returns and providing tax advice, during which time he serviced well over three hundred clients without incident or complaint before this case.

Mr. Gaffey's personal characteristics are exemplified by his long history of selflessness, hard work, commitment to his clients and friends, and profound devotion to his family.

Mr. Gaffey did not commit these offenses out of greed or a desire to profit from his crimes but through a desire to assist his client and co-defendant, Johan von der Goltz, and Mr. von der Goltz's family manage offshore assets and investments.  At the end of the day, Mr. Gaffey was merely a service provider to the von der Goltz family.

The funds at issue did not belong to Mr. Gaffey, who received very little financial benefit from the conduct at issue.  Rather, all of the assets, and virtually all of the financial advantages and profits, belonged to and were enjoyed by Mr. von der Goltz and his family.  Mr. Gaffey was not a wealthy man before he engaged in this conduct and he is not one now.

Mr. Gaffey accepted full responsibility for his actions and pled guilty to the crimes charged.

The offense conduct was neither a Ponzi scheme, an investment fraud scheme, nor a scheme where any individual victims were harmed or lost money.  This was a scheme to evade the payment of the von der Goltz family's income taxes and the only victim was the United States government, which – through seizures, forfeitures and payments by the defendants – has largely been made whole.

\\BOS - 020390/000002 - 1244066 v1

> Mr. Gaffey is a seventy-six year old cancer survivor who currently suffers from hypertension, stage three chronic renal failure, type two diabetes, a high risk of coronary artery disease, and obesity, all of which – along with his advanced age – place him at extremely high risk for severe illness or death resulting from COVID-19.[2]

Leniency is also appropriate because Mr. Gaffey is widely known as a kind and loving father and grandfather, devoted husband and loyal friend, as evidenced by the numerous letters of support written by family, friends, and colleagues.[3]

## The Court Should Impose the Recommended Sentence Below the Advisory Sentencing Guideline Range Based on the Factors Set Forth in 18 U.S.C. § 3553(a)

The Sentencing Guidelines are not presumed reasonable. To the contrary, the advisory sentencing guideline calculation serves only as the "starting point" for determining a sentence that is "sufficient but not greater than necessary" to fulfill the sentencing factors set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 522 U.S. 38, 44 (2007); *United States v. Booker*, 543 U.S. 200, 262 (2005). In determining the appropriate sentence, the Court is required to consider a broad range of factors including the nature and circumstances of the offense, the history and characteristics of the defendant, and the types of sentences available. *See* 18 U.S.C. § 3553(a)(1)-(7).

Section 3553(a), as modified by *Booker*, 543 U.S. at 259-60, "contains an overarching provision instructing district courts to 'impose a sentence sufficient but not greater than necessary' to accomplish the goals of sentencing . . . ." *Kimbrough v. United States,* 552 U.S. 85, 101 (2010). Sentencing under § 3553(a) therefore requires the Court to start with the minimum sentence permissible and add only so much additional punishment, if any, as necessary

---

[2] *See Center for Disease Control publication identifying certain underlying medical conditions that create an increased risk for severe illness from COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

[3] The letters submitted on behalf of Mr. Gaffey are attached to this memorandum as an exhibit.

to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).[4]  As discussed below, Mr. Gaffey's requested sentence is sufficient but not greater than necessary to achieve § 3553(a)'s goals.

## Mr. Gaffey's History and Characteristics

When evaluating a defendant's history and characteristics, it is appropriate for a sentencing court to consider whether the offense conduct deviates from an otherwise law abiding life, as well as a defendant's employment history, record of prior good works, and efforts to mitigate the offense.  *See e.g.  United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir. 1996) (adopting a totality of the circumstances test for determining whether defendant's conduct constitutes aberrant behavior); *Zecevic v. United States Parole Commission,* 163 F.3d 731, 735-36 (2d. Cir. 1998), *superseded by rule, United States v. Gonzalez,* 281 F.3d 38, 40 (2d Cir. 2002).[5]

Mr. Gaffey comes from humble roots.  He was born and raised in a large, working class family in Watertown, Massachusetts.  His father was an inspector for the electric company, while his mother was a homemaker.  His parents raised him and his five younger siblings in a tight-knit and loving home.  Mr. Gaffey had a good childhood, but it was not luxurious by any means.  Even though he had to work his way through Northeastern University as a gas station attendant, Mr. Gaffey nonetheless graduated second in his class with a bachelor's degree in accounting.

---

[4] The Court must consider each of the § 3553(a) factors as modified by *Booker* in fashioning an appropriate sentence.  These factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the applicable Sentencing Guidelines; (5) any pertinent Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

[5] Mr. Gaffey is not moving for a downward departure under the sentencing guidelines based on aberrant behavior but a similar analysis applies when evaluating a defendant's history and characteristics under § 3553(a).

\\BOS - 020390/000002 - 1244066 v1

As events played out, Mr. Gaffey had to grow up fast.  Shortly after graduating from college, Mr. Gaffey's father passed away suddenly and unexpectedly of a heart attack at the age of fifty-nine, thrusting him into the role of family patriarch even though he was only twenty-five years old.  At the time, his three youngest siblings – all sisters – were still in their teens and looked to Mr. Gaffey, their oldest brother, for support, guidance and advice.  Several years later, Mr. Gaffey's mother passed away after a long battle with cancer, leaving him to look after his siblings, the youngest of whom was still just twenty-one years old.  In the wake of his parents' deaths, Mr. Gaffey served as a mentor and patriarch for the extended Gaffey family, which now includes his wife, two children, four grandchildren, his four surviving siblings and their spouses, as well as literally dozens of nieces and nephews.  Mr. Gaffey continues to serve in that role to this day, from hosting the family's Thanksgiving dinner to providing advice and guidance on numerous issues, both large and small.

While attending Northeastern, Mr. Gaffey met Ruth, who soon became his wife.  The two married in 1968 and recently celebrated their fifty-first wedding anniversary.  Around the same time, Mr. Gaffey enlisted in the United States Army Reserve, attending basic training at Fort Knox.  He attained the rank of staff sergeant, served his country for six years, and was honorably discharged in 1975.

After completing basic training, Mr. Gaffey began what became a fifty year career in public accounting.  He started out working for Arthur Andersen for ten years, before deciding to branch out on his own.  In the late 1970s, Mr. Gaffey founded his own accounting firm, which eventually became known as Elder Gaffey & Paine, P.C., a firm specializing in tax return preparation.  Over the next forty years, Elder Gaffey & Paine, P.C. grew to employ fifteen accountants and staff, with four partners, and serviced approximately one thousand clients.  Mr.

Gaffey stepped down from the firm he help found in 2019 and recently surrendered his Certified Public Accountant's license to the Commonwealth of Massachusetts as a result of his guilty plea in this case.

At seventy-six years of age, Mr. Gaffey is now retired and is struggling with a variety of serious medical issues.  As set forth in the attached letter from his primary care physician[6], Mr. Gaffey is a cancer survivor who currently suffers from, among other ailments, hypertension, stage three chronic renal failure, type two diabetes, a high risk of coronary artery disease, and obesity, all of which – along with his advanced age – places him at increased risk for severe illness and death from COVID-19.  Indeed, any one of Mr. Gaffey's most serious medical conditions, including his high blood pressure, kidney disease, or diabetes, puts him at great risk for suffering a debilitating case of COVID-19, as does his age and weight.  Taken together, Mr. Gaffey's numerous medical ailments – combined with the high prevalence of COVID-19 in jails and prisons – mean that a sentence of imprisonment of any kind will pose a grave danger to Mr. Gaffey.  It is no exaggeration to say that any term of imprisonment in the current pandemic environment could very well constitute a death sentence for Mr. Gaffey.

In addition, Mr. Gaffey suffers from other chronic medical conditions that require close monitoring and annual testing under the supervision of his primary care physician.  These conditions include inflammation of the prostate, chronic inflammation of the esophagus, and a history of colonic polyps.

Unfortunately, Mr. Gaffey's wife is also struggling with numerous health issues that require ongoing treatment and, more importantly, his assistance.  Over the past few months, Ruth

---

[6] *See* Letter from Dr. Adolf Karchmer, attached hereto as Exhibit A-57.

Gaffey has inexplicably experienced a number of falls requiring hospitalization.[7]  These falls resulted in serious injuries including torn knee ligaments and broken ribs.  She is currently undergoing neurological testing to determine whether the cause of the falls is indicative of a more serious medical issue.  During this time, Mr. Gaffey has been Ruth's primary care giver and is indispensable to her care and treatment.  Given her limited mobility and current inability to drive, Mr. Gaffey assists her with everyday tasks such as cooking, moving around the house, and driving her to doctor and rehabilitation appointments.  Mr. Gaffey's direct and increasing role in caring for his ailing wife is also a relevant factor for the Court to consider when determining an appropriate sentence.

The offense to which Mr. Gaffey has pled guilty stands in stark contrast to who he is as a person.  As repeatedly described in the letters addressed to the Court, Mr. Gaffey's close friends, family, clients and partners were genuinely shocked to learn that he was involved in a criminal conspiracy.  They are all uniform in their praise of him as a genuinely good human being with strong moral character and empathy that simply cannot be reconciled with the conduct to which he pled guilty.[8]  The fact that fifty-eight family members, friends, co-workers, clients and other participants in Dick's life all took the time and effort to write letters to the Court in support of Dick in his time of need constitutes ample evidence of the high regard in which he is held in his community.

---

[7] *See PSR,* at ¶ 94, Letter from Ruth Gaffey, attached hereto as Exhibit A-1, Letter from Jennifer T. Phan, NP, attached hereto as Exhibit A-2.

[8] *See generally Letters of Support on behalf of Richard Gaffey,* attached here to at Exhibits A-1 through A-58.

Dick's younger brother Robert recalls that from a young age, Dick's parents taught him to be honest and respectful and to apply himself, and describes Dick as the "patriarch" of the Gaffey family, one of many to do so.[9]

> [Dick] has been a pillar of strength guiding us through the tragic loss of our beloved brother Charlie. Dick has a strong work ethic, supportive of others and committed to doing the right thing. He is respected within his community both at home and at work. He is known amongst his family, friends and clients that I have met, to be the most trustworthy, compassionate individual that you will ever know. As the saying goes, he is honest as the day is long.

Dick's nephew George Allee, echoes these sentiments.[10]

> [Dick] has always been someone who gives without asking for anything in return. I consider him to be the most kind, honest and ethical man I know. The whole Gaffey family has always looked up to him and known that he is someone that we can rely on. Personally, Richard helped me when I needed it without question. He was the person I turned to when opening my own restaurant. He is the first person I call when I have a financial question. I can't express properly how much his guidance means to me. There is no way I could ever repay him for his leadership and counsel.

Kimberly Teague, Dick's daughter, describes him as an honest, respected and completely fair-minded person.[11]

> Over the years he has formed loyal and lasting friendships both professionally and personally. His positivity is felt by all who know him. He sees the good in those around him, always assumes positive intent, and never speaks ill about anyone. I can certainly say that anyone that has ever crossed paths with my dad has only positive words to say about him. My father has helped countless friends and acquaintances over the years and has never asked for anything in return. It is my father's natural inclination to help anyone in need. He thrives from knowing that he has lent a hand to make someone's day or life easier. He is a man that seems to naturally attract the trust and respect of others.

---

[9] *See Letter of Support from Robert Gaffey,* attached hereto as Exhibit A-6.

[10] *See Letter of Support from George Allee,* attached hereto as Exhibit A-12.

[11] *See Letter of Support from Kimberly Teague,* attached hereto as Exhibit A-3.

David Shuman, a friend and former colleague who has known Dick for 35 years, describes him as a friend and mentor who is honest and a long-time solid citizen.[12]

> Dick is all things good – honest, caring, helpful, thoughtful, generous, immensely trusting, and if nothing else, selfless.  These things describe who Dick is as a person.

Maria Tremarche, one of Dick's partners at Elder Gaffey & Paine who has known him for 40 years, attests to his professionalism, pro bono work and dedication to family.[13]

> [Dick] is revered and highly regarded professional with a reputation for quality work.
>
> [H]e has done many, many hours of pro bono work during his long career and has worked tirelessly helping clients who have experienced both personal misfortunes and/or business struggles.

Harry Paine, another of Dick's partners at Elder Gaffey & Paine, likewise attests to his strength of character.[14]

> Simply put . . . Dick Gaffey is a good person.  It is impossible for me to reconcile the reality that he pled guilty to the charges against him with the character of the man I have known for forty-years.

Robert Elder, another of Dick's partners at Elder Gaffey & Paine, describes him as an upright, honest and hardworking individual who was a business associate and close friend.[15]

> I have often heard others describe Dick as "the nicest man in the world". He is selfless and goes out of his way to help others. Aside from the matters involved in this case, I would have said that Dick is incapable of any kind of wrong doing.
>
> Dick is coming to the end of a distinguished career with many accomplishments and an unblemished record. He is kind, dependable, and well regarded by his clients and peers. It is shocking and tragic that he found himself involved with those that were evidently involved in

---

[12] *See Letter of Support from David Shuman,* attached hereto as Exhibit A-47.

[13] *See Letter of Support from Marie Tremarche,* attached hereto as Exhibit A-33.

[14] *See Letter of Support from Harry Paine,* attached hereto as Exhibit A-40.

[15] *See Letter of Support from Robert Elder,* attached hereto as Exhibit A-39.

> circumventing US laws and that he is paying such a high price for his role in that involvement. I know Dick to be a truly decent human being. The charges to which he has pled guilty are inconsistent with the admirable traits of his I have observed over the last four decades.

Others describe Dick as humble, someone that gives without asking for anything in return, and who selflessly welcomes others into his large, loving and extended family. Sandra Donahue, a retired Boston school teacher who grew up with Dick, describes him as the "most trusting, giving soul, who always believes in the best of people no matter who they are."[16]

> I have such admiration for Richard Gaffey because he is a man of faith, trust, honesty, compassion and most of all his love and support of his family.

These and the many other letters of support leave no doubt that the offense conduct deviates markedly from Mr. Gaffey's otherwise law abiding life and does not reflect, in any material way, who he is as a person.

## The Nature and Circumstances of the Offense

Mr. Gaffey accepts full responsibility for the conduct to which he pled guilty, which consisted of assisting Johan von der Goltz and members of the von der Goltz family in evading taxes by failing to report income generated by offshore entities and failing to disclose the interest of Johan von der Goltz and his family members in foreign bank accounts. Mr. Gaffey further accepts full responsibility for his participation in the conspiracy to which he pled guilty. However, the government's statement of the offense set forth in the Presentence Investigation Report ("PSR") does not fully capture the complexities and nuances of the offense, Mr. Gaffey's precise role in the conspiracy, and the context in which the offenses were committed.[17]

---

[16] *See Letter of Support from Sandra Donahue,* attached hereto as Exhibit A-31.

[17] In addition, Mr. Gaffey objects to paragraphs 59 and 60 of the PSR alleging that Mr. Gaffey failed to comply with a subpoena issued to his accounting firm. As noted in Mr. Gaffey's Motion In Limine filed on December 20, 2019, Dkt. No. 154, Mr. Gaffey and his accounting firm were represented by counsel who

\\BOS - 020390/000002 - 1244066 v1

The offshore entities administered by Mossack Fonseca that lie at the heart of this case –
collectively known as the Revack entities – were established by Johan von der Goltz's father,
Rudiger von der Goltz, in the 1970s and 1980s, well before Mr. Gaffey ever met Johan von der
Goltz, much less started working for him.  Rudiger purportedly established these entities to hold
the von der Goltz family's investments due to political unrest and a rash of kidnappings in their
home country of Guatemala, including kidnappings of family members who were held for
ransom.

In 1988, Rudiger formed the Revack Trust, an offshore revocable trust, to hold title to the
Revack entities administered by Mossack Fonseca.  The Revack Trust was also formed well
before Mr. Gaffey became involved with Johan von der Goltz.  Under the terms of the Revack
Trust, Rudiger controlled all of the assets until his death, at which time Johan would inherit the
assets as the primary beneficiary.  Because Rudiger was not a U.S. citizen or green card holder,
he was not subject to taxation in the United States.  Rudiger passed away unexpectedly in June
1990.

By the time Mr. Gaffey prepared the first tax return for Johan von der Goltz in 1991 for
the 1990 tax year, the Revack Trust and Revack entities created by Rudiger were already in
place, and Rudiger had already funded those entities with his and his family's assets.  In other
words, Mr. Gaffey played no role in creating these offshore entities, and none of the monies
deposited with or invested in those entities belonged to him.

When Mr. Gaffey first met Johan von der Goltz, he understood that Johan belonged to a
wealthy German family who lived in Guatemala and had business interests in Central and South

---

communicated and cooperated with the government throughout the investigation and produced hundreds of
thousands of pages of documents in response to the subpoena.  The accounting firm fully complied with the
subpoena and produced all non-privileged documents. Moreover, the government never moved to compel
compliance of the subpoena or sought to hold the accounting firm in contempt for failure to comply with the
subpoena.

\\BOS - 020390/000002 - 1244066 v1

America.  Johan was a graduate of the Massachusetts Institute of Technology and Harvard Business School and was well known in Boston as a partner in Boston Capital Ventures ("BCV"), a venture capital firm investing in start-up companies.  Mr. Gaffey also understood that the von der Goltz family was represented by a prominent international tax attorney ("U.S. Counsel") at a well-known international law firm who provided the family with tax advice regarding the Revack entities and their investments in U.S. commercial real estate made through the offshore structures. [18]

Over time, at the request of his client, Mr. Gaffey eventually became more involved in Johan von der Goltz business and personal financial affairs.  At Johan's request, Mr. Gaffey served as an officer for the real estate investment vehicle created and managed by the von der Goltz' family's U.S. Counsel.  Also at Johan's request, Mr. Gaffey served as an officer of the offshore corporations created by Mossack Fonesca, opened domestic bank accounts on behalf of offshore corporations to facilitate the movement of funds to and from Panama to make investments in BCV, and paid Johan's personal bills, among other things.  Throughout this period of time, Johan von der Goltz and his lawyers at Mossack Fonseca steadfastly maintained that his elderly mother was the beneficial owner of the Revack entities.  Johan went so far as to provide Mr. Gaffey with a notarized affidavit purportedly signed by his mother stating that she was the beneficial owner of the entities. [19]

Notwithstanding the false narrative advanced for many years by Johan and others, including Mossack Fonseca, that the offshore entities were owned by Johan's mother, Mr. Gaffey

---

[18] This is the same law firm referred to as the "U.S. Law Firm" in the indictment and in paragraphs 54 through 58 of the PSR.

[19] This information is not included in order to suggest that Mr. Gaffey was unaware of the identity of the true owner of the Revack entities.  Instead, this information is relevant for the purpose of demonstrating that it was Johan von der Goltz and his counsel at Mossack Fonseca, and not Mr. Gaffey, who were the creators of the false narrative that Johan's mother was the beneficial owner of the Revack entities and were its primary advocates.

\\BOS - 020390/000002 - 1244066 v1

fully knew that a significant portion of the funds transferred from Panama and elsewhere ultimately ended up in Johan's personal bank account and were used to pay personal expenses for Johan and his family.  Mr. Gaffey also knew that Johan was named as the beneficiary of the Revack Trust and was subsequently named as the settlor and beneficiary of the Revack Holdings Foundation, an entity created jointly by Johan and Mossack Fonseca in 2007 to resettle the Revack Trust.  Despite this knowledge, Mr. Gaffey continued to prepare and file false tax returns for Johan and his sons that improperly failed to report their beneficial interests in the foreign entities and disclose their beneficial interests in foreign bank accounts and similarly did not account for income earned by those entities.

On balance, Mr. Gaffey's role in these offenses was far less substantial than that of Johan, Johan's son, Alex and Mossack Fonseca.  Mr. Gaffey did not create or form the offshore entities, was not asked for and did not provide tax advice regarding the taxation of the offshore entities, and had absolutely no ownership interest in the entities.  Indeed, it cannot be seriously disputed that Johan and his family were the primary beneficiaries of the false narrative created by Johan that Johan's mother was the beneficial owner of the offshore entities, as it allowed him to conceal his ownership of the offshore entities and avoid paying tax on the income generated by those entities.  The money invested in the Revack entities belonged to Johan von der Goltz; Johan and members of his family received and benefited from those monies; and as a result of the scheme, Johan evaded paying taxes on the income generated by those assets.  While Mr. Gaffey participated in the conduct at issue, his role was in no way as serious or substantial as Johan von der Goltz, nor did the benefits he received from the scheme come anywhere close to the substantial financial benefits received by Johan.

13

Somewhat remarkably, despite the extraordinary efforts undertaken by Johan to advance the false narrative that Johan's mother was the beneficial owner of the Revack entities, including the creation of affidavits and other documents utilizing his mother's passports, signature and other means of identification, only Mr. Gaffey was charged with the aggravated identity theft count that carries with it the two-year consecutive mandatory minimum sentence. This charging disparity is grossly unfair to Mr. Gaffey, whose role in the offense consisted of assisting Johan von der Goltz as an accountant, a service provider retained by Johan and members of his family. While Mr. Gaffey should never have participated in this conspiracy and knows that he acted wrongly, there is no doubt that Johan von der Goltz was, at all times, the driving force behind this scheme.

Moreover, as a further illustration of his more limited role, Mr. Gaffey received very little benefit for his participation in the conspiracy, especially as compared to Johan von der Goltz. While Johan evaded the payment of millions of dollars of income taxes, Mr. Gaffey received 20,000 shares of EXA stock and a direct payment of $25,000 over a roughly twenty year period. In addition, the PSR overstates the amount of money that Mr. Gaffey personally received. Specifically, the PSR states that Mr. Gaffey's benefit should include the entirety of the funds – $543,767 – that Mr. Gaffey's accounting firm was paid by Johan von der Goltz and his family for all of the various accounting and tax preparation services that the firm provided over the course of two decades.[20] However, this clearly overstates the benefit to Mr. Gaffey. As an initial matter, this money was paid to the firm, not to Mr. Gaffey directly, and as with any professional partnership, the revenue was used to pay firm overhead, salaries of firm employees, and other firm expenses, with only a relatively small amount being distributed to the four partners, including Mr. Gaffey. Accordingly, it is not at all accurate to suggest that Mr. Gaffey received

---

[20] *See PSR* at ¶ 50.

all, or even most, of the von der Goltz family's payments to the firm.  In addition, many of the services performed by the firm for the von der Goltz family were legitimate and proper, meaning that at least some portion of the payments was valid and not tainted in any way.

In pleading guilty to the charged conduct, Mr. Gaffey unequivocally took full responsibility for his role in the charged offenses.  He took the extraordinary step of voluntarily liquidating nearly his entire 401(k) account to satisfy his forfeiture and restitution obligations -- even though those assets were protected from forfeiture under ERISA.  While there is no excuse for his conduct, Mr. Gaffey acted in good faith by pleading guilty and repaying the government what is owed to make amends for the harm caused by him and Johan von der Goltz.

**The Purposes of Sentencing**

Section 3553(a) lists four purposes of sentencing: (1) just punishment, (2) deterrence, (3) protection of the public, and (4) rehabilitation.  Under the parsimony principle, the sentence imposed must be the minimum necessary to accomplish these purposes.

**Just Punishment and Deterrence**

Collateral consequences of criminal conduct and prosecution can properly be considered by the Court in weighing the need for additional punishment.  *See e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (departing from guideline range where defendant was already punished by the loss of his business as a result of EPA-related charges); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) ("[W]hen evaluating the justness of . . . punishment for the purposes of reaching a reasonable sentence under *United States v. Booker*, it is important to consider all other forms of punishment [the defendant] has already suffered.").

Mr. Gaffey understands the significance and seriousness of his offense, the primary harm being the economic loss suffered by the United States Treasury.  Indeed, he has already been

punished in ways that reach well beyond his ultimate sentence.  As a result of his guilty plea, he was forced to retire from the accounting firm he founded forty years ago and surrender his Massachusetts CPA license, foreclosing the possibility that he will ever practice accounting again.  Mr. Gaffey's fifty-year career in accountancy is effectively over.

Mr. Gaffey also voluntarily agreed to forfeit a significant portion of his 401(k) plan to satisfy his forfeiture and restitution obligations, assets that are subject to ERISA and that, as a result, could not otherwise be seized by the government absent his consent and agreement. Accordingly, he is now left with no prospect of future employment and little or no retirement funds to support him and his ailing wife through the last stage of their life together.

In addition to the financial and work-related consequences of his guilty plea, Mr. Gaffey's reputation has also been destroyed.  This case has received a significant amount of publicity in the community at large and in the accounting industry of which Mr. Gaffey is a part.  Despite the many good works that Mr. Gaffey has performed and that are recounted in the attached letters, he will now be best known for his involvement in the "Panama Papers" conspiracy.

The collateral consequences suffered by Mr. Gaffey serve as adequate punishment in and of themselves.  He has already paid a stiff price for his crimes and for the conduct that led to this conviction.  Further, the hardships Mr. Gaffey has already endured as a result of his conduct — including the adverse impact on his family, friends and partners — will undoubtedly serve as a strong deterrent to others inclined to commit similar offenses.

**<u>Rehabilitation</u>**

In promulgating the Sentencing Reform Act, Congress directed the Commission and the courts to impose a sentence of imprisonment only if it served some purpose of sentencing <u>other</u> than rehabilitation, and to use probation with conditions in all other circumstances.  *See* 28

16

U.S.C. § 994(k) ("The Commission shall insure that the guidelines reflect the general inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."); 18 U.S.C. § 3582(a) (instructing courts to recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation" when determining whether to impose a sentence of imprisonment and the length of any such sentence); S. Rep. No. 98-225 at 119, 176 (1983); *see also* S. Rep. No. 98-225 at 171, n. 531 (1983) (noting that "if an offense does not warrant imprisonment for some other purpose of sentencing, the committee would expect that the defendant would be placed on probation").

Here, a sentence of incarceration would serve no rehabilitative purpose whatsoever and the presentence report does not identify any rehabilitative services that could benefit Mr. Gaffey. He is seventy-six years old, no longer practices accounting, is in poor health and is retired.  Mr. Gaffey has no criminal history and is not aware of any complaints ever being filed against him by any client during his fifty-year career.  There is zero risk that he will reoffend.

## The Need to Avoid Unwarranted Disparities in Sentencing[21]

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *See* 18 U.S.C. § 3553(a)(6).  Mr. Gaffey's requested sentence is consistent with sentences imposed on similarly situated defendants in other cases involving unreported income from offshore bank accounts and avoids unwarranted sentencing disparities.

The circumstances surrounding this offense are similar and, in some cases, less serious than other criminal tax cases involving larger foreign bank balances, larger amounts of

---

[21] Factors Four and Five – the Sentencing Guidelines and policy statements – are addressed *supra*.

unreported income, and larger tax losses.  Those cases, which were brought as part of the government's crackdown on offshore bank accounts, resulted in far lower guideline ranges and the imposition of probationary sentences for similar or more egregious conduct than is present in this case.  Examples of these prior cases are set forth below:

> *H. Ty Warner, Northern District of Illinois, Case No. 13 cr 07-CR-227.* The defendant evaded over $24 million in income over eleven years by hiding unreported income in undisclosed Swiss bank accounts titled in nominee names.  Notwithstanding a $5.5 million tax loss and an advisory sentencing guideline range of 46 to 57 months of imprisonment, the Court imposed a sentence of a two-year term of probation.

> *Mary Estelle Curran, Southern District of Florida, Case No. 12-cr-80206.* The defendant concealed $47 million in assets in an undisclosed foreign bank account.  Notwithstanding the large dollar value of the undisclosed foreign bank account, the Court sentenced Curran to five seconds of probation.

> *Igor Olenicoff, Central District of California, Case No. 07-CR-227.*  The defendant controlled and concealed assets totaling approximately $200 million in undisclosed foreign bank accounts dating back to 1992.  Notwithstanding a tax loss of $52 million, the Court sentenced the defendant to a two-year term of probation with 120 hours of community service.

> *Steve Rubinstein, Southern District of Florida, Case No. 09-CR-60166.* The defendant concealed $7 million in undisclosed foreign bank accounts titled in the name of shell corporations in Monaco and used the funds to purchase his personal residence in Florida and foreign currency.  The Court sentenced the defendant to a three-year term of probation with a special condition that twelve months be served in home confinement.

> *Juergen Homann, District of New Jersey, Case No. 09-CR-724.* The Defendant concealed $5 million in offshore accounts.   The Court sentenced the defendant to a five-year term of probation and 300 hours of community service.

> *Jules Robbins, Southern District of New York, Case No. 10-CR-333.* Defendant used offshore nominee corporations to open foreign bank accounts to conceal nearly $42 million in undisclosed foreign bank accounts. The Court sentenced the defendant to twelve months' probation.

> *Ernest Vogliano, Southern District of New York, Case No. 10-CR-00327.* Defendant used offshore nominee corporations to open foreign bank accounts and conceal over $4.8 million from the IRS. The Court sentenced the defendant to a two-year term of probation.

> *Michael Reiss, Southern District of New York, Case No, 11-CR-668.* Defendant used foreign bank accounts titled in the name of offshore nominee trusts, foundations and corporations to conceal approximately $2.6 million from the IRS over a twenty-year period. This Court sentenced the defendant to one day of imprisonment followed by a three-year term of supervised release with the first eight months to be served in community confinement and 30 hours per week of community service during the term of supervised release.

As the sentences imposed in these cases demonstrate, a substantial downward variance from the advisory sentencing guideline range of 70 to 87 months, plus a two-year mandatory sentence, is needed to avoid unwarranted sentencing disparities. The sentences imposed in these cases were far less than the advisory sentencing guideline range in this case based on similar or, in some cases, more egregious conduct.[22] Accordingly, a substantial downward variance from the advisory guideline range in this case is plainly warranted.

**Mr. Gaffey's Request For A Sentence Below the Advisory Sentencing Guideline Range**

Based solely on the application of the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentence well below the advisory sentencing guideline range is entirely appropriate based on Mr. Gaffey's history and characteristics, the nature and circumstances of the offense, Mr. Gaffey's acceptance of responsibility, which includes his extraordinary efforts to pay restitution through forfeiture of his 401(k) account, and the need to avoid unwarranted sentencing disparities. Indeed, were it not for the two-year mandatory minimum sentence required by the aggravated identity theft charge, the Court would be more than justified in sentencing Mr. Gaffey to a term of probation in light of his advanced age, lack of criminal history, serious medical

---

[22] It is also worth noting, that despite similar conduct, none of the defendants in the analogous cases were charged with wire fraud, money laundering, or aggravated identity theft, which led to the higher advisory sentencing guideline range in this case.

issues, the remarkable support he has received from his family, friends and colleagues, and his role in the offense conduct. Accordingly, pursuant to Section 3553(a), the Court should impose a sentence of probation on Mr. Gaffey for Counts One through Seven.

Nevertheless, Mr. Gaffey fully appreciates that the Court is bound by the statutory provisions in 18 U.S.C. § 1028(A)(c)(1), that require the Court to sentence him to a consecutive term of twenty-four months imprisonment and that the Court may not reduce the sentence imposed on the predicate offense, wire fraud, to offset the two year mandatory minimum sentence. The Court does, however, have the discretion to reduce sentences imposed on the non-predicate offenses to compensate for the two-year mandatory minimum term. *United States v. Wahid,* 614 F.3d 1009, 1014 (9th Cir. 2010) (the statutory language of the aggravated felony statute is clear that "[w]hile a district court may not reduce a sentence for a *predicate* felony to compensate for the mandatory two-year consecutive term, it may exercise its discretion to reduce a sentence for a non-predicate felony"); *United States v. Vidal-Reyes*, 562 F.3d 43, 50-55 (1st Cir. 2009) (plain language of 18 U.S.C. § 1028A(b)(2)&(3) bars district court's consideration of the mandatory minimum when imposing a sentence on *predicate counts* but does not restrict district court from considering the mandatory minimum when sentencing on *all other counts*). In addition, as discussed above, the Court may reduce the sentence for the wire fraud count pursuant to Section 3553(a).

Title 18 U.S.C. § 1028(A) provides in relevant part, "[N]o term of imprisonment imposed on a person under this section shall run concurrently with any other term of imprisonment *imposed under any other provision of law,* including any term of imprisonment imposed for the felony during which the means of identification was transferred, possessed or used." 18 U.S.C. § 1028A(b)(2) (emphasis added). Section 1028A(b)(3) further requires that "[I]n determining any

term of imprisonment to be imposed for *the felony during which the means of identification was transferred possessed, or used,* a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section."

The phrase "the felony during which the means of identification was transferred, possessed or used" refers to enumerated predicate felonies set forth in 18 U.S.C. § 1028A(b)(3), while the phrase "*imposed under any other provision of law"* refers more broadly to both predicate and non-predicate offenses. *Wahid,* 614 F.3d at 104; *Vidal-Reyes,* 562 F.3d at 50-54; *see also United States v. Lara,* 722 Fed. Appx. 433, 436-438 (10th Cir. 2018).  Thus, under the plain language of the aggravated identity theft statute, the mandatory two year minimum sentence must run consecutively to sentences imposed on both predicate and non-predicate felonies.  However, the statute only limits the Court's discretion to reduce sentences imposed on the predicate felonies to compensate for the two year mandatory minimum sentence. Accordingly, while the Court may not reduce the sentence imposed on the wire fraud count to compensate for the mandatory two year consecutive term, the Court may exercise its discretion to reduce the sentences imposed on the other non-predicate felonies to compensate for the mandatory two year consecutive term.

Therefore, for Counts One to Seven, after applying the factors set forth in Section 3553(a), the Court should sentence Mr. Gaffey to a term of probation.  In calculating such a sentence for Counts One and Three to Seven, the Court may also take into consideration the two year mandatory sentence under Count Eight.  In any event, the facts and circumstances of this defendant and this offense provide ample justification for a probationary sentence for Mr. Gaffey on Counts One through Seven.  For the reasons discussed throughout this memorandum, Mr.

Gaffey respectfully requests that the Court sentence him to a term of probation for Counts One through Seven.

**Mr. Gaffey Requests That the Court Recommend that the Bureau of Prisons Evaluate Him Prior His Surrender Date to DetermineWhether He is Eligible to Serve His Sentence of Incarceration In Home Confinement**

Given the prevalence of COVID-19 in prison settings, Mr. Gaffey respectfully requests that the Court recommend that the Bureau of Prisons determine – prior to his surrender date - whether he is a candidate to serve his sentence of imprisonment at home in accordance with guidelines issued by the Attorney General in response to the COVID-19 pandemic.[23]  Mr. Gaffey's age and extensive medical history place him at high risk of severe illness or death from COVID-19.  The latest statistics from the Centers for Disease Control report over 2.9 million confirmed cases in the United States resulting in over 129,000 deaths.[24]  The magnitude of the risk from the virus continues to grow exponentially with over 50,000 new cases per day reported in the last week.

Hundreds of thousands of Covid-19 cases have been traced to "Hot Spots" or clusters such as nursing homes and correctional facilities where people are housed in close quarters with little opportunity for social distancing.  In American jails and prisons, over 84,000 people have been infected and at least 703 inmates and workers have died from COVID-19.[25]  The Bureau of

---

[23] The Court is well within its authority to recommend that the Bureau of Prisons determine whether Mr. Gaffey's sentence is best served in home confinement. *See e.g. United States v. Arthur,* 367 F.3d 119, 121 (2d Cir. 2004) ("recommendations to community confinement have been made in thousands of cases by hundreds of judges continuously since at least 1965"), *quoting*, *Iacaboni v. United States,* 251 F.Supp.2d 1015, 1017 (D. Mass. 2003).

[24] *See Center for Disease Control COVID-19 Statistics,* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[25] *See Coronavirus in the U.S.: Latest Map and Case Count* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories&pgtype=Homepage

\\BOS - 020390/000002 - 1244066 v1

Prisons currently reports that 7,830 federal inmates and staff have contracted COVID-19, resulting in 95 deaths at 71 Bureau of Prisons facilities and 29 residential reentry centers.[26]

Simply put the risk of COVID-19 infection in a prison, where inmates are tightly housed and share dining halls, bathrooms and showers, is far greater than the risk present in the community at large.  When imprisoned, inmates have less of an opportunity to practice social distancing which increases risk of infection because COVID-19 is transmitted through the air by droplets.  Placing someone like Mr. Gaffey in such a facility dramatically reduces his ability to protect himself from COVID-19 infection and greatly increases his risk of severe illness or even death from the virus.

The Bureau of Prisons announced in April that it was experiencing significant levels of COVID-19 infection at several facilities.[27]  In response, the Attorney General made a finding that the emergency conditions are materially affecting the functioning of the Bureau of Prisons and ordered the Director of the Bureau of Prisons to immediately process suitable inmates for home confinement.  In doing so, he ordered the Bureau of Prisons to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of the effected institutions.  The Bureau of Prisons also implemented Modified Operations to mitigate the spread of COVID-19.  All newly sentenced inmates are now processed through one of three quarantine sites -- FCC Yazoo City, Mississippi; FCC Victorville, California; or FTC Oklahoma City -- or to a Bureau of Prisons detention center or jail unit before being designated to a Bureau of Prisons facility.  Even going through this new intake process could endanger Mr. Gaffey and would possibly eliminate

---

[26] *See Bureau of Prisons COVID-19 Statistics,*
https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases&text=There%20are%201%2C346%20federal%20inmates,attributed%20to%20COVID%2D19%20disease.

[27] *See BOP Implementing Modified Operations at* https://www.bop.gov/coronavirus/covid19_status.jsp.

\\BOS - 020390/000002 - 1244066 v1

the benefits of home confinement, were he to contract the virus before the Bureau of Prisons made its decision.

Given the substantial risks faced by Mr. Gaffey should he be required to report to a Federal Correctional Institution in the midst of the COVID-19 pandemic, he respectfully requests that the Court sentence him to a term of two years imprisonment with a judicial recommendation that the Bureau of Prisons evaluate his status to determine whether he is eligible to serve his sentence in home confinement in accordance with the Attorney General's directive, before being required to report to a Federal Correctional Institution.

**Conclusion**

For the reasons discussed herein, Mr. Gaffey respectfully requests that the Court adopt his sentencing recommendation and impose a sentence of two years imprisonment with a judicial recommendation that the Bureau of Prisons determine whether he is eligible to serve his sentence in home confinement in accordance with the guidance issued by the Attorney General.

Mr. Gaffey further requests that the Court not impose a fine or an order of restitution given his inability to pay a fine and the substantial amount of money forfeited from his 401(k) plan, which he understands will be applied toward the restitution owed to the government in this matter.  In addition, in light of the funds already seized by the government in this case, along with the payments to be made by Mr. Gaffey and Johan von der Goltz, it is our understanding that the restitution obligation in this case has been or will soon be fully satisfied.

\\BOS - 020390/000002 - 1244066 v1

Respectfully Submitted,

RICHARD GAFFEY

By his attorneys,


/s/ William J. Lovett
William J. Lovett
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1007

/s/ Robert B. Buehler
Robert B. Buehler
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3261

\\BOS - 020390/000002 - 1244066 v1