UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                  :

UNITED STATES OF AMERICA       :
                                    :

      - v. -                         :
                                    :      18 Cr. 693 (RMB)

RICHARD GAFFEY,                :
    a/k/a "Dick Gaffey,"        :
                                    :

                        Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# GOVERNMENT'S SENTENCING MEMORANDUM

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

DEBORAH CONNOR
Chief, Money Laundering and Asset
Recovery Section, Criminal Division

EUN YOUNG CHOI and THANE REHN
Assistant United States Attorneys, United States Attorney's Office, Southern District of New York

MICHAEL PARKER
Trial Attorney, Criminal Division, United States Department of Justice

   -   Of Counsel -

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT .......................................................................... 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.      The Defendant ........................................................................................... 2

    B.      The Defendant's Offense and Relevant Conduct ...................................... 2

        1.      Gaffey's Role in the Creation and Maintenance of the Revack Entities ..................... 3

        2.      The Evasion of Von der Goltz's Reporting and Tax Obligations ............................... 3

        3.      Gaffey's Efforts to Hide Von der Goltz's Ownership of the Revack Entities by Using the Mother's Identity ............................................................................................................ 5

        4.      Von der Goltz's False Reports of Foreign Bank and Financial Accounts in 2014 ...... 7

        5.      Gaffey's Assistance of other U.S. Persons to Evade Taxes ........................................ 7

        6.      Payments Made to Gaffey ......................................................................................... 9

        7.      The Panama Papers Story and Gaffey's Participation in the Cover-Up ..................... 10

        8.      The Investigation and Gaffey's Failure to Comply with Subpoenas .......................... 11

III.    APPLICABLE LAW .......................................................................................... 11

IV.     DISCUSSION ..................................................................................................... 13

    A.      Seriousness of the Offense and Related Conduct, Need to Promote Respect for the Law and Need to Provide Just Punishment .......................................................................... 13

    B.      History and Characteristics of the Defendant .......................................... 14

        1.      The Letters Filed on Behalf of the Defendant .......................................................... 14

        2.      The Defendant's Reputation ..................................................................................... 16

        3.      The Defendant's Age and the COVID-19 Pandemic ................................................ 18

    C.      The Need to Afford Adequate Deterrence ............................................... 19

    D.      Avoidance of Unwarranted Sentencing Disparities ................................. 21

V.      ORDER OF RESTITUTION .............................................................................. 23

VI.     CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*,
   275 U.S. 87 (1927) ........................................................................................... 13

*Gall v. United States*,
   552 U.S. 38 (2007) ........................................................................................... 12

*Molina-Martinez v. United States*,
   136 S. Ct. 1338 (2016) ..................................................................................... 12

*Spies v. United States*,
   317 U.S. 492 (1943) ......................................................................................... 13

*United States v. Booker*,
   543 U.S. 220 (2005) ......................................................................................... 12

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ...................................................................... 12, 17

*United States v. Crosby*,
   397 F.3d 103 (2d Cir. 2005) ............................................................................ 12

*United States v. Cutler*,
   520 F.3d 136 (2d Cir. 2008) ...................................................................... 16, 17

*United States v. Ghailani*,
   733 F.3d 29 (2d Cir. 2013) .............................................................................. 21

*United States v. Johnson*,
   567 F.3d 40 (2d Cir. 2009) .............................................................................. 21

*United States v. Kuhlman*,
   711 F.3d 1321 (11th Cir. 2013) ....................................................................... 18

*United States v. Matera*,
   489 F.3d 115 (2d Cir. 2007) ............................................................................ 18

*United States v. McClatchey*,
   316 F.3d 1122 (10th Cir. 2003) ....................................................................... 15

*United States v. Musgrave*,
   761 F.3d 602 (6th Cir. 2014) ...................................................................... 17-18

*United States v. Pica*,
   692 F.3d 79 (2d Cir. 2012) .............................................................................. 18

(ii)

*United States v. Prosperi*,
   686 F.3d 32 (1st Cir. 2012) ................................................................... 17

*United States v. Regensberg*,
   635 F. Supp. 2d 306 (S.D.N.Y. 2009), aff'd, 381 F. App'x 60 (2d Cir. 2010) .................... 15

*United States v. Stefonek*,
   179 F.3d 1030 (7th Cir. 1999) ............................................................. 18

*United States v. Vrdolyak*,
   593 F.3d 676 (7th Cir. 2010) ............................................................. 15

*United States v. Warner*,
   No. 07 Cr. 227 (N.D. Ill.) ................................................................ 22

*United States v. Zukerman*,
   897 F.3d 423 (2d Cir. 2018) .............................................................. 13

## STATUTES AND SECONDARY SOURCES

18 U.S.C. § 3553 ......................................................... 2, 12, 13, 17, 18, 19, 21

U.S.S.G. ch. 2, *pt.* T ........................................................................ 20

U.S.S.G. § 2T1.1 ............................................................................. 20

Joshua D. Blank, *In Defense of Individual Tax Privacy*,
   61 Emory L.J. 265, 321 (2011) ........................................................ 19-20

U.S. Sentencing Commission, *Quick Facts on Tax Fraud Offenses*
   (2017) ...................................................................................... 21

## I.   PRELIMINARY STATEMENT

The United States respectfully submits this memorandum in connection with the sentencing of defendant Richard Gaffey, scheduled for September 24, 2020, at 11:00 AM, and in response to defendant's sentencing memorandum filed on July 6, 2020 ("Mem.") (Dkt. No. 228).

Gaffey is an accountant who played a key role in assisting multiple United States taxpayers commit tax evasion.   Gaffey served as the personal accountant for co-defendant Harald Joachim von der Goltz for many years, and managed the offshore entities and bank accounts through which von der Goltz hid his assets and evaded taxes.   In that role, Gaffey prepared false tax filings, submitted false statements to banks and financial institutions, and moved funds into and out of the United States for the benefit of von der Goltz.   He also fraudulently used the name, address, passport number, and other identifying information of von der Goltz's elderly mother ("the Mother") in furtherance of the scheme.   He was compensated hundreds of thousands of dollars for assisting von der Goltz to evade his taxes.   Through von der Goltz, Gaffey met several other United States taxpayers, and assisted them in evading taxes as well.

The parties have stipulated to a United States Sentencing Guidelines range of 94 to 111 months' imprisonment, with a mandatory minimum sentence of two years' imprisonment.   The Presentence Investigation Report ("PSR"), dated June 19, 2020, finds that this is the correct Guidelines Range, and recommends a sentence of 94 months' imprisonment.   (PSR at 36).   The Government respectfully submits that, given the age and the health of the defendant, a sentence below this range would be appropriate in this case. Nevertheless, a significant period of incarceration is necessary in this case to achieve the goals of sentencing set forth in Title 18, United

1

States Code, Section 3553(a), and the defendant's proposed sentence of simply the mandatory minimum two-year term would run contrary to the Section 3553(a) factors.

## II.    STATEMENT OF FACTS

### A.    <u>The Defendant</u>

The defendant was raised in a stable and supportive family environment.    (PSR ¶ 92). He has a bachelor's degree in accounting, and has been a certified public accountant since 1970.    (*Id.* ¶ 107).    He co-founded an accounting firm (the "U.S. Accounting Firm") in 1986, and was a partner there until he retired from his partnership in 2019, although he continues to work at the U.S. Accounting Firm as a consultant.    (*Id.* ¶ 111).

### B.    <u>The Defendant's Offense and Relevant Conduct</u>

Gaffey was instrumental in facilitating von der Goltz's efforts to evade the requirements of United States tax laws to report and pay income taxes for a period of approximately 20 years. The Government has submitted a detailed description of von der Goltz's tax evasion in its sentencing submission for von der Goltz, and will not repeat that description in full here.    (Dkt. No. 237, at 2-20).    This section will focus on particular aspects of Gaffey's involvement in von der Goltz's tax evasion scheme.

Of particular note, Gaffey falsely claimed that von der Goltz's elderly Mother, who is not a U.S. person, was the sole beneficial owner of the shell companies and accounts in which von der Goltz concealed his assets.    Gaffey regularly used a copy of the Mother's passport, as well as her name, date of birth, and other information in furtherance of the fraud.    Gaffey also assisted multiple other taxpayers in committing tax evasion.    These individuals included von der Goltz's

sons, as well as a friend of one of von der Goltz's sons, an individual referred to in the S8 Indictment as "Client-1."

### 1.     Gaffey's Role in the Creation and Maintenance of the Revack Entities

Von der Goltz evaded taxes by holding his assets through a sham entity originally called the "Revack Trust," which in 2007 he resettled into a Panamanian entity called the "Revack Holdings Foundation."    In or around 1999, Gaffey was informed by von der Goltz of this structure of concealing assets in undisclosed offshore entities (the "Revack Entities"), and Gaffey maintained files in his offices that documented von der Goltz's ownership interest in the Revack Entities.   (PSR ¶ 22).

In 2007, Gaffey played an instrumental role in creating the Revack Holdings Foundation, assisting von der Goltz and von der Goltz's Panamanian attorney Ramses Owens ("Owens") in drafting a "letter of wishes" for the foundation and later the Foundation regulations, which identified von der Goltz as the beneficial owner of Revack.  (*Id.* ¶¶ 23-24).   Gaffey maintained balance sheets for the Revack Entities, to assist him in monitoring and managing millions of dollars in assets that were not reported to the IRS. (*Id.* ¶ 25).

### 2.     The Evasion of Von der Goltz's Reporting and Tax Obligations

In approximately 1999, von der Goltz tasked Gaffey with the management of the assets of the various offshore Revack Entities, and the bank accounts set up in the names of Revack Entities (the "Revack Bank Accounts").  (*Id.* ¶ 27).   Gaffey effectuated transfers of funds from the Revack Entities at von der Goltz's instruction, including transfers to make investments on behalf of the Foundation, as well as to fund von der Goltz's various personal expenses (including, for instance, payments for von der Goltz's private airplane, grouse hunting trips to Scotland, and

purchases of art).   To facilitate Gaffey's ability to execute such transactions, Gaffey was named an officer for several of the Revack Entities, including an entity named EMJO Investments Ltd. ("EMJO").   (*Id.*).

Gaffey also served as an authorized signatory on United States bank accounts in the name of Revack Entities, and opened those accounts in a manner that concealed von der Goltz's beneficial ownership.   In connection with the opening of these accounts, Gaffey signed IRS forms falsely certifying that EMJO, a foreign shell entity, was the beneficial owner of the accounts and, thus, that the accounts were not subject to U.S. income tax withholding.   As a result, although these accounts held investments which generated millions of dollars in capital gains, no income tax was reported or paid on the gains that were generated.   (*Id.* ¶ 28).

In November 2007, Gaffey worked with von der Goltz to open certain Revack Bank Accounts for von der Goltz at a bank in Switzerland (the "Swiss Bank").   Of note, the account opening documents identified von der Goltz as the beneficial owner of each of these accounts, but falsely stated that he lived in Guatemala.   (*Id.* ¶ 29).   Gaffey was not a signatory on the Swiss Bank accounts, but assisted von der Goltz in preparing the account opening documents, and corresponded with employees of the Swiss Bank regarding the accounts.

Similarly, in the early 2000s, Gaffey assisted von der Goltz in opening foreign bank accounts in the names of various Revack Entities at a Panamanian Bank (the "Panamanian Bank Revack Accounts").   (*Id.* ¶ 31).   As with the Swiss Bank Revack Accounts, bank records for the Panamanian Bank Revack Accounts correctly identify von der Goltz as the beneficial owner, but incorrectly state that he is a resident of Guatemala.   From at least 2003 to 2016, Gaffey instructed various individuals to wire funds from various Revack Bank Accounts for von der Goltz's benefit.

4

In some cases, Gaffey used the Revack Bank Accounts to pay von der Goltz's expenses for items such as hunting trips and airplane hangar rentals.   In other cases, Gaffey simply transferred the money directly to von der Goltz's personal bank accounts.   For instance, between 2010 and 2016, von der Goltz received over $1.7 million into his personal bank accounts from foreign and domestic accounts nominally held by EMJO.   (*Id.*).

Gaffey assisted in preparing von der Goltz's Forms 1040 for the tax years 2000 through and including 2016, on which von der Goltz falsely and fraudulently failed to report the income and capital gains generated in connection with the domestic and foreign Revack Bank Accounts. (*Id.* ¶ 32).   The tax forms also falsely and fraudulently failed to report von der Goltz's interest in, or signature or other authority over, the foreign Revack Bank Accounts.

### 3.    Gaffey's Efforts to Hide Von der Goltz's Ownership of the Revack Entities by Using the Mother's Identity

Over time, von der Goltz, Gaffey, and Owens developed the fictitious cover story that von der Goltz's elderly Mother was the true beneficial owner of the Revack Entities.   As described in greater detail in the Government's sentencing submission for von der Goltz and in the PSR, Gaffey played a key role in developing this aspect of the fraud.   In 2007, for instance, Gaffey corresponded with Owens regarding the preparation of false documents to submit to open an account for EMJO at a United States brokerage firm, which claimed that von der Goltz's Mother was the beneficial owner of EMJO.   (*Id.* ¶¶ 34-40).

After 2007, Gaffey and von der Goltz began fraudulently using von der Goltz's Mother's name for various purposes, especially when communicating with financial institutions in the United States or conducting transactions that implicated the United States financial system.   (*Id.*

¶ 41).   For instance, between 2013 and 2016, Gaffey submitted bank account opening applications to two banks in New York for EMJO stating that the Mother was the beneficial owner of EMJO and using her name, address, date of birth, and other personal identifying information. In support of their efforts to create a paper trail to support these lies, von der Goltz, Gaffey, and Owens created false documents asserting that the Mother was the beneficial owner of the Revack Entities, and in certain instances had the elderly, blind Mother sign documents falsely attesting to her ownership. (*Id.*).

In his sentencing submission, Gaffey contends that von der Goltz "provide[d] Mr. Gaffey with a notarized affidavit purportedly signed by his mother stating that she was the beneficial owner of the entities," and further contends that this "demonstrate[s] that it was Johan von der Goltz and his counsel at Mossack Fonseca, and not Mr. Gaffey, who were the creators of the false narrative that Johan's mother" owned Revack.   (Mem. 12).   The facts do not support that argument.   In fact, documents in the U.S. Accounting Firm files show that it was Gaffey himself who drafted that false affidavit and sent it to von der Goltz, before von der Goltz had it executed and returned to Gaffey.[1]   This was in keeping with a years-long pattern of Gaffey preparing and

---

[1] Pursuant to the search warrant executed at the U.S. Accounting Firm, the Government seized documents that were on the U.S. Accounting Firm's shared file server.   Among these is a draft "Affidavit of Beneficial Ownership," falsely claiming that Revack is owned by the Mother, with a signature line dated May 15, 2014.   The metadata for the document establishes that it was drafted by Gaffey on May 14, 2014.   (*See* PANAMA00031797887 (attached hereto as Exhibit A)).   In another version of the draft "Affidavit of Beneficial Ownership," metadata establishes that Gaffey also drafted a fax cover sheet dated May 14, 2014 to "H.J. von der Goltz," noting that the draft was "For your review."   (*See* PANAMA0003179889 (attached hereto as Exhibit B)).   An executed version of the "Affidavit of Beneficial Ownership" dated May 15, 2014, which appears to bear a signature for the Mother, was also saved to the server.   (*See* PANAMA0003429071 (attached hereto as Exhibit C)).

submitting a panoply of false documents and certifications to financial institutions and others in which he claimed to be acting on behalf of the Mother.   Gaffey was fully implicated in this aspect of the fraud.

### 4. Von der Goltz's False Reports of Foreign Bank and Financial Accounts in 2014

In September 2014, Gaffey and employees of a United States law firm (the "U.S. Law Firm") prepared amended Reports of Foreign Bank and Financial Accounts ("FBARs") for von der Goltz for the years 2009 to 2013 (the "Amended FBARs").   (PSR ¶ 43).   The Amended FBARs were materially false in multiple respects.   Specifically, they asserted that the reason for the "[d]elinquent" submission of the Amended FBARs was because von der Goltz "learned of previously undisclosed accounts with [the Swiss Bank] for which he had no financial interest.   He had only signature authority."   (*Id.* ¶ 44).   However, as Gaffey well knew—and had known since he helped to open the Swiss Bank Revack Accounts—von der Goltz was the beneficial owner of those accounts, and held sole "financial interest" in the assets held therein.   Moreover, von der Goltz did not actually have signatory authority, by design.   (*Id.*).

### 5. Gaffey's Assistance of other U.S. Persons to Evade Taxes

In addition to von der Goltz, Gaffey also assisted other U.S. taxpayers in their efforts to evade taxes.   These individuals included the individual referred to in the S8 Indictment as "Client-1," as well as both of von der Goltz's sons.

In the early 2000s, Client-1, a U.S. citizen and taxpayer then living in London, hired Owens to create a Panamanian foundation, along with several sub-entities held by the newly established foundation, as well as bank accounts in the names of these entities.   Client-1 held her foreign-

generated income, ultimately totaling approximately $5 million, in the foreign bank accounts. Client-1 did not report or pay U.S. income taxes on any of the foreign income.

Client-1 subsequently moved back to the United States in the mid-2000s, and lived in Manhattan. In 2008, Client-1 wanted to move her offshore money to the United States, and Owens told her to speak with Gaffey. Client-1 contacted Gaffey by phone, and in November 2008 Client-1 traveled by train to meet Gaffey in person in Boston, Massachusetts, where Client-1 explained that she wanted to repatriate her undisclosed offshore funds. Gaffey suggested that Client-1 could create a U.S. company and have Owens "buy" the company from Client-1 using Client-1's own offshore money. (*Id.* ¶ 47).

Gaffey then advised Client-1 how to draft a company sale agreement that would appear to be legitimate, notwithstanding the lack of any actual sale and the fact that it was her own money that was being sent to her. Gaffey also gave advice about reporting the sham sale on her tax return to avoid scrutiny. Between November 2008 and approximately June 2009, Gaffey regularly spoke with Owens and Client-1 regarding the creation of a fraudulent document to show the "sale" of Client-1's company, and he reviewed and commented on drafts of the fraudulent sale contract. Gaffey also discussed with Owens how to structure the movement of Client-1's money into the United States in a manner that would evade IRS detection. (*Id.* ¶ 47).

Gaffey and the U.S. Accounting Firm also had longstanding relationships with von der Goltz's sons. Von der Goltz referred both of his sons to Mossack Fonseca to establish offshore shell companies in which to hide their income from the IRS. Gaffey, working with Mossack Fonseca and Owens, helped to facilitate tax evasion by the two sons in a variety of ways. (*Id.* ¶ 48). For instance, in 2009 and 2010, one of von der Goltz's sons (referred to in the Indictment

8

as "Client-3") received approximately $55,000 in payments from a New York-based metals company, for consulting work, which were sent to Client-3's account at the Panamanian Bank. Gaffey then instructed Mossack Fonseca employees to transfer the funds to Revack Entity accounts, before wiring the money back to Client-3 in the United States, falsely claiming that the funds represented a gift from the Mother rather than income earned by Client-3.   Gaffey prepared Client-3's tax returns for these years and did not report this income to the IRS.   (*Id.* ¶ 49).

### 6.   Payments Made to Gaffey

In furtherance of the conspiracy, von der Goltz paid Gaffey for his efforts in helping him manage the Revack Entities.   (*Id.* ¶ 50).   Von der Goltz paid Gaffey in a variety of ways, including through approximately $543,767 in fees paid to the U.S. Accounting Firm at which Gaffey was a partner, as well as payments von der Goltz made directly to Gaffey.   For instance, in August 2007, von der Goltz made a $25,000 payment to Gaffey after selling shares in a company he had invested in.   (*Id.*)

Von der Goltz also paid Gaffey and others in the form of stock of Exa Corporation, a software company in which von der Goltz invested through the Revack Entities that had an initial public offering in 2012.   (*Id.* ¶ 51).   In 2015, von der Goltz gave Gaffey 20,000 shares of Exa that had been held by one of the Revack Entities, which were then worth slightly more than $200,000.   Von der Goltz wrote a letter for Gaffey that falsely claimed that the shares were a gift from von der Goltz's Mother.

In 2016 and 2017, Gaffey sold the shares that von der Goltz had given him, and reported the sales as capital gains on his personal tax returns.   Voicemails and documents during this time frame establish that Gaffey and von der Goltz agreed that, in order to fraudulently reduce the

capital gains that would be due from Gaffey, Gaffey would inflate the cost basis for the Exa shares. (*Id.* ¶ 52).   The inflated cost basis figure that Gaffey reported for the Exa shares was in direct contradiction to internal U.S. Accounting Firm records that showed the true cost basis of the shares transferred by von der Goltz from his Revack Entities.   (*Id.* ¶ 53).   Because capital gains taxes are paid on the difference between the sale price of the shares and the owner's cost basis, the effect of an inflated cost basis is to reduce the capital gains tax paid when the sale is reported.

       **7.**      **The Panama Papers Story and Gaffey's Participation in the Cover-Up**

      On or about April 3, 2016, the "Panama Papers" news story broke. The Panama Papers involved the publication of a large volume of documents disclosed from the internal files of Mossack Fonseca.   After the Panama Papers story broke, von der Goltz, Gaffey, and Owens continued to work together to perpetuate their false cover story, which asserted that von der Goltz's Mother was the actual owner of the Revack Holdings Foundation.   (*Id.* ¶ 56).   For instance, on May 19, 2016—the same date that von der Goltz met with and made false statements to the Government—Gaffey sent to the U.S. Law Firm Representative a copy of a Form 3520, which is an IRS form that U.S. persons must file to report large gifts from foreign trusts or foreign persons at the same time that they file their tax returns.   The Form 3520 sent by Gaffey purported to be for von der Goltz for the tax year 2013, and listed a $592,287 cash gift dated June 11, 2013, from von der Goltz's Mother.   However, the IRS never received this Form 3520, or any Form 3520s for von der Goltz during the relevant period.   (*Id.*).   Moreover, the Form 3520 was not prepared at the time of von der Goltz's tax filings for 2013.   Rather, the document's metadata reveals that on May 19, 2016, Gaffey created this fabricated and backdated Form 3520, and then sent a copy of it to the U.S. Law Firm Representative.   (*Id.* ¶ 57).

On June 7, 2016, von der Goltz sent Gaffey a fax containing copies of documents from Mossack Fonseca that had been sent to him from Ramses Owens, which included correspondence evidencing von der Goltz's control over the Revack Trust.   Von der Goltz called Gaffey the same day and left a voicemail, stating "Unfortunately, with the interview I had with the IRS and the, whatchamacallit, the Justice Department, I think there's some bad issues regarding having lied, so that's of course critical for me now, I'm in real trouble."   (*Id.* ¶ 58).   Nonetheless, Gaffey continued to assist von der Goltz in fraudulently evading paying his taxes, including by assisting him in expatriating in 2017 without paying the expatriation tax that he owed.

### 8.   The Investigation and Gaffey's Failure to Comply with Subpoenas

The Government served Gaffey with a subpoena on October 13, 2016, and reissued the subpoena, at the request of Gaffey's counsel, to the U.S. Accounting Firm on November 8, 2016. (*Id.* ¶ 59).   During interviews conducted in July 2017 of two other partners of the U.S. Accounting Firm, the Government learned that Gaffey had not informed his partners of the issuance of the 2016 subpoenas or made any good-faith effort to collect all responsive documents from the U.S. Accounting Firm's files.   On August 9, 2017, law enforcement agents executed a search warrant at the premises of the U.S. Accounting Firm.   The records recovered during that search of the U.S. Accounting Firm, almost none of which had been produced by Gaffey in the ten months since the subpoena had issued for these records, proved to be highly incriminating.   (*Id.* ¶ 60).

## III.   APPLICABLE LAW

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar

11

ways."  *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2))

## IV.    DISCUSSION

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence that includes a significant term of imprisonment, but less than the Guidelines Range, is appropriate in this case.

### A.    Seriousness of the Offense and Related Conduct, Need to Promote Respect for the Law and Need to Provide Just Punishment

The sentence sought by the Government is necessary in light of the serious nature of the defendant's conduct, as well as the need to promote respect for the law and to provide just punishment.   *See* 18 U.S.C. § 3553(a)(2)(A).

The defendant's calculated and prolonged effort to mislead the IRS with respect to multiple taxpayers warrants a substantial sentence of incarceration.   Every tax fraud is theft from the pockets of every taxpaying citizen of this nation.   The Supreme Court has long-recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."   *Spies v. United States*, 317 U.S. 492, 495 (1943).   A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes. Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government." *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018); *see generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("[t]axes are what we pay for civilized society. . . .") (Holmes, J., dissenting).

13

The defendant's involvement in this tax evasion conspiracy cost the U.S. Treasury more than $3.4 million in actual losses.   Moreover, this loss is further aggravated by the *manner* in which the defendant carried out his evasion.   This was not a one-time mistake or a fleeting lapse in judgment.   Rather, repeatedly and over the course of decades, the defendant—an accountant whose main source of business was to prepare tax returns for his clients—made a conscious and deliberate choice to defraud the Government, and he was fully involved in setting up offshore companies, moving large amounts of money from offshore bank accounts into the United States, preparing false tax returns, and submitting false documents to banks.   He obtained a degree of expertise in tax fraud, such that Mossack Fonseca began referring other clients such as Client-1 to Gaffey to assist in tax evasion.   This prolonged and serious criminal conduct warrants a significant term of incarceration.

### B.    History and Characteristics of the Defendant

Unlike many of the defendants who appear before this Court, the defendant enjoyed significant financial stability and comfort as a well-educated, talented, and successful professional. He was not driven to crime by any financial need, but simply out of greed.

### 1.    The Letters Filed on Behalf of the Defendant

Just as with his co-defendant von der Goltz, Gaffey has submitted a number of letters attesting to his positive personal qualities and expressing support.   It is, of course, appropriate for the Court to take these letters into account in connection with sentencing.   However, these attestations to the defendant's positive qualities do not distinguish him from the typical defendant in a white-collar case.   As Judge Marrero observed in another case, this collection of letters

falls into a pattern advanced by a subset of the white collar criminal.   This category

14

> encompasses a select class: distinguished, reputable, highly esteemed model
> citizens such as this defendant.   The list of their achievements and virtues is long
> and impressive.   Let  us count the ways.   At home, they are good family men and
> women, caring spouses, loving parents, loyal and reliable to friends. At work, they
> are looked up to as outstanding professionals and business partners.   To their
> community's charities and public causes they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d

Cir. 2010); *see also United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003)

("excellent character references are not out of the ordinary for an executive who commits white-

collar crime; one would be surprised to see a person rise to an elevated position in business if

people did not think highly of him or her"); *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th

Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to

find that a defendant was involved as a leader in community charities, civic organizations, and

church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail

card" (citation and internal quotation marks omitted)).   The Government does not question that

Gaffey has had a successful career as an accountant and that he is supported by members of his

family and community.   But these qualities do not set Gaffey apart from his co-defendant or

from other similarly situated white-collar defendants—individuals who, although high-achieving

and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of

themselves from their family, friends, and colleagues.

      To take one set of examples, Gaffey has submitted several letters from his partners in his

accounting firm, Robert Elder, Harry Paine, and Marie Tremarche.   If these letters are to be

believed, all three of these partners worked side by side with Gaffey for years, including on von

der Goltz's business matters, without realizing that he was secretly using their jointly owned

accounting firm to perpetrate a multi-million dollar fraud.   Gaffey put the firm and his partners

at even greater peril when he concealed the existence of a subpoena addressed to the firm from

his partners for many months.   This resulted in the execution of a search warrant at the firm's

offices, where hundreds of incriminating documents were found in the firm's files.   While

Gaffey's business partners can attest to some of his personal attributes, the fact that he was able

to deceive them for years illustrates that the letters submitted on his behalf do not reflect a full

understanding of his character and conduct.

### 2.    The Defendant's Reputation

Gaffey also contends that his loss of reputation and professional consequences, including

the loss of his accounting license as a result of his guilty plea, warrant a lighter sentence. (Mem.

16)   However, the Second Circuit has rejected this reasoning.   In *United States v. Cutler,* 520

F.3d 136 (2d Cir. 2008), the district court

> ruled that although the seriousness of [defendant's] offense would ordinarily
> warrant a prison term, [defendant] had already received 'just punishment for the
> offense" because of "the public nature of the prosecution, the public humiliation
> that the defendant has suffered, the loss of his law license and various other
> consequences, and the certainty of prosecution.'   The court also found that these
> factors were sufficient to accomplish 'deterrence in the general sense.'

520 F.3d at 170 (citations to sentencing transcript omitted).   The Second Circuit's response was

blunt:   "As a matter of law and reason, we cannot agree."   *Id.*

The Circuit then noted in *Cutler* that "the consequences listed by the court are hardly

unusual.   An attorney convicted of a felony usually loses his license to practice law.   The

imposition of a light sentence on this basis is not within the court's discretion."   *Id.* (citing *Koon*

*v. United States*, 518 U.S. 81, 110 (1996)).   The Circuit also wrote:

16

Nor is it unusual for a person convicted of participating in a conspiracy to perpetrate massive frauds to be publicly prosecuted and suffer public humiliation.  Those are consequences generally suffered by anyone accused and convicted of a crime, especially a crime involving frauds causing losses of more than $100 million.  Thus, the imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.

Finally, the circumstances referred to by the district court do not constitute punishment.  The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process.  These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment."  Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment.  And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—*i.e.,* that [defendant's] public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require.  And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*Id.* at 171;[2] *see also United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (vacating and remanding non-incarceratory sentence because "the district court relied heavily on the fact that

---

[2] After it decided *Cutler*, the Second Circuit held that when reviewing what is sufficient to meet the § 3553(a) considerations in any particular case "we will not substitute our own judgment . . . [w]e will instead set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (citation and internal quotations marks omitted).  The *Cavera* court then wrote:  "To the extent that our prior cases may be read to imply a more searching form of substantive review, we today depart from that understanding," and cited *Cutler* at pages 164 and 167.  *Id.* (footnote omitted).  The Circuit has not, to the Government's knowledge, questioned the logic of the portions of *Cutler* quoted above.

Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life.   '[N]one of these things are [his] sentence.   Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").

> [N]o "middle class" sentencing discounts are authorized.   Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.   It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.   But in this instance we must fight our nature.   Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

### 3.       The Defendant's Age and the COVID-19 Pandemic

The defendant's sentencing submission relies heavily on his age and health conditions to argue for a non-incarceratory sentence.   (Mem. 22-24).   To be sure, the Government acknowledges that the Court should take the defendant's age and health into account, and because of this, concedes that a sentence below the Guidelines Range is warranted here. However, Gaffey's age and health are just some of the characteristics for the Court to consider, and these factors in and of themselves should not outweigh the other 3553(a) factors that counsel in favor of a substantial term of incarceration in this case.   *See, e.g., United States v. Matera*, 489 F.3d 115, 123 (2d Cir. 2007) (affirming 25-year sentence imposed on 65-year-old defendant

when district court found that the other 3553(a) factors outweighed the defendant's arguments about his age and health); *United States v. Pica*, 692 F.3d 79, 89 (2d Cir. 2012) (affirming 108-month sentence imposed on 75-year-old defendant).

The Government also acknowledges that Gaffey's age and health conditions place him at a heightened risk of serious illness due to the COVID-19 pandemic that is currently ongoing. However, the Court has other mechanisms for dealing with this than simply declining to impose a term of incarceration.   As of the time of this writing, it appears that COVID-19 conditions have improved in the federal prison system since the initial outbreak, and it is unknown what conditions will be in the United States generally and in the federal prisons in particular at the time of sentencing, much less at the time of the defendant's surrender date.   The Government has consented to extensions of surrender dates for other defendants in recent months, and acknowledges that a delay in Gaffey's surrender date may be warranted in the future if conditions at the time warrant it, but no such decision need be made at this time.

### C.   <u>The Need to Afford Adequate Deterrence</u>

The sentence sought by the Government is also necessary here to "afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(B).   General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud.   A recent IRS study of tax compliance estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes.[3]   This means that hundreds of billions of dollars are

---

[3]  *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at* www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf

lost every year because people like the defendant choose to shirk their responsibilities as taxpayers. Put bluntly, meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

Indeed, the importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. Moreover, the need for general deterrence is greatest in cases involving particularly lucrative and difficult-to-detect tax fraud schemes, such as schemes like the defendant's that use offshore companies. As the Commentary to Section 2T1.1 states:

> Although tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore

---

.

warrant an additional sanction for deterrence purposes.

U.S.S.G. § 2T1.1, comment. (Backg'd).

This is especially so in this case, which involves a high-profile tax accountant—a named partner in his own accounting firm—who facilitated evasion for multiple taxpayers over the course of many years.   As Gaffey himself acknowledges, this case has garnered "a significant amount of publicity in the community at large and in the accounting industry of which Mr. Gaffey is a part." (Mem. 16).   It would send a terrible message to the accounting industry if Gaffey did not receive a substantial period of incarceration for his highly sophisticated, willful participation in a large-scale tax fraud.

### D.  **Avoidance of Unwarranted Sentencing Disparities**

A sentence such as that sought by the Government would also comport with "the need to avoid unwarranted sentence disparities among defendants."   18 U.S.C. § 3553(a)(6).   While avoidance of national sentencing disparities is the primary concern animating this sentencing factor, *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013), the Court may also consider the potential for disparity between co-defendants.   *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009).   In terms of national sentencing disparities, the Government previously submitted for the Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case. (*See* Dkt. No. 237, Exhibit E (the "Sentencing Chart")).   The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts, demonstrating that sentences within or slightly below the Guidelines Range are the norm for complex tax cases.

The United States Sentencing Commission also maintains data showing that the average term of incarceration for all tax fraud offenders who were sentenced in 2017 was 17 months. *See* U.S. Sentencing Comm'n, Quick Facts on Tax Fraud Offenses (2017) at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY17.pdf. That average, however, is largely based on defendants who had significantly lower culpability than Gaffey. The average minimum of the Guidelines range for these defendants was between 24 and 26 months. *Id.* Here, the Guidelines Range is 70 to 87 months, with a mandatory consecutive sentence of 24 months, for a total range of 94 to 111 months. Furthermore, the median tax loss was $277,576, and 87.2% of all taxes cases involved a tax loss of $1.5 million or less. Here, the tax loss was over ten times the median tax loss in tax cases.

Gaffey identifies eight prior tax cases, from around the country and dating from 2007 through 2013, in which the defendant did not receive a sentence of incarceration. (Mem 18-19). That method, of cherry-picking a small number of cases in which the defendant's requested sentence was imposed, sheds little to no light on the question of what sentence would be consistent with how defendants are typically sentenced in comparable cases. Moreover, the cases identified by Gaffey are entirely inapposite.[4] The Government agrees with Gaffey, however, that in terms

---

[4] Two of the cases cited by Gaffey involved defendants who had attempted to join the IRS's voluntary disclosure program shortly after hearing about it but were ineligible for technical reasons. *See United States v. Warner*, No. 07 Cr. 227 (N.D. Ill.); *United States v. Curran*, No. 12 Cr. 80206 (S.D. Fla.). Two cases involved defendants who entered cooperation agreements and received 5K1.1 letters. *See United States v. Rubinstein*, No. 09 Cr. 60166 (S.D. Fla.); *United States v. Homann*, No. 09 Cr. 724 (D.N.J.). One of the cases involved a defendant whose Guidelines Range of six to twelve months reflected zero tax loss, *United States v. Robbins*, No. 10 Cr. 333 (RJH) (S.D.N.Y.), and in another, the tax loss was approximately $12,000, *United States v. Vogliano*, No. 10 Cr. 333 (TPG) (S.D.N.Y.)
In the final case cited by Gaffey, *United States v. Reiss*, No. 11 Cr. 668 (RMB) (S.D.N.Y.), this

of relative culpability among co-defendants, von der Goltz's culpability exceeds that of Gaffey.

*      *      *

The facts of this case warrant a significant penalty.   The defendant used his special training and skill as an accountant to perpetrate an elaborate fraudulent scheme.   His conduct was unusually brazen, as it did not only involve filing false tax returns, but also involved creating false documents, deceiving financial institutions, and misusing the identity of a third party to conceal the scheme.   A significant term of imprisonment, as contemplated by the Sentencing Guidelines, is necessary in this case.

## V.    ORDER OF RESTITUTION

Prior to sentencing, the Government will submit a proposed order of restitution, in line with the plea agreement and the PSR.

---

Court imposed a sentence of one day of imprisonment and eight months in a community confinement center.   In *Reiss*, however, the offense conduct was limited to a failure to disclose foreign accounts holding funds that the defendant had inherited; the Guidelines Range was 30 to 37 months based on a tax loss of approximately $400,000; the defendant had promptly accepted responsibility, agreed to pay a substantial civil penalty, and entered a guilty plea pre-indictment; and the defendant was a preeminent cancer researcher and doctor for whom the Court imposed a requirement of 30 hours a week of community service for three years.   None of those circumstances is present here.

## VI.    CONCLUSION

The Government respectfully submits that, based on the facts and arguments set forth above, a significant incarceratory sentence is appropriate here.

Dated:    New York, New York
          July 27, 2020

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney
                                        Southern District of New York

                                        DEBORAH CONNOR
                                        Chief, Money Laundering and
                                              Asset Recovery Section
                                        Criminal Division


                              By:    _____/s/_____
                                     Eun Young Choi / Thane Rehn
                                     Assistant United States Attorneys

                                     Michael Parker
                                     Trial Attorney, Criminal Division

cc:    Defense counsel (by ECF)